T.C. Memo. 2016-142

UNITED STATES TAX COURT

THOMAS L. WEINTRAUT, TRANSFEREE, ET AL.,[1] Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 6505-12, 6715-12,      Filed July 27, 2016.
6751-12.

<u>Brett J. Miller</u> and <u>Randal J. Kaltenmark</u>, for petitioners.

<u>Stewart Todd Hittinger</u> and <u>Samuel A. Naylor</u>, for respondent.

CONTENTS

FINDINGS OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      4

FFI and Petitioners. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      4

FFI, Petitioners, and MidCoast. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     12

---

[1]Cases of the following petitioners are consolidated herewith: Curtis D. Fankhauser, Transferee, docket No. 6715-12; and Cynthia A. Fankhauser, Transferee, docket No. 6751-12.

[*2] Tax Returns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  83

IRS Examination With Respect to FFI and Petitioners. . . . . . . . . . . . . . . . .  86

OPINION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  95

Petitioners' Motion in Limine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  95

Evaluation of Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  104

Transferee Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  105
    Section 6901. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  105
    Feldman v. Commissioner.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  107
    Transferee Status for Purposes of Section 6901. . . . . . . . . . . . . . . . .  112
    Liability Under Indiana UFTA. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  154
        Transfers for Purposes of the Indiana UFTA. . . . . . . . . . . . . . .  155
        Fraudulent Transfers Under the Indiana UFTA. . . . . . . . . . . . . .  220
        Respondent's Claim for FFI's
          Unpaid 2001 Deficiency Liability. . . . . . . . . . . . . . . . . . . . .  222
        Respondent's Claim for FFI's
          Unpaid 2001 Penalty Liability. . . . . . . . . . . . . . . . . . . . . . .  230
        Respondent's Claim for Transferee Interest. . . . . . . . . . . . . . . .  237

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  263

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, Judge:  Respondent determined that petitioner Curtis D.

Fankhauser is liable as a transferee of ffi Corp. for the unpaid deficiency in

[*3] Federal income tax (sometimes, tax) of $609,037.43[2] and the unpaid accuracy-related penalty under section 6662(a)[3] of $85,482 of that corporation for its taxable year 2001, but only to the extent of the net value of the assets that that corporation transferred to him, which respondent determined in the notice of liability was $1,824,143.99, as well as interest thereon as provided by law.

Respondent determined that petitioner Cynthia A. Fankhauser is liable as a transferee of ffi Corp. for the unpaid deficiency in tax of $609,037.43[4] and the unpaid accuracy-related penalty under section 6662(a) of $85,482 of that corporation for its taxable year 2001, as well as interest thereon as provided by law.[5]

---

[2]As discussed below, in the respective answers in these cases, respondent conceded that the Federal unpaid deficiency in tax of ffi Corp. for its taxable year 2001 is $578,338.43.

[3]All section references are to the Internal Revenue Code in effect at all relevant times. All Rule reference are to the Tax Court Rules of Practice and Procedure.

[4]See supra note 2.

[5]As discussed below, in the notice of liability issued to petitioner Cynthia A. Fankhauser, respondent did not limit Ms. Fankhauser's transferee liability to the extent of the net value of the assets that FFI transferred to her, which respondent determined in that notice was $233,877.44.

**[\*4]** Respondent determined that petitioner Thomas L. Weintraut is liable as a transferee of ffi Corp. for the unpaid deficiency in tax of $609,037.43[6] and the unpaid accuracy-related penalty under section 6662(a) of $85,482 of that corporation for its taxable year 2001, but only to the extent of the net value of the assets that that corporation transferred to him, which respondent determined in the notice of liability was $514,520.35, as well as interest thereon as provided by law.

We must decide whether to sustain respondent's determinations as modified by respondent in the respective answers in these cases.[7] We hold that we shall to the extent stated below.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time they filed the respective petitions in these cases, petitioners resided in Indiana.

FFI and Petitioners

On August 28, 1947, certain individuals who were not related to Curtis D. Fankhauser (Mr. Fankhauser), Thomas L. Weintraut (Mr. Weintraut), and Cynthia A. Fankhauser (Ms. Fankhauser) incorporated Ewing Foundry, Inc., under the

---

[6]See supra note 2.

[7]See supra note 2.

**[\*5]** laws of the State of Indiana. On February 6, 1959, the articles of incorporation of Ewing Foundry, Inc., were amended to change its name to Farm Fans, Inc. On March 30, 1990, the articles of incorporation of Farm Fans, Inc., were amended to change its name to ffi Corp. (FFI). At all relevant times, FFI was a C corporation with its principal place of business in Indiana. (We shall refer to the C corporation that was incorporated as Ewing Foundry, Inc., on August 28, 1947, as FFI, even though that corporation operated under different names until March 30, 1990, when its name was changed to ffi Corp.)

From 1960 until 2001, FFI was in the business of designing, manufacturing, and selling equipment used for drying, handling, and conditioning grain. From 1967 until December 20, 2001, FFI had its offices at 5900 Elmwood Avenue, Indianapolis, Indiana (Elmwood property), where it also conducted all of its sales operations and its research and development operations.

In November 1989, Mr. Weintraut, who holds a bachelor's degree in business and accounting from Indiana University and who was licensed as a certified public accountant (C.P.A.),[8] joined FFI as its chief financial officer (CFO). Mr. Weintraut took tax classes in college and took tax review courses

---

[8]During 2001 until at least the time of the trial in these cases, Mr. Weintraut's license as a C.P.A. was in an inactive status.

[*6] while preparing for his C.P.A. examination. Before he joined FFI as its CFO, Mr. Weintraut had worked as an accountant or as the controller for certain companies. As an accountant, Mr. Weintraut worked on the audit staff, where his responsibilities included examining the fairness of company financial statements. Mr. Weintraut's work as an accountant did not include any tax work. Sometime after Mr. Weintraut joined FFI as its CFO, he became and remained at all relevant times FFI's executive vice president, treasurer, and secretary.

In November 1991, Mr. Fankhauser, who holds a bachelor's degree in civil engineering from the University of Missouri,[9] joined FFI as its president. On January 15, 1996, Mr. Fankhauser purchased all of the outstanding stock of FFI. Richard Thrapp (Mr. Thrapp), who was a partner with the law firm known at the time of trial as Ice Miller, LLP (Ice Miller), represented him with respect to that purchase. After Mr. Fankhauser became the sole stockholder of FFI, he remained at all relevant times its president.[10]

---

[9]Mr. Fankhauser's education at the University of Missouri did not include any classes in accounting or business. At the time of the trial herein, Mr. Fankhauser had been using a tax return preparer to prepare his tax returns.

[10]We shall sometimes refer collectively to Mr. Fankhauser and Mr. Weintraut as FFI's officers.

[*7]   In 1997, Mr. Fankhauser gave 10 percent of the outstanding stock of FFI to his spouse, Ms. Fankhauser.  Ms. Fankhauser, who studied art for two years at Kansas State University, was not at any time involved in the operations or the management of FFI.

On December 30, 1997, Mr. Weintraut purchased 20 percent of the outstanding stock of FFI from Mr. Fankhauser.  On July 13, 2000, Mr. Weintraut purchased an additional two percent of the outstanding stock of FFI from Mr. Fankhauser.

From July 13, 2000, until December 20, 2001, Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser owned 68 percent, 22 percent, and 10 percent, respectively, of FFI's outstanding stock.  (During the times Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser owned all the stock of FFI, we shall sometimes refer collectively to them as the FFI stockholders.)  At all relevant times until December 20, 2001, the members of the board of directors of FFI were Mr. Fankhauser and Mr. Weintraut.  (During the times Mr. Fankhauser and Mr. Weintraut were members of the board of directors of FFI, we shall sometimes refer collectively to them as the FFI directors).

During 1998 and 1999, the sales revenues of FFI declined as a result of a series of dry harvest seasons and deteriorating economic conditions.  Conse-

[*8] quently, FFI restructured its operations by cutting costs through significant staff reductions. By 2000, FFI's sales revenues had stabilized.

In 2000, the FFI stockholders decided to sell FFI through the sale of their respective portions of FFI stock or the sale of FFI's assets. On October 2, 2000, FFI retained Banc One Capital Markets, Inc. (Banc One),[11] to evaluate the market for the sale of FFI's stock or FFI's assets and to solicit and negotiate with pro-spective buyers of that stock or those assets. FFI made Banc One its exclusive agent for any transaction in which control of FFI through ownership of its stock or its assets would be transferred for consideration to another entity in a stock sale, asset sale, merger, tender or exchange offer, leveraged buyout, joint venture, recapitalization, restructuring, or other business combination. In October 2000, Banc One contacted numerous potential buyers of FFI's stock or FFI's assets.

In October 2000, the GSI Group, Inc. (GSI), a competitor of FFI in the business of manufacturing grain equipment, approached FFI and expressed an interest in acquiring some of FFI's assets. From October through December 2000,

---

[11]When FFI retained Banc One in 2000, it was in the business of offering investment banking services and financial advisory services.

**[*9]** FFI, with the assistance of its attorney, Mr. Thrapp, engaged in negotiations for the sale of certain of its assets to GSI (FFI asset sale).[12]

On December 19, 2000, Mr. Fankhauser and Mr. Weintraut, as owners of 90 percent of FFI's outstanding stock, signed an asset sale agreement on behalf of FFI (FFI asset sale agreement). In that agreement, FFI agreed to sell to GSI, and GSI agreed to purchase from FFI, the following assets: (1) all of FFI's inventory, patents, trademarks, trade names, blueprints, orders for products that were to be provided to FFI customers on dates after the closing date of the FFI asset sale agreement, and customer lists and (2) a significant portion of FFI's manufacturing equipment. In the FFI asset sale agreement, GSI agreed to pay to FFI $6,864,018 and to assume certain of FFI's liabilities in return for the assets that FFI agreed to sell to GSI. FFI and GSI agreed in the FFI asset sale agreement that the closing date of the FFI asset sale to GSI was to be January 2, 2001.

On December 19, 2000, the FFI stockholders and the FFI directors held respective special meetings at which they approved a plan to liquidate and dissolve FFI (December 19, 2000 plan of liquidation) in the event and only in the event that the FFI asset sale to GSI closed on January 2, 2001, as required by the

---

[12]In the mid-1990s, Mr. Fankhauser and Mr. Weintraut started retaining Mr. Thrapp to represent FFI in certain matters. Around December 1, 2000, FFI terminated Banc One's services.

[*10] FFI asset sale agreement. On January 2, 2001, the FFI asset sale closed pursuant to the FFI asset sale agreement. Consequently, on that date, the condition precedent to the December 19, 2000 plan of liquidation was satisfied.

On or before May 21, 2001, FFI sold to unrelated third parties for approximately $1,063,645 certain assets that GSI had not agreed to purchase in the FFI asset sale agreement, including certain of FFI's automobiles and certain of its manufacturing equipment (FFI May 21, 2001 asset sale).

FFI anticipated that it would have a significant Federal income tax liability and a significant State income tax liability (sometimes collectively, Federal and State income tax liabilities) as a result of the FFI asset sale and the FFI May 21, 2001 asset sale. As of October 1, 2001, FFI had made on the dates indicated the following Federal estimated income tax payments for its taxable year 2001 totaling $625,000 (sometimes, FFI Federal 2001 estimated income tax payments):

| Date | Payment |
|---|---|
| 4/17/2001 | $225,000 |
| 6/15/2001 | 225,000 |
| 10/1/2001 | 175,000 |
| Total | 625,000 |

[*11] In addition to the FFI Federal 2001 estimated income tax payments of $625,000 that FFI had made as of October 1, 2001, it had an overpayment credit of $3,592 for its taxable year 2001 that was attributable to its taxable year 2000. (We shall refer to the total (i.e., $628,592) of the FFI Federal 2001 estimated income tax payments of $625,000 and FFI's Federal overpayment credit for its taxable year 2001 of $3,592 as the FFI Federal 2001 income tax payments.)

On October 5, 2001, the FFI stockholders voted to dissolve FFI in accordance with the December 19, 2000 plan of liquidation.

On October 19, 2001, FFI sold for $3,250,000 the Elmwood property (FFI Elmwood sale) to an unrelated company known as 5900 Elmwood Avenue, LLC (Elmwood Avenue LLC). Elmwood Avenue LLC paid $1 million of that $3,250,000 purchase price by executing a promissory note for $1 million (Elmwood Avenue LLC note) that was payable to FFI. (We shall sometimes refer collectively to the FFI asset sale, the FFI May 21, 2001 asset sale, and the FFI Elmwood sale as the FFI 2001 asset sales.)

On October 19, 2001, FFI took certain steps in preparation for its planned liquidation and dissolution, including (1) filing articles of dissolution with the secretary of state of Indiana (Indiana secretary of state); (2) informing the attorney general of Indiana (Indiana attorney general) and the Department of Workforce

[*12] Development of Indiana that it was dissolving; (3) mailing Form IT-966, NOTICE OF CORPORATE DISSOLUTION LIQUIDATION OR WITH-DRAWAL (Form IT-966), to the Department of Revenue of Indiana; and (4) mailing Form 966, Corporate Dissolution or Liquidation (Form 966), to the Internal Revenue Service (IRS). Form 966 that FFI completed and mailed to the IRS indicated that FFI's "(anticipated) [l]ast month, day, and year of final tax year" was December 31, 2002.

As of November 30, 2001, FFI had made State estimated income tax payments for its taxable year 2001 totaling $157,700 (FFI State 2001 income tax payments). Of those payments, FFI had paid $152,000 to the State of Indiana and the remaining $5,700 to certain other States.

After the FFI 2001 asset sales, FFI had no operations, no employees engaged in operations, no income, and no operational assets (except certain oxidation technology).

## FFI, Petitioners, and MidCoast

Mr. Thrapp was aware that FFI had agreed to, and did, sell to unrelated third parties most of its assets, including all of its operating assets (except certain oxidation technology), and that it not only intended but also had taken formal steps to liquidate and dissolve. Nonetheless, on December 7, 2001, he informed

[*13] the FFI officers (i.e., Mr. Fankhauser and Mr. Weintraut) that MidCoast Credit Corp.[13] might be interested in purchasing their FFI stock and the FFI stock of Ms. Fankhauser at a so-called premium; that is to say, MidCoast might be interested in purchasing all of the FFI stock for an amount that was greater than the liquidation value of FFI, i.e., the value of FFI's assets after the payment of its liabilities, including its Federal income tax liability and its State income liability for its taxable year 2001.[14] Mr. Thrapp informed the FFI officers that the purchase price for the stock that MidCoast usually paid in deals like the one that it was suggesting to FFI and the FFI stockholders was calculated by using a percentage of the total of the acquired company's Federal income tax liability and State income tax liability, which varied from acquisition to acquisition but was within a range that MidCoast had established.

At all relevant times, MidCoast was a subsidiary of Shorewood Holding Corp. (Shorewood) and was part of the consolidated group of corporations for

[13]For convenience, we shall sometimes refer to MidCoast Credit Corp. and any other company that was related to, or that was a designee of, MidCoast Credit Corp. as MidCoast.

[14]Mr. Thrapp had some familiarity with MidCoast because it was a client of Ice Miller with respect to a transaction that was unrelated to the transactions herein and that closed in November 2001. Mr. Thrapp considered the information that Ice Miller obtained as a result of that representation to be privileged.

[*14] which Shorewood filed consolidated tax returns.  At those times, Michael

Bernstein (Mr. Bernstein) and Honora Shapiro (Ms. Shapiro)[15] each owned 50

percent of the outstanding stock of Shorewood.

Mr. Thrapp, who was not an attorney specializing in Federal income tax

matters and who was not qualified to provide advice with respect to such matters,[16]

understood and advised the FFI officers that MidCoast had a Federal income tax

and State income tax deferral strategy (tax strategy) that it considered to be

proprietary and that consequently it would not share any details about that tax

strategy with them.  Mr. Thrapp further understood and informed the FFI stock-

holders that MidCoast had used its tax strategy as part of an acquisition methodol-

ogy in which it acquired for cash certain C corporations with cash and certain

Federal and State income tax liabilities.  Mr. Thrapp did not know any of the

details of MidCoast's acquisition methodology or its tax strategy.[17]  However,

---

[15]Ms. Shapiro died before the trial in these cases.

[16]For convenience, we shall refer to an attorney or any other person who specializes in Federal income tax matters and who is qualified to provide advice with respect to such matters as a tax professional.

[17]Even if Mr. Thrapp had known, through Ice Miller's representation of MidCoast, some or all of the details regarding MidCoast's acquisition methodology and its tax strategy, he would not have been able to disclose any such details to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser.  That was because

(continued...)

[*15] it was Mr. Thrapp's understanding, which he shared with the FFI officers, that MidCoast used the cash of an acquired C corporation in order to buy charged-off debt securities that MidCoast intended to use in its so-called asset recovery business, but he had no understanding of how MidCoast used those securities as part of its tax strategy.

Mr. Weintraut and Mr. Fankhauser made only certain limited inquiries of Mr. Thrapp with respect to MidCoast's overall acquisition methodology, including its tax strategy, of acquiring C corporations. However, Mr. Weintraut and Mr. Fankhauser, directly or through Mr. Thrapp, and Ms. Fankhauser, through Mr. Fankhauser, knew that MidCoast's pricing in its acquisition methodology was inextricably intertwined with its tax strategy.

On December 7, 2001, the day on which Mr. Thrapp informed the FFI officers about MidCoast's possible interest in purchasing the stock of FFI, the FFI officers, Mr. Thrapp, and FFI's accountants, Patrick Burns (Mr. Burns) and Victor

---

[17](...continued)
MidCoast was a client of Ice Miller of which Mr. Thrapp was a partner, and Mr. Thrapp was subject to certain ethical constraints with respect to the disclosure of any client information.

[*16] Vernick (Mr. Vernick),[18] of Katz, Sapper & Miller (Katz accounting firm), an accounting firm, held a conference call with certain representatives of Mid-Coast.

Neither the FFI stockholders nor Mr. Thrapp saw any need to, and did not, press MidCoast's representatives regarding the details of its acquisition methodology, its tax strategy, and its asset recovery business, all of which they understood were interrelated. Nor did the FFI stockholders or Mr. Thrapp see any need to, or in fact, inquire through their respective contacts whether there were persons who were not employed by MidCoast or by Ice Miller and who might be familiar with MidCoast's acquisition methodology, its tax strategy, and its asset recovery business.[19]

On December 11, 2001, Mr. Fankhauser, Mr. Weintraut, and Ms. Fank-hauser executed an engagement letter (engagement letter dated December 11, 2001) in which they retained Ice Miller to represent FFI and them as stockholders of FFI with respect to MidCoast's proposal to purchase the FFI stock. The

---

[18]Mr. Burns and Mr. Vernick died before the trial in these cases.

[19]The record does not establish why Mr. Thrapp and the FFI stockholders did not inquire through their respective contacts whether there were persons who were not employed by MidCoast or by Ice Miller and who might be familiar with MidCoast's acquisition strategy, its tax strategy, and its asset recovery business.

[*17] engagement letter dated December 11, 2001, stated in pertinent part the following with respect to the potential conflict of interest created by Ice Miller's representation of MidCoast that Ice Miller had concluded it needed to explain to Mr. Fank-hauser, Mr. Weintraut, and Ms. Fankhauser:

MidCoast Conflict of Interest

      While we have no direct conflict in this particular matter, i.e., we are not representing MidCoast, its affiliates or Other Parties in connection with this Transaction [contemplated transactions involving FFI, the FFI stockholders, and MidCoast], we have represented and currently represent MidCoast and/or its affiliates, and Other Parties, in connection with other, unrelated matters. All confidential information that we have obtained about MidCoast, its affiliates and Other Parties as a result of these representations shall remain confidential. These prior and existing relationships will not prevent Ice Miller from zealously representing the interests of the Sellers [Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser] in connection with the Transaction, but these relationships are ones that you deserve to be aware of in connection with retaining us for this Transaction.

      As attorneys in Indiana, we are obligated to bring to your attention Rule 1.7 of the Rules of Professional Conduct applicable to attorneys in Indiana. Rule 1.7 provides, in pertinent part, as follows:

      (a)    A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

      (1)    the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

      (2)    each client consents after consultation.

**[\*18]**    (b)    A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1)    the lawyer reasonably believes the representation will not be adversely affected; and

(2)    the client consents after consultation.

Based upon the information which has been provided to us, we do not believe that our representation of the Sellers in connection with the Transaction will (a) adversely affect the relationship with MidCoast, (b) be adversely affected by our relationship with MidCoast and/or its affiliates, or any of the Other Parties.  Likewise, we do not believe our relationship with MidCoast would materially limit our ability to represent the Sellers and FFI.  However, we do think that it is prudent to request your written acknowledgment of our relationship with MidCoast and consent to our representation of the Sellers in connection with the Transaction in light of these circumstances.  Your execution of this letter will constitute such a formal consent and waiver of any such actual or potential conflicts of interest.

On December 11, 2001, Olga Parra (Ms. Parra) signed, as the executive vice president of MidCoast, a consent and waiver of conflict of interest on behalf of MidCoast.[20]  Ms. Parra also was the general counsel of MidCoast.

Also on December 11, 2001, Mr. Bernstein sent to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser on behalf of MidCoast a nonbinding letter of

---

[20]The record does not establish whether any of the FFI stockholders executed the engagement letter, but we presume that all of them did so.

[*19] intent (letter of intent) with respect to a proposed acquisition of their FFI

stock by MidCoast that required FFI to redeem as part of that acquisition 75 per-

cent of its stock from its stockholders.  The letter of intent[21] stated in pertinent

part:

> Dear Shareholder(s) [Mr. Weintraut, Mr. Fankhauser, Ms. Fank-
> hauser]:
>
> We have received and reviewed certain material regarding ffi Corpo-
> ration, an Indiana corporation (the "Company") that you have pro-
> vided to us. This letter of intent ("Letter") is to set forth the basic
> terms pursuant to which MidCoast Credit Corp. and/or its designee
> (the "Share Buyer")[22] shall acquire all of the remaining issued and
> outstanding shares of the Company (the "Shares") from its sharehold-
> ers (the "Shareholders") pursuant to a stock purchase transaction (the
> "Proposed Share Transaction") to occur immediately after or simulta-
> neously with the redemption by the Company of approximately
> seventy five percent (75%) of the Shares from the Shareholders in
> consideration for (i) an assignment of receivables relating to a prom-
> issory note [Elmwood Avenue LLC note], including accrued interest,
> in the approximate amount of nine hundred twenty nine thousand
> dollars ($929,000), (ii) an amount equal to the estimated refund of

---

[21]When referring to the letter of intent, the share purchase and redemption agreement (discussed below), the transactions described in those documents, and any other agreement or document associated therewith or related thereto, our use of terms such as "sale", "purchase", "redemption", "loan", and similar terms is for convenience only.  Our use of any such terms is not intended to imply, and does not imply, that any of those transactions was a sale, purchase, redemption, loan, or similar transaction for Federal income tax purposes.

[22]As discussed below, MidCoast designated FFI Acquisition, a limited liability company, to serve as the "Share buyer" in the "Proposed Share Trans-action" discussed in the letter of intent.

[*20] Indiana corporate income tax payments made by the company for its 2001 tax year in the approximate amount of one hundred fifty thousand dollars ($150,000), (iii) an assignment of the right to receive a refund of the estimated federal corporate income tax payments made by the Company for its 2001 tax year in the approximate amount of six hundred thirty six thousand dollars ($636,000),[23] and (iv) the transfer by the Company to the Shareholders of certain Oxidation Technology related assets and other scheduled non-cash assets of the Company (the "Redemption Price") (the "Proposed Share Redemption").

This Letter is intended to provide a framework for us to utilize as we negotiate the terms and conditions of a definitive share purchase and redemption agreement ("Definitive Agreement") pursuant to which the Proposed Share Transaction and the Proposed Share Redemption (collectively, the "Transaction") would be consummated. Accordingly, this Letter does not constitute a legally binding or enforceable agreement or commitment on the part of the parties to negotiate or proceed with or toward the Transaction, nor does it purport to set forth a complete statement of the terms and conditions of the Transaction; provided, however, that in consideration of the time and costs incurred and to be incurred in proceeding towards a possible Transaction, the provisions in numbered paragraphs 1.3, 1.4, 1.5, 1.6 and 1.7 below (the "Binding Provisions") shall be legally binding upon the execution and acceptance of this Letter by those parties.

The Share Buyer contemplates that the basic terms and conditions of the Proposed Share Transaction shall be as follows:

Section 1.1 **Share Purchase Price**. The Share Buyer shall purchase the Shares at the closing of the Proposed Share Transaction (the "Share Closing") for a purchase price (the "Share Purchase Price") equal to the amount of the Company's cash as of the Share Closing less forty nine (49%) of the Company's combined state and

---

[23]The letter of intent erroneously stated that the FFI Federal 2001 income tax payments totaled $636,000. The correct total is $628,592.

**[*21]** federal corporate income tax liability (taking into account any net operating loss carryforwards) attributable to the Company's business operations and any sale, conveyance and/or transfer of its assets during its 2001 tax year without taking into account any estimated tax payment made by the Company with respect to such taxes (the "Deferred Tax Liability").

The Share Purchase Price shall be reduced by an amount equal to any Liabilities remaining as of the Share Closing. "Liabilities" shall include all specifically scheduled Liabilities of the Company, other than the Deferred Tax Liability and any liability attributable to reasonable and customary professional fees incurred in connection with the Proposed Share Transaction not to exceed twenty thousand dollars ($20,000), which will not be borne by the Shareholders. If the Transaction does not close, the Shareholders will be responsible for the payment of their professional fees. The parties expressly acknowledge that to the extent that the parties fail to reach agreement on the number and amount of the Liabilities to be scheduled, the Transaction will not proceed.

Section 1.2. **Conditions Precedent**. The following shall be conditions precedent to the Share Closing:

(a) The Share Buyer's completion of due diligence to its satisfaction, as provided in Section 1.6 below, by the expiration of the Due Diligence Period (as such term is defined in Section 1.6 below);

(b) The execution by the Share Buyer and the Shareholders of a Definitive Agreement, with such terms and conditions as shall be satisfactory to the Share Buyer and the Shareholders, in their sole discretion, by December 20, 2001;

(c) No adverse changes to the business or financial condition of the Company between the date of this Letter and the Share Closing;

(d)     No breach of warranty, representation or covenant contained in the Definitive Agreement as of the Share Closing;

(e)     Consummation of the Proposed Share Redemption immediately prior to or simultaneously with the Proposed Share Closing;

(f)     The occurrence of the Share Closing by December 20, 2001.

\*          \*          \*          \*          \*          \*          \*

Section 1.6   **Access to Information**.  The Shareholders shall provide representatives of the Share Buyer with access to the books, records, properties, and other relevant information of the Company. The Share Buyer shall complete its examination of the Company at the Share Buyer's expense by the Share Closing (the "Due Diligence Period").  The Shareholders and their respective agents and representatives shall cooperate with the Share Buyer and the Share Buyer and the Share Buyer's agents and representatives in their due diligence examination and shall provide the Share Buyer's agents and representatives with access to the Company's books, records, properties, employees agents and representatives at such reasonable times and places as the Share Buyer and the Shareholders shall reasonably agree.  If the Share Buyer elects not to proceed with the Proposed Share Transaction for any reason, it shall so notify the Shareholders in writing prior to the expiration of the Due Diligence Period.

\*          \*          \*          \*          \*          \*          \*

Section 1.8   **Definitive Share Agreement**.  The parties to this Letter acknowledge and agree that the Shareholders shall be required, in the event the Shareholders elect to execute a Definitive Agreement, to make certain representations, warranties and covenants relative to certain matters in the Definitive Agreement.  Those matters are as follows:

**[*23]**

(a) Each of the Shareholder' (if other than natural persons) and the Company's valid organization and good standing and the sufficient authority and capacity to execute, deliver and perform the Share Agreement and consummate the Proposed Share Transaction;

(b) The enforceability and binding effect of the Share Agreement in accordance with its terms;

(c) The Shareholders' title to and ownership of the Shares free and clear of any liens, charges or other encumbrances;

(d) The due and valid issuance of the Shares;

(e) The capital structure of the Company, including a representation to the effect that the Shares purchased by the Share Buyer constitute one hundred percent (100%) of all of the issued and outstanding capital stock of the Company;

(f) The lack of any options, warrants, rights of first refusal, preemptive rights or similar rights or obligations with respect to the Shares and any authorized, but unissued shares of the Company;

(g) The absence of any law, rule, order, document or agreement that would prohibit or be in conflict with any of the Shareholders' or the Company's execution of the Share Agreement or the consummation of the Proposed Share Transaction;

(h) Except as specifically scheduled by the Shareholders, the absence of any litigation and liabilities, including but not limited to any pending or threatened environmental litigation or liabilities relating to any of the Company's assets;

**[*24]**

(i)    The amount of the tax basis in the Company's assets giving rise to the Deferred Tax Liability;

(j)    The payment of all taxes of the Company (other than the Deferred Tax Liability), filing of all tax returns and related tax issues;

(k)    The accuracy of the Company's financial statements; and

(l)    Any other warranties, representations, and covenants that is customary and reasonable with respect to transactions of the same nature as the Proposed Share Transaction.

The Share Buyer shall warrant, represent and covenant that it shall cause the Company to pay the Deferred Tax Liability to the extent that the Deferred Tax Liability is due given the Company's post-closing business activities and shall file all federal and state income tax returns on a timely basis related thereto.

Section 1.9  **Indemnification**.  In addition, subject to a negotiated cap (which the parties believe to be approximately $2,300,000) and survival period (which the parties believe will be 2 years for all claims other than those claims related to tax Liabilities, which will survive for the applicable statute of limitations period) which will attempt to mirror the liability the Shareholders would be exposed to upon the dissolution and winding up of the Company, the Shareholders shall indemnify the Company and the Share Buyer and their respective officers, directors, shareholders, employees or representatives against any loss, claim, damage or expense, including attorneys' fees and costs, which any one or more of them incur as a result of an alleged or actual (i) act or omission of the Company or the Shareholders occurring prior to the Share Closing, or (ii) breach of any warranty, representation or covenant given or made by the Company or the Shareholders with respect to the Company or its assets prior to the Share Closing.

[*25] Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser (through Mr. Fankhauser) knew, directly or through Mr. Thrapp, that the transactions that MidCoast had proposed in the letter of intent would result in their receiving a greater amount of assets--a so-called premium--than they would receive if FFI were to liquidate and dissolve[24] and the Federal and State income tax liabilities that FFI had incurred as a result of the FFI 2001 asset sales were to be paid in full. That is why on December 12, 2001, the day after MidCoast had sent FFI and the FFI stockholders the letter of intent, Mr. Weintraut on behalf of FFI and the FFI stockholders signed and accepted the terms of that letter. On the same date, Mr. Bernstein signed and accepted those terms on behalf of MidCoast.

At no time before or after signing the letter or before the closing of the transactions to which FFI, the FFI stockholders, and MidCoast agreed in the share purchase and redemption agreement (discussed below) did Mr. Thrapp or Kyle Hupfer (Mr. Hupfer )[25] with Ice Miller or Mr. Burns or Mr. Vernick[26] with the

---

[24]FFI and the FFI stockholders had previously taken formal actions to effect the liquidation and the dissolution of FFI.

[25]Mr. Hupfer, who at all relevant times was an associate with Ice Miller and who performed certain nontax work for FFI and the FFI stockholders relating to the MidCoast proposed transactions, was not a tax professional. Consequently, he was not qualified to, and did not, provide any Federal income tax advice to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser or to FFI with respect to the

(continued...)

[*26] Katz accounting firm inform FFI and the FFI stockholders about possible tax problems associated with those transactions. Nor did Mr. Thrapp, Mr. Hupfer, Mr. Burns, or Mr. Vernick recommend to FFI and to the FFI stockholders that they retain a tax professional to provide advice with respect to the transactions that MidCoast had proposed in the letter of intent or to which they thereafter agreed in the share purchase and redemption agreement. FFI and the FFI stockholders did not retain any tax professional to provide advice with respect to those transactions, even though FFI had retained tax professionals over the years to provide it with tax advice with respect to certain matters.

After the various parties accepted the letter of intent, Mr. Thrapp was responsible for negotiating in large part the agreement among those parties regarding the transactions that MidCoast had proposed in that letter.[27] Mr. Wein-

---

[25](...continued)
transactions which MidCoast had proposed in the letter of intent or to which they agreed in the share purchase and redemption agreement. (We shall sometimes refer collectively to Mr. Thrapp and Mr. Hupfer as petitioners' attorneys.)

[26]The record does not establish that Mr. Burns or Mr. Vernick was a tax professional.

[27]It was Mr. Thrapp who negotiated with MidCoast and was able to obtain its agreement to pay the attorneys' fees (up to a stated limit) that Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser were to incur in connection with implementing MidCoast's proposed transactions.

[*27] traut, however, negotiated directly with certain of MidCoast's represent-atives the percentage of FFI's 2001 Federal and State income tax liabilities that MidCoast was to pay to purchase the stock of the FFI stockholders. In doing so, Mr. Weintraut attempted to have MidCoast agree to pay a percentage that was at the high end of the range of percentages to which he understood MidCoast had agreed in the past as part of its acquisition methodology.

The FFI stockholders did not personally undertake any due diligence efforts (due diligence) on behalf of FFI or themselves with respect to the transactions that MidCoast had proposed in the letter of intent. Instead, the FFI stockholders relied on Mr. Thrapp to conduct due diligence with respect to those transactions.

Mr. Thrapp spent some time performing a limited amount of due diligence on behalf of FFI, Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser with re-spect to the transactions that MidCoast had proposed in the letter of intent. At a time not established by the record, Mr. Thrapp reviewed certain promotional materials that MidCoast had prepared in which MidCoast represented that it had been in business since 1958 and had been in the asset recovery business since 1996. In those promotional materials, MidCoast indicated that it acquired corpo-rations for use in connection with its asset recovery business and continued to operate those corporations after it acquired them. MidCoast also indicated in

[*28] those promotional materials that it caused the corporations that it acquired to satisfy their respective tax liabilities as well as other liabilities. Mr. Thrapp did not perform due diligence with respect to FFI Acquisition, the entity that Mr. Bernstein formed and that MidCoast designated to serve as the purchaser of the stock of the FFI stockholders (discussed in more detail below).

Mr. Thrapp claimed to have believed that the limited amount of due diligence that he performed was adequate taking into account the information and the circumstances with respect to the transactions that MidCoast had proposed in the letter of intent and the signatories to that letter about which he had knowledge or an understanding. Mr. Thrapp further claimed to have believed that the knowledge and the understanding that he had with respect to the transactions that Mid-Coast had proposed in the letter of intent and the signatories to that letter enabled him to determine and to assess the risks that he concluded those transactions posed to his clients, FFI and the FFI stockholders. Mr. Thrapp claimed to have held those beliefs even though (1) he did not know any of the details of MidCoast's acquisition methodology, its tax strategy, or its asset recovery business; (2) he was not a tax professional and thus was not qualified to know of, or be sensitive to, any tax risks associated with the transactions which MidCoast had proposed or to which FFI and the FFI stockholders agreed in the share purchase and redemption

[*29] agreement; and (3) he knew (as discussed below) that the funds that were to be provided to MidCoast in order to effect the acquisition of the FFI stock were to be returned as of the closing of that transaction to the provider of those funds.

Following the execution of the letter of intent, MidCoast began performing due diligence with respect to FFI in anticipation that the signatories to that letter would agree to undertake the transactions that MidCoast had proposed in that letter and that the closing date of those transactions would be December 20, 2001. Mr. Weintraut assisted MidCoast's controller, Carolyn Sesco (Ms. Sesco), and MidCoast's independent accountant, Scott Elkins, with respect to that due diligence. Mr. Weintraut spent several days in providing that assistance.

On December 14, 2001, FFI sent by facsimile to Mr. Hupfer preliminary financial computations (FFI's preliminary financial computations) that Mr. Weintraut had prepared by using FFI's financial records. According to FFI's preliminary financial computations, FFI had for its taxable year 2001 a projected Federal income tax liability of $801,749 and a projected State income tax liability of $225,030.

The FFI stockholders and the FFI directors entered into a joint consent dated December 15, 2001, to revoke FFI's December 19, 2000 plan of liquidation.

[*30] On December 17, 2001, FFI organized FFW Holdings, LLC (FFW), under the laws of the State of Indiana. FFW, whose sole member was FFI, was a disregarded entity for Federal tax purposes. FFI formed FFW to serve, inter alia, as a vehicle to transfer to the FFI stockholders certain of FFI's cash and noncash assets and all of its liabilities except its Federal and State 2001 income tax liabilities in exchange for 75 percent of the outstanding stock of FFI that they owned. On December 19, 2001, Mr. Weintraut, as executive vice president of FFI, signed FFW's operating agreement.

Around December 18, 2001, Mr. Weintraut prepared a balance sheet for FFI (December 18, 2001 balance sheet) that reflected its assets and its liabilities as of that date on the assumption that the transactions proposed in the letter of intent were to occur. According to the December 18, 2001 balance sheet, FFI was to have the following assets and the following Federal income tax liability and State income tax liability for its taxable year 2001 after it distributed membership interests in FFW to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in ex-

[*31] change for 75 percent of the FFI stock that they owned:[28] (1) cash of

$875,855.49, (2) the right to a refund of the FFI State 2001 income tax payments

of $157,700, (3) an anticipated Federal income tax liability (anticipated 2001

Federal income tax liability) for FFI's taxable year 2001 of $794,949.13, and (4)

an anticipated State income tax liability (anticipated 2001 State income tax lia-

---

[28]The December 18, 2001 balance sheet did not show as an asset of FFI the balance of $11,955.46 in a certain bank account in the name of FFI (FFI's bank account balance of $11,955.46). Nor did that balance sheet show as a liability of FFI certain outstanding checks of $11,955.46 issued by FFI (FFI's outstanding checks of $11,955.46). Because FFI's bank account balance of $11,955.46 and FFI's outstanding checks of $11,955.46 were in the same amounts, they offset each other and had no effect on the share purchase price (discussed below) calculated in the December 18, 2001 balance sheet. Consequently, for convenience, we shall not refer, except infrequently, to FFI's bank account balance of $11,955.46 as an asset of FFI or to FFI's outstanding checks of $11,955.46 as a liability of FFI when we discuss the transactions and the events that are relevant to the issues presented here.

In addition, the December 18, 2001 balance sheet did not show as an asset of FFI a receivable of $43,926.57 (discussed below) from the Prudential Life Insurance Co. of America (Prudential), which FFI had never claimed, which the State of Indiana was holding in the name of FFI, and of which no one associated with FFI or MidCoast was aware at the time MidCoast proposed the transactions in the letter of intent and at the time the transactions closed pursuant to the share purchase and redemption agreement of FFI, the FFI stockholders, and MidCoast. As a result, the receivable from Prudential of $43,926.57 (Prudential demutualization funds receivable of $43,926.57) had no effect on the share purchase price calculated in the December 18, 2001 balance sheet. Consequently, for convenience, we shall not refer, except infrequently, to the Prudential demutualization funds receivable of $43,926.57 as an asset of FFI when we discuss the transactions and the events that are relevant to the issues presented here.

**[*32]** bility) for FFI's taxable year 2001 of $231,151.56.[29]  (We shall sometimes refer collectively to the total (i.e., $1,026,100.69) of FFI's anticipated 2001 Federal income tax liability and anticipated 2001 State income tax liability that were shown in the December 18, 2001 balance sheet as FFI's total anticipated 2001 tax liability.)

Pursuant to a formula set forth in the December 18, 2001 balance sheet, the stock purchase price for the stock of FFI that MidCoast was to purchase from the FFI stockholders was to be determined, as shown in certain computations in that balance sheet, by reducing FFI's total assets (i.e., $1,033,555.49) consisting of cash of $875,855.49 and the right to a refund of the FFI State 2001 income tax payments of $157,700, which FFI would be considered to own upon effecting the redemption transaction that MidCoast had proposed in the letter of intent, by 49 percent (i.e., by $502,789.34) of FFI's total anticipated 2001 tax liability of

---

[29]As noted, Mr. Weintraut made the underlying computations of FFI's anticipated 2001 Federal income tax liability and its anticipated 2001 State income tax liability shown in the December 18, 2001 balance sheet.  Those liabilities totaled $1,026,100.69, which is different from the total (i.e., $1,026,779) of FFI's projected Federal income tax liability of $801,749 and its projected State income tax liability of $225,030 for its taxable year 2001 that were shown in FFI's preliminary financial computations that he also prepared.  The record does not establish the reason for that difference.

[*33] $1,026,100.69. The balance of $530,766.15 was to be the purchase price for the FFI stock that MidCoast was to purchase from the FFI stockholders.

On December 18, 2001, Prudential entered into a demutualization transaction whereby it converted from a mutual insurance company to a stock insurance company. FFI was a policyholder at the time of that demutualization transaction and, as such, was entitled to receive certain shares of Prudential stock and a certain amount of Prudential's cash. Because FFI did not make a claim to Prudential for the stock and the cash to which it was entitled as a result of Prudential's demutualization, Prudential paid $43,926.57 to the Indiana Attorney General's office.[30]

On December 19, 2001, immediately before the contribution of certain of its assets to FFW, FFI had the following assets and liabilities:

---

[30]See supra note 28.

**[*34]**

| Assets | Amounts |
|---|---|
| Cash | $1,045,510.95 |
| Elmwood Avenue LLC note | 913,895.43 |
| Real estate in Thief Falls, Minnesota | ([1]) |
| Cash in escrow from FFI asset sale | 197,131.52 |
| Oxidation technology | ([2]) |
| Refundable utility deposit | 1,153.54 |
| Interest receivable on Elmwood Avenue LLC note | 19,387.87 |
| Insurance premium refund | 2,696.00 |
| Total | 2,179,775.31 |

| Liabilities | Amounts |
|---|---|
| Accounts payable to ADP | $81.00 |
| Accounts payable to Ronald Cook | 620.32 |
| Accounts payable to Citizens Insurance | 10,000.00 |
| Accounts payable to Ice Miller | 32,454.03 |
| Payments due to retirees | 25,684.08 |
| Refunds due dealers | 1,046.47 |
| GSI warranty claim adjustment | 9,608.09 |
| Accrued property taxes | 33,144.21 |
| Contingent payable to Hanover Insurance | 10,000.00 |
| Unpaid 2001 anticipated Federal income tax liability[3] | 166,357.13 |
| Unpaid 2001 anticipated State income tax liability[4] | 73,451.56 |
| Total | 362,446.89 |
| Excess of assets over liabilities | 1,817,328.42 |

[1]The record does not establish the value of the real estate in Thief Falls, Minnesota.

[2]The record does not establish the value of the oxidation technology.

[3]FFI had made payments totaling $628,592 with respect to its anticipated 2001 Federal income tax liability of $794,949.13.

[4]FFI had made payments totaling $157,700 with respect to its anticipated 2001 State income tax liability of $231,151.56.

[*35] On December 18, 2001, in preparation for the transactions contemplated in the letter of intent, Mr. Bernstein organized under the laws of the State of Indiana[31] FFI Acquisition (FFIA), a limited liability company, to enter into those transactions as MidCoast's designee. According to FFIA's operating agreement, Mr. Bernstein was required to contribute $1,000 in return for his interest as FFIA's sole member.[32]

---

[31]The parties stipulated that FFI Acquisition was organized under the laws of the State of Indiana as an Indiana limited liability company. In the share purchase and redemption agreement that FFI Acquisition, FFI, Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser executed, FFI Acquisition represented and warranted in section 3.2 that "purchaser [FFI Acquisition] is duly organized and validly existing under the laws of the State of Florida." In the preamble of that same agreement, FFI Acquisition is described as an "Indiana Limited Liability Company". MidCoast apparently followed virtually the same or a very similar pattern when it agreed to buy at a so-called premium stock of a C corporation that held cash resulting from the sale of operating assets and that had Federal and State income liabilities attributable to those sales. Consequently, MidCoast most likely had a cookie-cutter type agreement that it used in order to effect the purchase of the C corporation stock in the instant cases and in other cases with virtually identical or very similar fact patterns. That would explain, but not justify or excuse, the inconsistencies between (1) the stipulation of facts in these cases and the preamble of the stock purchase and redemption agreement and (2) section 3.2 of that agreement.

[32]The record does not establish that Mr. Bernstein contributed $1,000 to FFIA in return for his interest as its sole member. Nor does the record establish that FFIA had any assets as of the closing of the transactions, which MidCoast had proposed in the letter of intent or to which FFI, the FFI stockholders, and FFIA agreed in the share purchase and redemption agreement, or that it had any assets after that closing other than the stock of FFI.

[*36] On December 19, 2001, FFI contributed the following assets and liabilities[33]

to FFW:

| Assets | Amounts |
| --- | --- |
| Cash | $157,700.00 |
| Elmwood Avenue LLC note | 913,895.43 |
| Right to refund of FFI Federal 2001 income tax payments | 628,592.00 |
| Real estate in Thief Falls, Minnesota | ([1]) |
| Cash in escrow from FFI asset sale | 197,131.52 |
| Oxidation technology | ([2]) |
| Refundable utility deposit | 1,153.54 |
| Interest receivable on Elmwood Avenue LLC note | 19,387.87 |
| Insurance premium refund | 2,696.00 |
| Assets total | 1,920,556.36 |

| Liabilities | Amounts |
| --- | --- |
| Accounts payable to ADP | $81.00 |
| Accounts payable to Ronald Cook | 620.32 |
| Accounts payable to Citizens Insurance | 10,000.00 |
| Accounts payable to Ice Miller | 32,454.03 |
| Payments due to retirees | 25,684.08 |
| Refunds due dealers | 1,046.47 |
| GSI warranty claim adjustment | 9,608.09 |
| Accrued property taxes | 33,144.21 |
| Contingent payable to Hanover Insurance | 10,000.00 |
| Liability total | 122,638.20 |
| Excess of assets over liabilities | 1,797,918.16 |

[1]The record does not establish the value of the real estate in Thief Falls, Minnesota, that FFI contributed to FFW.

[2]The record does not establish the value of the oxidation technology that FFI contributed to FFW.

[33]The assets and the liabilities shown assume that the transactions proposed in the letter of intent were to occur.

[*37] On December 20, 2001, Stephen J. Shapiro (Mr. Shapiro) executed a certificate on behalf of FFIA, which included resolutions of Mr. Bernstein dated December 19, 2001. Those resolutions provided that FFIA, as the designee of MidCoast, was to enter into the share purchase and redemption agreement with FFI and the FFI stockholders.

On December 20, 2001, FFIA, FFI, and the FFI stockholders entered into a share purchase and redemption agreement (SPRA), the terms of which were similar but not identical to the terms that MidCoast had proposed in the letter of intent. Mr. Bernstein signed the SPRA on behalf of FFIA; Mr. Weintraut signed it on behalf of FFI; and Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser signed it as the FFI stockholders.

The only reason that FFI and the FFI stockholders accepted MidCoast's letter of intent and thereafter decided to, and did, enter into the SPRA with Mid-Coast and the related agreements (discussed below) was that those stockholders wanted to, and MidCoast agreed that they would, receive a substantially greater amount--a so-called premium--from the transactions which MidCoast proposed to them or to which they agreed in the SPRA than they would receive from the liquidation of FFI after FFI's total anticipated 2001 tax liability of $1,026,100.69, which was attributable to the FFI 2001 asset sales, was paid (posttax liquidation

[*38] value). When they accepted MidCoast's letter of intent and thereafter entered into the SPRA with MidCoast and the related agreements (discussed below), Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser knew, as did Mr. Thrapp, that the only reason that the FFI stockholders would be able to receive such a premium was that that total anticipated 2001 tax liability would not be paid. In other words, Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser knew, as did Mr. Thrapp, that if and only if FFI's total anticipated 2001 tax liability was not paid would the FFI stockholders receive the so-called premium.[34]

---

[34]The respective amounts of the Federal income tax liability and the State income tax liability of FFI for its taxable year 2001 that were attributable to the FFI 2001 asset sales were estimated to be $794,949.13 and $231,151.56, respectively. As discussed below, under the SPRA, the stockholders of FFI were to retain as of the closing of the transactions under the SPRA, through their respective ownership interests in FFW that FFI was to distribute to them in the so-called redemption transaction under the SPRA, the right to a refund of the FFI Federal 2001 income tax payments of $628,592. FFI, as FFIA's designee, was to retain as of the closing of the transactions under the SPRA the right to a refund of the FFI State 2001 income tax payments of $157,700. Because of those antici-pated refunds of those respective income tax payments, Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser knew that none of FFI's total anticipated 2001 tax liability of $1,026,100.69 would be paid, thereby enabling them to receive a substantially greater amount, a so-called premium, from the transactions MidCoast proposed to them than they would receive from the liquidation of FFI after FFI's total anticipated 2001 tax liability of $1,026,100.69 was paid in full.

[*39] Immediately before the closing of the SPRA on December 20, 2001, FFI had the following assets and liabilities[35]

| Assets | Value |
|---|---|
| Membership interest in FFW[1] | $1,920,556.36 |
| Cash | 875,855.49 |
| Right to refund of FFI State 2001 income tax payments | 157,700.00 |
| Asset total | 2,954,111.85 |

| Liabilities | Value |
|---|---|
| Liabilities held by FFW | $122,638.20 |
| Anticipated Federal 2001 income tax liability | 794,949.13 |
| Anticipated 2001 State income tax liability | 231,151.56 |
| Liabilities Total | 1,148,738.89 |
| Excess of assets over liabilities | 1,805,372.96 |

[1]FFW held the right to a refund of the FFI Federal 2001 income tax payments totaling $628,592.

The SPRA provided in pertinent part:

This Share Purchase and Redemption Agreement ("Agreement") is made and entered into on December 20, 2001, by and among FFI Acquisition, LLC, an Indiana limited liability company ("Purchaser"), ffi Corporation (formerly Farm Fans, Inc.), an Indiana corporation (the "Company") and Curtis D. Fankhauser, Cynthia A. Fankhauser, and Thomas L. Weintraut, the shareholders of the Company (each a "Seller," and collectively the "Sellers").

---

[35]The assets and the liabilities shown assume that the transactions to which the parties to the SPRA agreed were to occur.

WHEREAS, the Sellers own all of the issued and outstanding common shares of the Company (the "Common Shares");

WHEREAS, the Company has previously sold substantially all of the assets of the Company pursuant to those certain documents, instruments and agreements dated primarily as of January 2, 2001, and October 12, 2001 by and between the Company and The GSI Group, Inc. (the "Asset Purchaser") and 5900 Elmwood Avenue, LLC and its predecessors and assigns (the "Real Estate Purchaser") (all of the documents, instruments and agreements entered into by the parties in connection with these transactions are listed on Schedule 1.0 and are hereinafter collectively referred to as the "Asset Purchase Agreements"); and

WHEREAS, the Company contributed cash and certain non-cash assets to FFW Holdings, LLC, a newly formed Indiana limited liability company ("Newco, LLC"), and FFW Holdings, LLC assumed only certain specific liabilities of the Company (the "Assumed Liabilities") pursuant to a Contribution Agreement dated December 19, 2001 (the "Contribution Agreement"), in exchange for all of the membership interests of Newco, LLC; and

\*          \*          \*          \*          \*          \*          \*

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made and in further consideration of the representations, warranties and covenants contained herein, the parties agree as follows:

## ARTICLE I.

## PURCHASE AND SALE OF SHARES

Section 1.1.  **Sale and Purchase of Shares.**

(a)     At the Closing [which is deemed effective at 11:59 p.m. on December 20, 2001], subject to the terms

and conditions of this Agreement, the Company shall purchase the Redemption Shares from Sellers and the Sellers shall sell, assign and deliver the Redemption Shares to the Company, free and clear of all liens, claims, encumbrances, security interests and similar interests of any kind or nature whatsoever (the "Redemption").

(b) At the Closing, subject to the terms and conditions of this Agreement, the Purchaser shall purchase the Purchase Shares from Sellers, and the Sellers shall sell, assign and deliver the Purchase Shares to the Purchaser, free and clear of all liens, claims, encumbrances, security interests and other interests of any kind or nature whatsoever.

The number of Shares being purchased by the Company, and the number of Shares being purchased by the Purchaser shall be as set forth on Schedule 1.1.

Section 1.2. **Purchase Price.** The aggregate purchase price for the Shares (the "Purchase Price") shall be equal to the sum of the Redemption Value plus the Purchase Payment, and shall be paid by the Company with respect to its purchase of the Redemption Shares, and by the Purchaser with respect to its purchase of the Purchase Shares, as follows:

(a) At the Closing, the Company shall deliver to Sellers all of the membership interests of Newco, LLC (the "Redemption Payment," or the "Redemption Value"). The assets and liabilities of Newco, LLC at that time shall consist solely of those listed on Schedule 1.2(a).

(b) At the Closing, the Purchaser shall deliver to the Sellers in cash via wire transfer of immediately

**[*42]**     available funds an amount equal to $530,766.15[36] in proportion to their ownership interests of the Company (the "Purchase Payment").[37]

Section 1.3.  **Closing.**  The purchase and sale of the Shares pursuant to this Agreement (the "Closing") shall take place at the offices of Ice Miller, One American Square, Indianapolis, Indiana at 9:00 a.m. on December 20, 2001, or at such other time and place as the Sellers and the Purchaser mutually agree (which date is designated the "Closing Date").  For purposes of this Agreement, the Closing shall be deemed effective as of 11:59 p.m. on the Closing Date (the "Effective Time").

## ARTICLE II.

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

As an inducement to enter into this Agreement, the Sellers hereby jointly and severally represent and warrant to the Purchaser as follows:

\*          \*          \*          \*          \*          \*          \*

Section 2.10.  **Retained Assets.**  Immediately following the Closing hereunder, the Company's assets will consist only of (i) cash in an amount not less than $875,855.49, (ii) $11,955.46 which shall be in the bank account #0099990437 with Fifth Third Bank to satisfy

---

[36]The amount of the "Purchase Payment" in the SPRA was the amount of the "Stock Purchase Price" shown in the December 18, 2001 balance sheet.

[37]As discussed below, although the FFI stockholders were deemed to have been paid for their respective stockholdings in FFI "in cash via wire transfer of immediately available funds", their respective portions of the so-called purchase payment for those holdings were placed into an escrow account and were not in fact distributed to them by wire transfer until December 21, 2001, the day after the closing.

**[\*43]** outstanding checks (the "Bank Account") and (iii) a right to receive a refund of $152,000 from the State of Indiana, and $5,700 from other states, for 2001 income taxes which were prepaid in 2001 (the "State Tax Refund"), which shall be free and clear of all liens, claims and encumbrances of any nature whatsoever.[38]

\*        \*        \*        \*        \*        \*        \*

Section 2.13.   **Tax and Other Returns and Reports.**   All federal, state, local and foreign tax returns, reports, statements and other similar filings required to be filed by the Company or any Subsidiary including, without limitation, the federal and state income tax returns for the Company's and each Subsidiary's fiscal year ended December 31, 2000, (collectively the "Tax Returns") with respect to any federal, state, local or foreign taxes, assessments, interest, penalties, deficiencies, fees and other governmental charges or imposition, (including, without limitation, all income tax, unemployment compensation, social security, payroll, sales and use , excise, privilege, property, ad valorem, franchise, license, school and any other tax or similar governmental charge or imposition under the laws of the United States or any state or municipal or political subdivision thereof or any foreign country or political subdivision thereof) (the "Taxes"), have been filed with the appropriate governmental agencies in all jurisdictions in which such Tax Returns are required to be filed, and all such Tax Returns properly reflect the liabilities of the Company and each Subsidiary for Taxes for the periods, property or events covered thereby.  All Taxes accrued since the end of the last tax period or from the date which Tax Returns were last filed, including, without limitation, those arising from the operations of the Company or any Subsidiary up to the Closing, have been accurately and properly determined and are set forth on Schedule 2.13 hereof ("Current Taxes").  All Taxes, including, without limitation, the

---

[38]The assets described in section 2.10 of the SPRA are the assets that were shown in the December 18, 2001 balance sheet (except for FFI's bank account balance of $11,955.46 and FFI's outstanding checks of $11,955.46, see supra note 28).

[*44] Current Taxes and those Taxes which are called for by the Tax Returns, have been or will be paid on or before the Closing Date, other than the Deferred Tax Liability.  The Company and each Subsidiary has made all deposits required by law to be made with respect to employees' withholding and other employment taxes, including, without limitation, the portion of such deposits relating to taxes imposed upon it.  Neither the Company nor any Subsidiary has received any notice of assessment or proposed assessment in connection with any Tax Returns, and there are not pending any tax examinations of or tax claims asserted against the Company or any Subsidiary or any of their assets or properties.  Neither the Company nor any Subsidiary has extended, or waived the application of, any statute of limitations of any jurisdiction regarding the assessment or collection of any Taxes.  There are no tax liens (other than any lien for current taxes not yet due and payable set forth on Schedule 2.13 hereof) on any of the assets or properties of the Company or any Subsidiary.  There is no basis for any additional assessment of any Taxes.  The Company has not filed any returns or other documents with the IRS indicating that the Company would be dissolved or was dissolved or that it would discontinuing business operations, except that the Company has filed a Form 966 with the Internal Revenue Service.

\*          \*          \*          \*          \*          \*          \*

## ARTICLE III.

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to each of the Sellers as follows:

Section 3.1.  **Authorization of Purchaser.**  When executed and delivered by the Purchaser, this Agreement will constitute the valid and legally binding obligation of the Purchaser enforceable against the Purchaser in accordance with its terms.

**[*45]**     Section 3.2.   **Corporate Status of Purchaser.**   Purchaser is duly organized and validly existing under the laws of the State of Florida.  Purchaser has all requisite legal and corporate power and authority to own, lease and operate its properties and assets and to carry on its business as now conducted and as proposed to be conducted, and has all requisite legal and corporate power and authority to enter into and execute this Agreement and the documents and instruments related hereto.

Section 3.3.   **Consents.**   Purchaser is not required to obtain any permit, consent, approval, order or authorization from, and is not required to make any registration, qualification, designation, declaration or filing with, any federal or state governmental authority or third party in connection with the execution, delivery or performance of this Agreement or the consummation of the transaction contemplated hereby.

Section 3.4.   **Authorization.**   All actions on the part of Purchaser necessary for the authorization, execution, delivery and performance of this Agreement, and the consummation of the transactions contemplated hereby and thereby, has been taken prior to the Closing.  This agreement has been duly executed and delivered by Purchaser and constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms and conditions.

Section 3.5.   **Noncontravention.**  The execution, delivery and performance of this Agreement by Purchaser does not and will not, in any Material Respect, violate, conflict with or result in the breach of any term, condition or provision of, or require the consent of any other person under: (a) any existing law, ordinance, or governmental rule or regulation to which Purchaser is subject; (b) any judgment, order, writ, injunction, decree or award of any court, arbitrator or governmental or regulatory official, body or authority which is applicable to Purchaser; (c) the charter documents of Purchaser, or any securities issued by Purchaser; or (d) any mortgage, indenture, agreement, contract, commitment, lease, plan, authorization, or other

instrument, document or understanding, oral or written, to which Purchaser is a party, by which Purchaser may have rights or by which any of the assets of Purchaser may be bound or affected, or give any party with rights thereunder the right to terminate, modify, accelerate or otherwise change the existing rights or obligations Purchaser thereunder.

Section 3.6.  **Disclosure.**  Purchaser has not omitted to state to the Sellers any material fact relating to Purchaser which is necessary in order to make the representations or warranties of Purchaser contained in this <u>Article III</u> not misleading or which if disclosed would reasonably affect in any Material Respect the decision of a person considering a sale of the Shares.

## **ARTICLE IV.**

## **CONDITIONS OF PURCHASER'S OBLIGATIONS TO CLOSE**

The obligations of the Purchaser under this Agreement are subject to the fulfillment, at or before the Closing, of each of the following conditions:

\*         \*         \*         \*         \*         \*         \*

Section 4.7.  **Financial Condition and Redemption.** Immediately prior to the Closing, the Company shall possess assets consisting solely of (i) the right to receive the State Tax Refund, (ii) cash in an amount not less than $875,855.49, (iii) $11,955.46 which shall be in the Bank Account, and (iv) the membership interests of Newco, LLC, and the Company shall be subject to no Liabilities except its obligations under the Contribution Agreement.  The redemption by the Company of the Redemption Shares shall have been closed to the satisfaction of the Purchaser.

\*         \*         \*         \*         \*         \*         \*

**[\*47]**                                          **ARTICLE VI.**

**COVENANTS**

     To the extent applicable, Sellers, Purchaser and the Company further covenant and agree as follows:

\*      \*      \*      \*      \*      \*      \*

     Section 6.3.  **Full Access.**  Following the Closing, to the extent necessary, the Sellers will permit representatives of the Purchaser to have full access at all reasonable times to the books, records (including tax records), contracts and documents of or pertaining to the Company, any Subsidiary, or the Shares.  To the extent the Purchaser takes possession at Closing of any of the books or records of the Company or any Subsidiary, the Purchaser shall provide the Sellers, to the extent necessary, access at all reasonable times to such books and records.  Sellers will use their reasonable best efforts to permit Purchaser or its representatives to have access to the books and records of the Company that were transferred to the Asset Purchaser and the Real Estate Purchaser upon request.

\*      \*      \*      \*      \*      \*      \*

     Section 6.7.  **Survival of Representations and Warranties and Indemnification Obligations.**

     (a)    The parties agree that the representations and warranties of the Sellers under this agreement or in any certificate, schedule, statement, document or installment furnished hereunder, and the indemnification obligations of the Sellers under this Agreement as more particularly set forth in Article IX hereof, shall survive for a period of two (2) years after the Closing Date, except that the representations, warranties and obligations, and related indemnification obligations for breach or nonperformance thereof, with respect to Taxes and Tax Returns

**[*48]**   shall survive subject only to the applicable statute of limitations periods, if any, and except that the Sellers' obligation to indemnify, defend and hold harmless the Purchaser, any Subsidiary, and the Company under this Agreement with respect to claims against the Company arising under the Asset Purchase Agreements shall survive for as long as the Company has any obligation to (i) indemnify, defend or hold harmless (or is otherwise determined to be liable to) any party under any of the Asset Purchase Agreements arising under such agreement, or (ii) preform any covenant or obligation under any Asset Purchase Agreement.  Additionally, the two (2) year survival period shall not apply to Liabilities arising out of Newco, LLC's failure to satisfy the Liabilities it specifically assumes under the Contribution Agreement.

(b)     The parties agree that the representations and warranties of the Purchaser under this Agreement or in any certificate, schedule, statement, document or instrument furnished hereunder and the indemnification obligations of the Purchaser under this Agreement as more particularly set forth in <u>Article IX</u> hereof shall survive for a period of two (2) years after the Closing Date.

\*          \*          \*          \*          \*          \*          \*

Section 6.10.   **Taxes and Tax Filings**.  The Sellers agree, at their sole cost and expense, to prepare, or cause to be prepared, all tax returns, other that the state and federal income tax for the fiscal year ending December 31, 2001, (the "Sellers Tax Returns") that are due to be filed after the Closing Date and that relate to any and all required taxable activities of the Company or any Subsidiary through and including the Closing Date, and shall file all returns and pay all taxes in connection therewith.  On or before the tenth (10th) business day before their due date, Sellers will submit to the Company copies of all such Seller[s] Tax Returns.  In addition to the preparation of the

**[*49]** Sellers' Tax Returns, Sellers shall also prepare and submit to the Company all Forms W2 and 1099 for the Company's employees' and independent contractors during the period of Sellers' ownership of the Company.  The Company shall assist the Sellers in this process if required.  The Sellers agree to assist the Company, upon its request, in the preparation and filing of all future Tax Returns and in the application for and procuring of all Tax refunds and agree[] to provide all documents required by the Company in order to verify or substantiate the information in any Tax Return or application for a Tax refund.  The Purchaser shall cause the Company to prepare and file the state and federal income tax returns for the fiscal year ending December 31, 2001.  The Company shall report on its federal and state income tax returns all gains attributable to the receipt of the proceeds from the Asset Purchaser and Real Estate Purchaser pursuant to the allocation required by the Asset Purchase Agreements, and shall pay the applicable tax authorities the Deferred Tax Liability, if any, resulting from such gain in light of the other post-closing activities of the Company.  The Sellers and Newco, LLC, jointly and severally, (i) agree to repay to the Company an amount equal to the difference between $157,700 and the actual amount of the State Tax Refund actually received by the Company, if any, and (ii) provided that the Company files its request for the State Tax Refund on or before January 31, 2002, shall repay an amount equal to the full amount of the State Tax Refund to the Company if it is not received within one hundred twenty (120) days of the filing of the application for refund; provided that neither Sellers nor Newco, LLC shall have any liability to pay such a deficiency or refund if (y) it results from an act or omission of the Company after the Closing, or (z) the Company fails to completely satisfy the Deferred Tax Liability, if any, resulting from such gain in light of the other post-closing activities of the Company.  Additionally, if the Company has not received the State Tax Refund within ninety (90) days of filing the application for refund, the Company shall notify the Sellers and shall allow the Sellers to pursue the State Tax Refund on its behalf and shall give Sellers all commercially reasonable assistance in its efforts to collect such refund[.]

[*50] *       *       *       *       *       *       *

# ARTICLE VII.

# EVENTS AT CLOSING.

Section 7.1.   **Simultaneous Occurrence of Events at Closing.**   All of the events which are to occur at the Closing under this Agreement, including but not limited to, the delivery of the Share certificates and the payment of the Purchase Price and all other related exchanges shall be deemed to have occurred simultaneously.

Section 7.2.   **Documents to be Delivered by the Sellers.** At the Closing, the Sellers shall deliver to the Purchasers and/or the Company as applicable:

(a)   The certificates for the Shares with a stock power duly executed in blank for each certificate;

(b)   The certificate of the Sellers specified in Section 4.6;

(c)   The resignations of the Sellers and the other officers, employees, agents, and directors of the Company specified in Section 6.1;

(d)   Any Business Records requested by the Purchaser under Section 6.9;

(e)   Any documents or certificates necessary to convey control over each and every checking, savings, and other operations accounts of the Company to the Purchaser, including, without limitation, signature cards;

**[\*51]**     (f)     The Articles of Incorporation and By-Laws of the Company certified by the Secretary of the Company; and

(g)     A release, in form satisfactory to the Purchaser in its sole discretion, of all claims, liabilities, obligations, loss, damage or responsibility that any of the Sellers or Newco, LLC may have against the Company, including, without limitation, any claims, liabilities or obligations for indemnification, contribution or otherwise, but specifically excluding any claims, liabilities or obligations arising out of this Agreement or the transactions described herein, and any rights the Sellers have to enforce the terms, conditions or obligations of the Asset Purchase Agreements against the Asset Purchaser and the Real Estate Purchaser.

Section 7.3.     **Documents to be Delivered by the Purchaser.** At the Closing, the Purchaser shall deliver to the Sellers:

(a)     The Purchase Payment owed to each Seller or their nominee;

(b)     The certificate of the executive officer of Purchaser as specified in Section 5.3;

(c)     Certified resolutions of the Purchaser authorizing the transactions contemplated by this Agreement;

(d)     An incumbency certificate identifying the executive officers of Purchaser;

(e)     The Articles of Organization and Operating Agreement of Purchaser certified by the Secretary of Purchaser within sixty (60) days of the Closing;

(f)    The Stock Pledge Agreement executed by Purchaser; and

(g)    The Guaranty executed by MidCoast Credit Corp.

Section 7.4.  **Documents to be Delivered by the Company.** At the Closing, the Company shall deliver to the Purchasers and the Sellers:

(a)    The Redemption Payment to Sellers;

(b)    Certified resolutions of the Company authorizing the transactions contemplated by this Agreement; and

(c)    An incumbency certificate identifying the executive officers of the Company;

(d)    The professional fees of the Sellers up to $20,000; and

(e)    A Certificate of Existence from the Indiana Secretary of State.

\*      \*      \*      \*      \*      \*      \*

# ARTICLE IX.

# INDEMNIFICATIONS.

\*      \*      \*      \*      \*      \*      \*

Section 9.2.  **Indemnification Obligation of the Purchaser.** After the Closing, the Purchaser will reimburse, indemnify, defend and hold harmless Sellers and their heirs, legal representatives, successors or assigns (an "Indemnified Seller Party") against and in respect of any and all Indemnified Claims incurred or suffered by any

[*53] Indemnified Seller Party, as to which a Claim Notice is given in accordance with Section 9.3 within the applicable time period specified in Section 6.7, and that results from, relates to or arises out of, (i) any misrepresentation, breach of warranty or nonfulfillment of any agreement or covenant on the part of the Purchaser under this Agreement, (ii) any misrepresentation in or omission from any certificate, schedule, written statement, document or instrument furnished to the Sellers by Purchaser[] pursuant hereto, (iii) a liability or obligation first arising subsequent to the Closing out of Purchaser's operation of the Company or conduct of the Company's business from and after the Closing, and (iv) any costs and expenses, including reasonable attorney[s'] fees and expenses incurred in connection with the enforcement of this indemnification.

\*        \*        \*        \*        \*        \*        \*

## ARTICLE X.

## MISCELLANEOUS.

Section 10.1.   **Expenses.**  Except for the $20,000 in professional fees of the Sellers (the "Professional Fees"), whether or not the transactions contemplated by this Agreement are consummated, the Sellers, for themselves and the Company, shall pay the Sellers' and the Company's fees and expenses incurred in connection with the negotiation, preparation and the consummation of all transactions contemplated by this Agreement, including, without limitation, all attorneys', accountants' and financing fees, and the Purchases likewise shall pay its own fees and expenses.  In the event that the transaction contemplated by this Agreement does not close for any reason (even as a result of a breach), the Seller shall not be entitled to have the Professional Fees paid by Purchaser.

\*        \*        \*        \*        \*        \*        \*

Section 10.3.   **Agreement is Entire Contract.**   This Agreement and the other documents delivered pursuant hereto (including,

[*54] without limitation, the Schedules and Exhibits attached hereto) constitute the entire contract between the parties hereto relating to the subject matter hereof, and no party shall be liable or bound to the other in any manner by any warranties, representations or covenants except as specifically set forth herein and therein. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective heirs, legal representatives, successors and assigns, of the parties here to, nothing in this Agreement, expressed or implied, is intended to confer upon any party, other than the parties here to and their respective heirs, legal representatives, successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided herein.

Mr. Thrapp, who principally negotiated the terms in the SPRA of the covenants, the representations, the warranties, and the indemnification obligations of FFIA in the event of any breaches of any of those covenants, representations, and warranties, believed that those obligations of FFIA were adequate for the transactions to which FFIA, FFI, and the FFI stockholders agreed in the SPRA. He held that belief even though FFIA was organized a few days before the closing of the transactions in the SPRA and even though it had no assets at that time or after that closing except for the stock of FFI.

On December 20, 2001, FFIA, FFI, the FFI stockholders, and Leagre Chandler & Millard, LLP (Leagre), entered into an escrow agreement (SPRA escrow agreement) in which Leagre was designated as escrow agent for the other parties to that agreement and was to establish and maintain an escrow account

[*55] (Leagre escrow account). Under the terms of that agreement, an unnamed investor agreed to provide certain funds as a "loan" to FFIA (Shapiro funds) that FFIA was to use to acquire the stock of FFI that FFIA had agreed to purchase in the SPRA. All the funds to be deposited under the terms of that escrow agreement were to be deposited into the Leagre escrow account. The SPRA escrow agreement provided in pertinent part:

> This Escrow Agreement (the "Agreement") is made and entered into this 20th day of December 2001, by and between ffi corporation, an Indiana corporation ("ffi corporation"), FFI Acquisition, LLC, an Indiana limited liability company ("FFI Acquisition"), Curtis D. Fankhauser, Cynthia A. Fankhauser, and Thomas L. Weintraut, all of which (sic) are Indiana residents and shareholders of ffi corporation (collectively, the "Shareholders") and Leagre Chandler & Millard LLP, as escrow agent (the "Escrow Agent").

> ### WITNESSETH

> WHEREAS, the Shareholders and ffi corporation have entered into a certain Share Purchase and Redemption Agreement [SPRA] with FFI Acquisition, LLC, an Indiana limited liability company ("FFI Acquisition") dated December 20, 2001 (the "Share Purchase Agreement"), whereby FFI Acquisition will purchase all of the outstanding common shares of ffi corporation from the Shareholders which are outstanding after the Redemption (as defined in the Share Purchase Agreement) (the "Shares") in consideration of approximately $530,766.15, as adjusted pursuant to the Share Purchase Agreement (the "Share Purchase Price");

> WHEREAS, a certain investor related to FFI Acquisition (the "Investor") [Ms. Shapiro] has agreed to loan monies to FFI Acquisition to be used to fund the Share Purchase Price (the "Investor

[*56] Funds"), and the Escrow Agent has agreed to act as escrow agent with respect to the Investor Funds in accordance with the terms and conditions of that certain Escrow Agreement, attached hereto as Exhibit A (the "Investor Escrow Agreement"); and

WHEREAS, ffi corporation has agreed to deposit certain monies into escrow with the Escrow Agent to satisfy the terms and conditions of the Investor Escrow Agreement and to facilitate the closing under the Share Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants of the parties set forth herein and the mutual benefits to be derived herefrom, the parties, intending to be legally bound, hereby agree as follows:

1.      Delivery of Investor Funds into Escrow.  The Investor shall cause the Investor Funds to be delivered, by wire transfer, into the Escrow Agent's trust account (the "Escrow Account") only after ffi corporation deposits the remaining cash of ffi corporation into the Escrow Account which is estimated to be $875,855.49 (the "ffi funds"), and the Escrow Agent agrees to hold and disburse the Investor Funds and the ffi Funds in accordance with the terms and conditions of this Agreement and the Investor Escrow Agreement.

2.      Delivery of Shareholder Funds.  At the Closing (as defined in the Share Purchase Agreement), the Escrow Agent shall deliver that portion of the Investor Funds to the Shareholders (in the denominations set forth on the closing statement attached hereto as Exhibit B (the "Closing Statement") [Cash Reconciliation and Disbursement Schedule of Escrow Funds by Leagre] required to satisfy the Share Purchase Price in accordance with the terms and conditions of the Share Purchase Agreement, provided all of the Shareholder's conditions precedent set forth in the Share Purchase Agreement have been satisfied and the transaction has not been otherwise terminated.

3.      Repayment of Investor Funds.  At the Closing, the Escrow Agent shall pay an amount equal to the Investor Funds to the

**[*57]**  Investor, and shall pay the balance in the Escrow Account to FFI Acquisition or its designee.

4.     Delivery Upon Failure to Close.  At anytime prior to the execution of the Closing Statement by all of the Sellers, ffi corporation may instruct the Escrow Agent to return the ffi Funds to ffi corporation or its designee, and upon receipt of such instructions, the Escrow Agent shall cause the ffi Funds to be disbursed in accordance with the instructions.

On December 20, 2001, FFIA, MidCoast, Ms. Shapiro, and Leagre entered into an escrow agreement (Shapiro escrow agreement).  According to the terms of the Shapiro escrow agreement, to which the SPRA escrow agreement referred and which was an attachment to the SPRA escrow agreement, Ms. Shapiro agreed to provide $550,000 as a "loan" to FFIA (i.e., Shapiro funds).  According to the terms of the Shapiro escrow agreement, FFIA was to use the Shapiro funds to acquire the stock of FFI that FFIA had agreed to purchase in the SPRA.  All of the funds to be deposited under the terms of the Shapiro escrow agreement were to be deposited into the same Leagre escrow account into which all of the funds to be deposited under the terms of the SPRA escrow agreement were to be deposited. The Shapiro escrow agreement provided in pertinent part:

This Escrow Agreement (the "Agreement") is made and entered into this 20th day of December, 2001, by and between FFI Acquisition, LLC, an Indiana limited liability company ("FFI Acquisition"), MidCoast Credit Corp., a New York corporation ("MCC"), MidCoast Acquisition Corp., a Florida corporation ("MAC"), Honora

[*58] Shapiro, a California resident and a shareholder of MidCoast Credit Corp. ("Shapiro"), and Leagre, Chandler & Millard, LLP, as Escrow Agent and counsel to FFI Acquisition, MCC and MAC (the "Escrow Agent"), and Matthew Dollinger, Floyd Grossman and Jessica M. Seidman, all as Attorney-in-Fact for Honora Shapiro (collectively the "Dollinger Firm").

WITNESSETH

WHEREAS, the shareholders of ffi Corporation, a[n] Indiana Corporation ("ffi"), and FFI Acquisition have entered into a Share Purchase Agreement dated as of December 20, 2001 ("Share Purchase Agreement"), whereby FFI Acquisition intends to purchase all of the issued and outstanding capital stock of ffi (the "Shares") from Curtis D. Fankhauser, Cynthia A. Fankhauser and Thomas L. Weintraut (the "ffi Shareholders") in consideration of the payment of the approximate sum of $550,000.00, as adjusted pursuant to the Share Purchase Agreement (the "Share Purchase Price");

WHEREAS, Shapiro has agreed to loan Five Hundred Fifty Thousand and 00/100 ($550.000.00) Dollars to FFI Acquisition, MCC and MAC to be used to fund the Share Purchase Price as required to be paid pursuant to the terms and conditions of the Share Purchase Agreement (the "Shapiro Funds"), and Leagre, Chandler & Millard, LLP has agreed to act as settlement agent for the transaction and as Escrow Agent with respect to the Shapiro funds in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants of the parties set forth herein and the mutual benefits to be derived here from, the parties, intending to be legally bound, hereby agree as follows:

1. **Delivery of Shapiro Funds Into Escrow.** Shapiro shall cause the Shapiro Funds to be delivered by wire transfer to the Escrow Agent's trust account (the "Escrow Account"), and the Escrow Agent agrees to hold and disburse the Shapiro Funds in accordance

with the terms and conditions of this Agreement.  The Escrow Account is maintained in the name of "Leagre, Chandler & Millard--Trust Account", with Hunting National Bank, 201 N. Illinois Street, Suite 1800, Indianapolis, Indiana 46204 (ABA No.; 044000024), with an Account Number of 01400666470.

2.    **Appointment of Attorney-In-Fact.**  Shapiro hereby appoints and designates Mathew Dollinger and/or Floyd G. Grossman, and/or Jessica M. Seidman, all residents of the State of New York ("Dollinger Firm") as her true and lawful attorney-in-fact to: (i) execute and deliver, in Shapiro's name, any and all documents, notices and/or instruments, including, without limitation, checks and/or drafts for the payment and/or distribution of the Shapiro Funds as contemplated by this Agreement and the Share Purchase Agreement, and (ii) do and preform all acts on her behalf which are necessary to effect the transaction contemplated by this Agreement and the Share Purchase Agreement, all with the same force and effect as though Shapiro was personally present, and Shapiro also hereby ratifies and confirms that Dollinger Firm shall do by virtue hereof. The power of attorney granted hereunder shall become effective when this Agreement is signed by Shapiro, and shall continue in effect for thirty (30) days from the date of the execution of this Agreement.

3.    **Delivery of Shapiro Funds.**  At the Closing (as defined in the Share Purchase Agreement), the Dollinger Firm, in their discretion, shall authorize and direct the Escrow Agent, in writing, to deliver the Shapiro funds to FFI Acquisition, MCC and MAC for delivery to the ffi Shareholders in accordance with the terms and conditions of the Share Purchase Agreement provided (i) all of the conditions precedent set forth in the Share Purchase Agreement have been satisfied to the satisfaction of the Dollinger Firm; (ii) the Transaction Settlement Statement has been executed and delivered into escrow by the parties; and (iii) the Escrow Agent has possession in escrow of sufficient funds from ffi, or other sources, and authority in escrow to immediately initiate a wire transfer of the sum of $550,000.00 to the account of Shapiro.  The Escrow Agent shall issue to the Dollinger Firm written notice via facsimile certifying and

**[\*60]** attesting that (i) the Transaction Settlement Statement has been executed and delivered by all parties and (ii) the Escrow Agent has in its possession good funds in the amount of at least $550,000.00, which have been provided by ffi into the Escrow Account, and that upon written notice via facsimile from the Dollinger Firm, the Escrow Agent will proceed to disburse moneys to the parties of the Share Purchase Agreement in accordance with the Settlement Statement and simultaneously initiate a wire transfer of the sum of $550,000.00 from the Escrow Account to the Shapiro Account (as defined below). Simultaneously with the foregoing written notice, Escrow Agent shall provide the Dollinger Firm with a copy of the fully executed Settlement Statement. Upon receipt of written authorization from the Dollinger Firm to release the Shapiro Funds, Escrow Agent hereby agrees to deliver the Shapiro Funds and the ffi Funds held in Escrow Agent's Account in accordance with the terms of this Agreement.

4. **Repayment of Shapiro Funds.** In connection with the Closing of the transaction contemplated by the Share Purchase Agreement, ffi and/or the ffi shareholders shall be directed to pay the entire cash assets of ffi into the Escrow Account, and the Escrow Agent agrees to hold and disburse an amount equal to the Shapiro Funds in accordance with terms and conditions of this Agreement. After the Cash Assets of ffi have been declared to be good funds in the Escrow Account, the Dollinger Firm, shall, pursuant to paragraph 3 above, authorize the Escrow Agent, in writing, to forward, by wire transfer, an amount equal to the Shapiro Funds, without interest, to the following: "HSBC Bank, One Old Country Road, Carle Place, New York 11514, BA No. 021-001088 for further credit to Honora Shapiro in Account No. 020-478658" (the "Shapiro Account"). Simultaneously with initiation of the wire transfer from the Escrow Account and/or the payment of the Purchase Price to the ffi Shareholders, the Escrow Agent shall enter an order with the financial institution where the Escrow Account is maintained to deliver the sum of $550,000.00 to the Shapiro Account.

[*61] On December 20, 2001, FFIA, FFI, and the FFI stockholders signed a document titled "Cash Reconciliation and Disbursement Schedule of Escrow Funds by Leagre" (cash reconciliation agreement), which also was an attachment to the SPRA escrow agreement. The cash reconciliation agreement set forth directions to Leagre, the escrow agent, regarding the manner in which it was to disburse the respective funds that were to be deposited into the Leagre escrow account pursuant to the SPRA escrow agreement and the Shapiro escrow agreement. The cash reconciliation agreement showed that FFI, Ms. Shapiro, and MidCoast were to make the following deposits into the Leagre escrow account:

| Depositor | Amount |
| --- | --- |
| FFI | $875,855.49 |
| Ms. Shapiro | 550,000.00 |
| MidCoast | 20,000.00 |
| Total | 1,445,855.49 |

The cash reconciliation agreement instructed the escrow agent, Leagre, to make the following disbursements from the Leagre escrow account to the following persons:

[*62]

| Distributee | Amount |
|-------------|--------|
| Ms. Shapiro | $550,000.00 |
| Mr. Fankhauser | 360,920.98 |
| Mr. Weintraut | 116,768.55 |
| Ms. Fankhauser | 53,076.62 |
| Ice Miller | 20,000.00 |
| FFI | 345,089.34 |
| Total | 1,445,855.49 |

On December 20, 2001, Mr. Shapiro on behalf of MidCoast and Mr. Fankhauser on behalf of FFW signed the guarantee (SPRA guarantee) that section 7.3(g) of the SPRA required. The SPRA guarantee provided in pertinent part:

> FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, and in connection with the consummation of the transactions contemplated in (i) that certain Share Purchase and Redemption Agreement by and among FFI Acquisition, LLC, an Indiana limited liability company ("Purchaser"), ffi corporation, an Indiana corporation ("FFI") and Curtis D. Fankhauser, Cynthia A. Fankhauser and Thomas Weintraut (collectively, the "Sellers") (the "Share Agreement") and (ii) that certain assignment by FFI to FFW Holdings, LLC, an Indiana limited liability company ("Holdings"), immediately prior to and as part of the transactions contemplated by the Share Agreement, of FFI's right to receive a refund of the estimated federal corporate income tax payments made by FFI for its 2001 tax year (the "Tax Refund") in the approximate amount of $636,000 (the "Assignment"), the undersigned, MidCoast Credit Corp., a Florida corporation (the "Guarantor"), guarantees the payment of the Tax Refund by FFI to Holdings within five (5) business days of the receipt by FFI of the Tax Refund,

**[*63]** as required by the terms of the Assignment. Notwithstanding any other provision of this Guaranty to the contrary, the Guarantor shall have no liability under this Guaranty unless and until payment of the Tax Refund is received by FFI.  In no event shall FFI's liability exceed the amount actually received by FFI with respect to such Tax Refund.  This Guaranty shall continue and be in full force and effect until the Tax Refund is fully paid to Holdings.  Guarantor understands and acknowledges that the Sellers were induced to enter into the Share Agreement in reliance upon this Guaranty.

*        *        *        *        *        *        *

In the event the payment of the Tax Refund by FFI to Holdings is held to constitute a preference under any bankruptcy law, or if for any other reason Holdings is required to refund such payment or pay the amount thereof to any other party, or if for any reason Holdings is required to pay, repay or refund to FFI or to any other party any value received by Holdings from any source in payment of or on account of the Tax Refund, such payment by FFI or value received by Holdings shall not constitute a release of Guarantor from any liability under this Guaranty, but Guarantor shall continue to be liable to the same extent as if such payment had not been made or such value received, and Guarantor agrees to pay such amount to Holdings upon demand and this Guaranty shall continue to be effective or shall be reinstated, as the case may be, to the extent of any such payment or value.

As agreed to and shown in the cash reconciliation agreement, on December 20, 2001, FFI, Ms. Shapiro,[39] and MidCoast made the following deposits into the Leagre escrow account:

---

[39]Pursuant to paragraph 1 of the SPRA escrow agreement, Ms. Shapiro made her deposit into the Leagre escrow account only after FFI had made its deposit into that account.

[*64]

| Depositor | Amount |
|-----------|--------|
| FFI | $875,855.49 |
| Ms. Shapiro | 550,000.00 |
| MidCoast | 20,000.00 |
| Total | 1,445,855.49 |

Before the closing of the transactions (SPR transactions) to which the parties to the SPRA agreed, Mr. Thrapp, one of petitioners' attorneys, concluded that as of that closing the Leagre escrow account contained the funds needed to effect the closing of those transactions, which included the $550,000 that he (and, as discussed below, Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser) knew Ms. Shapiro was to deposit into the Leagre escrow account on the day of the closing. Mr. Thrapp reached that conclusion even though he (and, as discussed below, Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser) knew that that $550,000 was to be returned to Ms. Shapiro as of that closing.[40] Mr. Thrapp also knew, and he advised FFI, Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser, that if FFI were not solvent as of the closing of the transactions to which they and FFIA (MidCoast's designee) had agreed in the SPRA and/or if FFI's funds, as

---

[40]Because the closing of the transactions under the SPRA was to be effective as of 11:59 p.m. on December 20, 2001, the $550,000 was in fact returned to Ms. Shapiro by wire transfer on the day after the closing, which Mr. Thrapp (and, as discussed below, Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser) knew.

[*65] opposed to so-called new money, were used in order to effect the acquisition by FFIA of the stock of FFI from the FFI stockholders, those stockholders would be subject to possible claims under the laws of the State of Indiana by the creditors of FFI. That was because those stockholders, who were so-called insiders, would have received the assets of FFI.

Each of the FFI stockholders, each of whom had signed the SPRA, the SPRA escrow agreement to which the Shapiro escrow agreement was attached, and the cash reconciliation agreement which also was attached to the SPRA escrow agreement, knew, as did Mr. Thrapp, that the so-called loan of $550,000 that Ms. Shapiro had deposited into the Leagre escrow account on December 20, 2001, before the closing of the transactions under the SPRA but only after FFI had made its required deposit into that Leagre escrow account, was not evidenced by a promissory note or other written document and did not bear interest. The FFI stockholders, as well as Mr. Thrapp, also knew that that purported loan by Ms. Shapiro was to be deemed repaid as of the closing of the transactions under the SPRA, which was deemed to occur simultaneously pursuant to that agreement.[41]

---

[41]Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser also knew, as did Mr. Thrapp, that although they were deemed to receive as of the closing of the trans-actions their respective proportionate portions of the purchase price for the transfer of their FFI stock to FFIA, the wire transfers to their respective bank

(continued...)

[*66] Moreover, each of them knew, as did Mr. Thrapp, that pursuant to the SPRA and the related agreements (i.e., the SPRA escrow agreement, the Shapiro escrow agreement, and the cash reconciliation agreement) FFI was to deposit $875,855.49 into the Leagre escrow account as of the closing of the transactions under the SPRA at 11:59 p.m. on December 20, 2001, and that FFI as FFIA's designee was to receive only $345,089.34 from that escrow account as of the closing of those transactions.[42] Each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser also knew, as did Mr. Thrapp, that the difference between the amount that FFI was to deposit into the Leagre escrow account (i.e., $875,855.49) and the amount that FFI as FFIA's designee was to receive from that escrow account (i.e., $345,089.34) was equal to $530,766.15. Each of the FFI stockholders knew, as did Mr. Thrapp, that that difference was equal to the amount of the purchase price that they were to receive for their FFI stock under the SPRA from, according to the terms of that agreement, FFIA.

---

[41](...continued)
accounts of those proportionate portions were not to occur until the day after the closing of those transactions.

[42]As was true of the respective wire transfers to Mr. Fankhauser, Mr. Weintraut, Ms. Fankhauser, and Ms. Shapiro, FFI received a wire transfer on the day after the closing.

[*67] In addition, each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser understood, as did Mr. Thrapp, that MidCoast through FFIA was purporting to purchase FFI stock from them in order to acquire FFI so that MidCoast would be able to use FFI's cash in order to buy charged-off debt securities that MidCoast intended to use in its so-called asset recovery business. However, each of the FFI stockholders knew, as did Mr. Thrapp, that MidCoast through FFIA agreed in the SPRA to pay them $530,766.15 in cash for their FFI stock and that as of the closing of the SPR transactions FFI (FFIA's designee) was to receive only $502,789.34 (i.e., cash of $345,089.34 and the right to a refund of the FFI State 2001 income tax payments of $157,700). In other words, each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser knew, as did Mr. Thrapp, that MidCoast through FFIA agreed in the SPRA to pay $530,766.15 in cash in return for only $502,789.34, which MidCoast purportedly would use in the asset recovery business that it was to operate in FFI.

Moreover, each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser knew, as did Mr. Thrapp, or should have known, as Mr. Thrapp should have known, that Ms. Shapiro's so-called loan of $550,000 to FFIA was not needed or used in order to effect the purchase of the FFI stock under the SPRA and that that so-called loan was mere window dressing designed to make it appear that FFIA,

**[*68]** not FFI, was providing the funds to be paid to them for the transfer of their FFI stock to FFIA. In other words, each of the FFI stockholders knew, as did Mr. Thrapp, or should have known, as Mr. Thrapp should have known, that Ms. Shapiro's so-called loan of $550,000 to FFIA was devoid of any economic substance-- a sham that was designed and intended to make it appear as though FFIA, not FFI, was providing the funds to be paid to the FFI stockholders for the transfer of their FFI stock to FFIA. Moreover, each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser knew, as did Mr. Thrapp, or should have known, as Mr. Thrapp should have known, that the source of the funds that they were to receive for the transfer of their FFI stock to FFIA was FFI, not FFIA. That is to say, each of the FFI stockholders, as well as Mr. Thrapp, knew, or should have known, that FFI, not FFIA, was to, and did, pay each of those stockholders each such stockholder's proportionate portion of the so-called purchase price (i.e., $530,766.15) that each was to, and did, receive under the SPRA.

As of the closing of the transactions under the SPRA on December 20, 2001, FFI had no operations, no employees engaged in operations, no income, no

[*69] operational assets, and no liabilities except FFI's total anticipated 2001 tax liability of $1,026,100.69.[43]

On December 20, 2001, in accordance with the terms of the SPRA, the followings transactions to which the parties agreed in the SPRA closed effective as of 11:59 p.m. on that date: (1) FFI distributed all of its membership interests in FFW to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser and received from them 75 percent of the outstanding stock of FFI (SPR redemption transaction),[44] and (2) Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser transferred to FFIA the remaining 25 percent of the outstanding stock of FFI that they owned and received $530,766.15 (SPR sale transaction).[45] As required by section 7.1 of the SPRA, the SPR transactions were deemed to occur simultaneously.

On December 20, 2001, Mr. Fankhauser and Mr. Weintraut resigned as officers, directors, and employees of FFI, as required by the SPRA. After their resignations, Mr. Weintraut and Mr. Fankhauser had no further involvement in any

---

[43]See supra note 34.

[44]Upon FFI's distribution to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser of all of the membership interests in FFW, they owned 68 percent, 22 percent, and 10 percent, respectively, of FFW's membership interests.

[45]The respective portions of the $530,766.15 that Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser received are set forth below.

[*70] operations or any management of FFI.[46]  Nonetheless, as discussed below, Mr. Weintraut, at Mr. Thrapp's request, prepared and sent to MidCoast on December 31, 2001, completed appropriate IRS forms requesting a refund of the FFI Federal 2001 income tax payments.

At all relevant times after the closing of the transactions under the SPRA on December 20, 2001, each of the following individuals was a director and/or an officer of FFI:

| Name | Position |
| --- | --- |
| Mr. Bernstein | Director and president |
| Ms. Sesco | Treasurer and assistant secretary |
| Ms. Parra | Secretary |
| Mr. Shapiro | Director and executive vice president |

On December 21, 2001, Leagre, as the escrow agent of the SPRA escrow agreement and the Shapiro escrow agreement and pursuant to the cash reconciliation agreement, made the following distributions from the Leagre escrow account to the persons indicated:

---

[46]Ms. Fankhauser was not at any time involved in the operations or the management of FFI.

[*71]

| Distributee | Amount |
| --- | --- |
| Ms. Shapiro | $550,000.00 |
| Mr. Fankhauser | 360,920.98 |
| Mr. Weintraut | 116,768.55 |
| Ms. Fankhauser | 53,076.62 |
| Ice Miller | 20,000.00 |
| FFI[1] | 345,089.34 |
| Total | 1,445,855.49 |

[1]The funds distributed to FFI were wired into a new account in FFI's name at SunTrust Bank (FFI's SunTrust Bank account) that FFIA and Mr. Bernstein controlled.

On December 21, 2001, Mr. Bernstein on behalf of MidCoast and FFIA and in his individual capacity signed an agreement between those two entities and himself. That agreement provided in pertinent part:

Notwithstanding the ownership of FFI Acquisition, LLC, MidCoast Credit Corp. is the financial beneficiary of the ffi Corporation transaction and ownership of ffi Corporation. MidCoast Credit Corp. shall receive all of the economic benefits of the limited liability entity.

Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser were not aware of the above-described agreement until respondent gave them a copy of it in anticipation of the trial in these cases.

[*72] On December 20, 2001, after the SPR transactions closed simultaneously at 11:59 p.m., FFI did not have any business operations and did not commence any asset recovery business operations or any asset receivable collection business operations. At no time after the closing of the SPR transactions did FFI have any business operations, including any asset recovery business operations or any asset receivable collection business operations.

On December 20, 2001, after the SPR transactions closed simultaneously at 11:59 p.m., FFI had (1) assets totaling $502,789.34, which consisted of cash of $345,089.34 and the right to a refund of $157,700 of State 2001 income tax payments, and (2) an anticipated Federal and State 2001 income tax liability and an anticipated State income tax liability totaling $1,026,100.69, or a negative net asset value of $523,311.35.[47]

On December 21, 2001, FFIA and Willow Holdings, LLC (Willow Holdings), agreed to form FFI Financial, LLC (FFI Financial), and did so on December 24, 2001. Willow Holdings' sole member was Willow Investment Trust, whose trustee was Walter E. Schmidt (Mr. Schmidt).

---

[47]See supra note 28 regarding FFI's bank account balance of $11,955.46, FFI's outstanding checks of $11,955.46, and the Prudential demutualization funds receivable of $43,926.57.

[*73] On December 26, 2001, Mr. Bernstein had $340,000 wired from FFI's SunTrust Bank account to a MidCoast account at the Bank of New York.

On a date not established by the record between December 24 and 31, 2001, FFI Financial and FFI entered into an agreement under which FFI Financial agreed to, and did, contribute U.S. Treasury bills (T-bills) to FFI, which Willow Holdings had contributed to it, which had a value of $8,000, and which Willow Holdings had represented to FFI Financial had a tax basis of $2,962,960. (We shall refer to the transactions to which FFI Financial and FFI agreed concerning the T-bills as the T-bill transaction.)

MidCoast, FFI Financial, and FFI received from Manatt, Phelps & Phillips, LLP (Manatt), a Federal income tax opinion letter dated December 28, 2001 (Manatt opinion letter) regarding the T-bill transaction, for which MidCoast paid Manatt $10,000. The Manatt opinion letter was based on certain representations that FFI Financial, FFI, and Willow Holdings were to provide in a letter (representations letter) to be sent to Manatt (discussed below). The opinion letter stated in pertinent part:

> In accordance with your request, we provide the following analysis and opinions relating to certain federal income tax conse-quences of the transaction (the "Contribution") whereby FFI Finan-cial, LLC, a Delaware limited liability company ("Parent"), contrib-uted eight Treasury Bills in the amount of $8,000 and having a

**[*74]**  stated tax basis of $2,962,960 as of the date of Contribution (the "Assets") to FFI Corporation, an Indiana corporation ("Subsidiary").

At the time of the Contribution, Parent owned all of the issued and outstanding shares of Subsidiary.  Subsidiary did not issue any shares of its stock to Parent as a result of the Contribution because (according to Parent) issuance of such shares in exchange for the Assets would have been meaningless (due to the existing ownership by Parent of 100% of Subsidiary).

For purposes of our opinion, we have examined the following documents:

1. Letter regarding ownership allocation for FFI Financial, LLC, dated December 21, 2001[.]

2. Certificate of Formation of FFI Financial, LLC, filed with the Secretary of State of Delaware dated December 21, 2001.

3. Limited Liability Company Agreement of FFI Financial, LLC, dated as of December 24, 2001.

4. Unanimous Written Consent of the Sole Member of Willow Holdings, LLC, a Delaware limited liability company, concerning FFI Financial, LLC, dated December 24, 2001.

5. Unanimous Written Consent of the Sole Member of FFI Acquisition, LLC, a Delaware limited liability company, concerning FFI Financial, LLC, dated December 24, 2001.

6. Unanimous Written Consent of the Members of FFI Financial, LLC, authorizing the Contribution, dated December 26, 2001.

7. Unanimous Written Consent of the Directors of FFI Corporation authorizing the Contribution dated December 26, 2001.

**[\*75]**          8.          Contribution and Assumption Agreement by and between FFI Financial, LLC, and FFI Corporation, dated December 26, 2001.

Our understanding of the facts related to this opinion letter is derived in part from our review of copies of the documents listed above.  We have assumed, without independent investigation, that (a) such copies constitute true, accurate and complete copies of the originals of such documents; (b) such documents reflect the valid and binding obligations of the respective parties thereto and are enforceable in accordance with their terms; (c) such documents reflect the entire agreement among the respective parties thereto with respect to the subject matters thereof; and (d) the transactions that are the subject of such documents were carried out in accordance with the terms of such documents.  If there were, are or will be material transactions in connection with the Contribution that are not described in the documents listed above or in your representation letter to us referred to below, or are not carried out as described therein, our opinions could be adversely affected.

We have also relied for purposes of this letter on facts set forth in a representation letter from Parent and Subsidiary to us of even date herewith.  Among the representations in that letter is the representation that, for federal income tax purposes, Parent's tax basis for the Treasury Bills that Parent contributed to Subsidiary was $2,962,960 immediately before the Contribution.  We have assumed, without independent investigation, the accuracy and completeness of all such representations.  If such representations at any time are not true, correct and complete, our opinions could be adversely affected.

The Internal Revenue Service takes the position that genuine non-tax business purposes must be present in the case of an asset contribution in order for a transaction to meet the requirements of Section 351 of the Internal Revenue Code of 1986, as amended (the "Code").  Both Parent and Subsidiary have represented that they have substantial non-tax business reasons for engaging in the Contribution and that they entered into the Contribution principally with a view

**[*76]** towards making an economic profit apart from tax consequences. According to Parent and Subsidiary, their non-tax business purposes were as follows: The contributed assets will strengthen the balance sheet of Subsidiary in preparation for Subsidiary entering into a new line of business. Subsidiary also will use pre-Contribution assets in its new business. The new business is that Subsidiary will purchase portfolios of credit card receivables and collect those receivables. Subsidiary's anticipated cumulative internal rate of return from realization of the receivables, assuming reinvestment of the proceeds of receivables collection, according to a pro forma cash flow statement prepared by MidCoast Credit Corp. for Subsidiary, on a discounted present value basis (using a 6% discount factor), is 312.41% over 10 years. Subsidiary will also enter into a collection and management agreement with MidCoast Credit Corp. in pursuance of this business.

Any change or inaccuracy in the facts set forth in the documents specified above or in the above-referenced representations letter could adversely affect our opinions. We have undertaken no obligation to monitor subsequent developments after the Contribution or to analyze them as they may affect the opinions set forth in this letter.

In rendering these opinions, we have examined such available documents, laws, regulations and other legal matters as we have considered necessary or appropriate for purposes of the opinions expressed herein. We have not made any independent investigation in rendering these opinions other than as described herein. We have not been requested to make any such independent investigation.

Our opinions are based upon the Code as of the date hereof, the legislative history of the Code, currently applicable regulations promulgated thereunder (including proposed regulations), published administrative positions of the Internal Revenue Service in revenue rulings and revenue procedures, and judicial decisions. Such legal authorities are all subject to change, either prospectively or retroactively. No assurance can be provided as to the effect of any such

[*77] change upon our opinions.  We have undertaken no obligation to update this letter.

The opinions set forth herein have no binding effect on the Internal Revenue Service or the courts.  No assurance can be given that, if contested, a court would agree with the opinions set forth herein.  The opinions set forth herein represent rather our best legal judgment as to the likely outcome of the issues addressed herein if such issues were litigated and all appeals exhausted.

In the case of transactions such as the Contribution, many federal, state and local income and other tax consequences arise.  We have been asked only to address the issues specifically set forth below.  No opinion is expressed regarding any other issue.

This letter is being issued solely for the benefit of FFI Corporation and for the benefit of FFI Financial, LLC, as the sole shareholder of Subsidiary as of the date of the Contribution.  It may not be relied upon by any other person without our prior written consent.

Subject to the foregoing, it is our opinion that, more likely than not:

(a)    The Contribution satisfied the requirements of Section 351 of the Code.

(b)    The tax basis for the Assets transferred from Parent to Subsidiary in the Contribution was a carryover tax basis in accordance with Section 362 of the Code.

(c)    Based on the representations made to us in the above-referenced representations letter from Parent and Subsidiary, the carryover tax basis for Subsidiary was $2,962,960 for the Treasury Bills Parent contributed to Subsidiary.

The representations letter dated December 28, 2001, which as of February

15, 2002, Mr. Schmidt had signed on behalf of Willow Holdings, but which Mr.

[*78] Bernstein had not signed on behalf of FFI Financial and FFI, stated in

pertinent part:[48]

> FFI Financial, LLC, a Delaware limited liability company ("Parent"), and FFI Corporation, an Indiana corporation ("Subsidiary"), have requested your opinion regarding certain federal income tax consequences of a transaction (the "Contribution") whereby Parent transferred eight Treasury Bills in the amount of $8,000, having a stated value of $8,000 and having a stated tax basis of $2,962,960 as of the date of the Contribution (the "Assets") to Subsidiary.

> The undersigned officer of Parent and the undersigned officer of Subsidiary have full power and authority to commit Parent and Subsidiary, respectively, to the representations contained in this letter. Willow Holdings, LLC, a Delaware limited liability company and a member of Parent ("Willow Holdings") also represents herein Parent's tax basis for the Assets immediately prior to the Contribution. The officer of Willow Holdings signing below has full power and authority to make such representation. Parent and Subsidiary understand that the conclusions in your opinion letter are dependent in part on the accuracy of this representations letter and that your opinion could be adversely affected if this representations letter is not true, complete and correct.

> Parent and Subsidiary have seen a draft of your tax opinion letter prior to issuance of this representations letter. That draft opinion letter makes specific reference to certain listed documents. Parent and Subsidiary understand that your opinion letter could be adversely affected if there were material transactions in connection with the Contribution that are not described in those listed documents or in this representations letter, or were not carried out as described therein and herein.

---

[48]The record does not establish whether Mr. Bernstein ever signed the representations letter.

**[*79]**      Parent and Subsidiary have asked you to address solely the federal income tax consequences of the Contribution that are specifically set forth in your draft tax opinion letter referred to above. Parent and Subsidiary are aware that the Contribution may involve many other tax issues and consequences under the Internal Revenue Code of 1986, as amended (the "Code"), and other tax statutes. However, Parent and Subsidiary have not asked you to consider or render an opinion regarding such other tax issues.

For purposes of your tax opinion, Parent, Subsidiary and Willow Holdings (as appropriate) represent to you, after due investigation, as follows:

1.      All factual statements in your draft tax opinion letter concerning the Contribution are true, correct and complete.

2.      Parent and Subsidiary took all proper actions to transfer from Parent to Subsidiary beneficial ownership of the Assets. Parent did not retain any beneficial ownership in the Assets it transferred to subsidiary.

3.      Both Parent and Subsidiary had substantial non-tax business reasons for engaging in the Contribution. Both Parent and Subsidiary entered into the Contribution principally with a view toward making an economic profit apart from tax consequences. The Contribution will strengthen the balance sheet of Subsidiary in preparation for Subsidiary entering into a new line of business. Subsidiary also will use pre-Contribution assets in its new business. The new business is that Subsidiary will purchase portfolios of credit card receivables and collect those receivables. Subsidiary's anticipated cumulative internal rate of return from realization of the receivables, assuming reinvestment of the proceeds of receivables collection, according to a pro forma cash flow statement prepared by MidCoast Credit Corp. for Subsidiary, on a discounted present value basis (using a 6% discount factor), is 312.41% over 10 years. Subsidiary will also enter into a collection and management agreement with MidCoast Credit Corp. in pursuance of this business.

**[\*80]**     4.     Parent and Subsidiary have treated and will treat the Contribution in a manner that is consistent with its form.

5.     At the time of the Contribution and thereafter, Parent owned 100% of the issued and outstanding shares of Subsidiary.  Due to its ownership of all of the Subsidiary stock, issuance of more Subsidiary shares to Parent in connection with the Contribution would have been meaningless.  For this reason, Subsidiary did not issue shares to Parent as a result of the Contribution.  The members of Parent formed Parent and made their contributions of assets to Parent principally for substantial business purposes.  These reasons included strengthening the capitalization of Parent so that Parent could act as a holding company for Subsidiary and have the flexibility to engage in future business opportunities in a holding company structure.

6.     No stock or securities were or will be issued by Subsidiary for services rendered to or for the benefit of Subsidiary in connection with the Contribution.  No stock or securities were or will be issued by Subsidiary for indebtedness of Subsidiary that is not evidenced by a security or for interest on indebtedness of Subsidiary which accrued on or after the beginning of the holding period of Parent for the debt.

7.     Parent neither accumulated receivables nor made any extraordinary payment of payables in anticipation of the Contribution. Subsidiary has report and will reported items which, but for the Contribution, would have resulted in income or deduction to Parent in a period subsequent to the Contribution and such items have and will constitute income or deductions to Subsidiary when received or paid by Subsidiary.

8.     The Contribution was not the result of solicitation by a promoter, broker or investment house.

9.     Subsidiary did not take the Assets subject to any debt and did not assume any debt of Parent in connection with the Contribution.

10.     There was no indebtedness between Subsidiary and Parent and there was no indebtedness created in favor of Parent as a result of the Contribution.

11.     The Contribution occurred under a plan agreed upon before the Contribution in which the rights of the parties were defined.

12.     There was no plan or intention on the part of Subsidiary to redeem or otherwise reacquire any Subsidiary stock held by Parent.

13.     Taking into account any issuance of additional shares of Subsidiary stock, any issuance of stock for services, the exercise of any Subsidiary stock rights, warrants or subscriptions, any public offering of Subsidiary stock and the sale, exchange, transfer by gift, or other disposition of any of the stock of Subsidiary held by Parent, Parent was the sole shareholder and in "control" of Subsidiary within the meaning of Section 368(c) of the Code at the time of the Contribution.  At the time of the Contribution, Parent was not under a binding obligation, and had no plan or intention, to dispose of any portion of its stock in Subsidiary following the Contribution.

14.     Subsidiary and Parent each paid their own expenses increased in connection with the Contribution.

15.     At the time of the Contribution, Subsidiary was not an "investment company" within the meaning Section 351(e) of the Code.

16.     Willow Holdings, a member of Parent, represents that, for federal income tax purposes, Parent's tax basis for the Treasury Bills that Parent contributed to Subsidiary was $2,962,960 immediately before the Contribution.

17.     You may rely on the accuracy of the representations herein for purposes of your tax opinion letter without further inquiry or independent investigation.

**[\*82]**     18.     Parent and Subsidiary hereby consent to your reference to this representations letter in your tax opinion letter.

19.     The undersigned have undertaken such investigation as the undersigned deemed necessary to ensure the accuracy of the foregoing representations.

On a date not established by the record between December 20 and 31, 2001, Mr. Thrapp asked Mr. Weintraut to prepare Form 4466, Corporation Application for Quick Refund of Overpayment of Estimated Tax (Form 4466). On December 31, 2001, Mr. Weintraut mailed to MidCoast a completed, but unsigned,[49] Form 4466, Corporation Application for Form 4466, for FFI (FFI's Form 4466). That form showed "total tax from Form 1120" of zero and an "[o]verpayment of estimated tax" of "$628,592.00". On January 4, 2002, FFI's Form 4466, which Mr. Bernstein had signed on behalf of FFI, was mailed to the IRS. At a time not established by the record, Ms. Sesco sent a note to Mr. Weintraut informing him that FFI's Form 4466 had been sent to the IRS. On January 17, 2002, the U.S. Department of the Treasury issued a check for $628,592 to FFI with respect to its taxable year 2001, which FFI endorsed to FFW.

---

[49]Mr. Weintraut did not sign FFI's Form 4466 on behalf of FFI because following his resignation on December 20, 2001, he was no longer an officer or a director of FFI.

[*83] On January 14, 2002, Form 966 that Ms. Sesco had signed on behalf of FFI was mailed to the IRS. In that form, FFI indicated that it no longer intended to liquidate as it had indicated in Form 966 that it had submitted to the IRS on October 19, 2001.

In January 2002, FFI received from the State of Indiana three checks totaling $5,756.56 that constituted refunds by that State of certain retail sales tax (retail sales tax refunds). FFI estimated the respective Federal and State income tax liabilities on those refunds, deducted 51 percent of those estimated total liabilities from the $5,756.56 of retail sales tax refunds that it had received, and sent the balance (i.e. $4,608.26), to FFW.[50]

## Tax Returns

Mr. Weintraut timely filed Form 1040, U.S. Individual Income Tax Return (Form 1040), for his taxable year 2001. Mr. Fankhauser and Ms. Fankhauser filed jointly Form 1040 for their taxable year 2001. In those respective forms, Mr.

---

[50]No one associated with FFI or with MidCoast was aware of the retail sales tax refunds totaling $5,756.56 at the time MidCoast proposed the transactions in the letter of intent and at the time of the closing of the transactions under the SPRA. As a result, those refunds had no effect on the share purchase price calculated in the December 18, 2001 balance sheet (discussed above). Consequently, for convenience, we shall not refer, except infrequently, to the State retail sales tax refunds as an asset of FFI when we discuss the transactions and the events that are relevant to the issues presented here.

[*84] Weintraut and Mr. Fankhauser and Ms. Fankhauser reported the gain that each had realized on December 20, 2001, as a result of the SPR transactions under the SPRA. Mr. Weintraut and Mr. Fankhauser and Ms. Fankhauser timely paid their respective Federal income taxes on those respective gains.

On May 13, 2002, the IRS granted FFI an extension of time until September 15, 2002, within which to file Form 1120, U.S. Corporation Income Tax Return (Form 1120), for its taxable year 2001 (2001 tax return). On September 18, 2002, respondent received FFI's 2001 tax return.

In Schedule D, Capital Gains and Losses (2001 Schedule D), attached to FFI's 2001 tax return FFI reported a "[s]ale price" of "$655,776", "[c]ost or other basis" of "$661,527", and long-term capital loss of "$5,751" with respect to a "SALE OF SECURITIES" on January 2, 2001. In the 2001 Schedule D, FFI reported a "[s]ale price" of "$8,196", "[c]ost or other basis" of "$2,962,960", and long-term capital loss of "$2,954,764" with respect to a sale of T-Bills on December 27, 2001. (We shall refer collectively to the long-term capital losses totaling $2,960,515 that FFI claimed in the 2001 Schedule D as the claimed 2001 Schedule D losses.)

In Form 4797, Sales of Business Property, attached to its 2001 tax return, FFI reported a net gain $1,478,038 (gain from the sale of business property) from

[*85] a "Sales or Exchanges of Property Used in a Trade or Business and Involuntary Conversions from Other Than Casualty or Theft".  FFI reduced the gain from the sale of business property by the claimed 2001 Schedule D losses of $2,960,515.  As a result, FFI reported a net long-term capital loss in the 2001 Schedule D of $1,482,477.  Of the portion of that capital loss that was used to offset the $1,478,038 of gain from the sale of business property, all except $5,751 (i.e., $1,472,287) was attributable to the T-bill transactions (T-bill claimed loss).

FFI also claimed in its 2001 tax return deductions of (1) $771,260 for "legal and professional" expenses, (2) $35,000 for a "management fee", and (3) $225 for a rent expense.  After taking into account those three claimed deductions and certain other deductions in its 2001 return, FFI reported in its 2001 tax return "[t]axable income" of "$1,007,345", "[t]otal tax" of "$143,003", and "tax due" of "$143,003".  FFI did not pay any part of the tax shown due in its 2001 tax return when it filed that return.  FFI filed Form 1138, Extension of Time for Payment of Taxes by a Corporation Expecting a Net Operating Loss Carryback, dated March 3, 2002, in which it indicated that it expected a net operating loss for its taxable year 2002 that would exceed the amount of its taxable income for its taxable year 2001.

**[\*86]** On September 22, 2003, the IRS received FFI's Form 1120 for its taxable year 2002 (2002 tax return). In its 2002 tax return, FFI reported negative "[t]axable income" and a net operating loss of $902,722 (2002 NOL). Of the 2002 NOL of $902,722, FFI carried back (1) $31,048 to its taxable year 1997 and (2) $871,674 to its taxable year 2001.

On September 23, 2004, the IRS received FFI's Form 1120 for its taxable year 2003 (2003 tax return). In its 2003 tax return, FFI reported negative "[t]axable income" and a net operating loss of $14,550 (2003 NOL). FFI carried back all of the 2003 NOL of $14,550 to its taxable year 2001.

### IRS Examination With Respect to FFI and Petitioners

Around July 22, 2005, respondent began an examination of FFI's taxable year 2001. Around December 2, 2005, respondent began an examination of FFI's taxable year 2002 from which $871,674 of its claimed 2002 NOL of $902,722 had been carried back to its taxable year 2001. Around July 31, 2008, respondent began an examination of FFI's taxable year 2003 from which all of its claimed 2003 NOL of $14,550 had been carried back to its taxable year 2001. FFI was represented by counsel throughout the IRS' examination of its taxable years 2001, 2002, and 2003 and the resolution of that examination (discussed below).

[*87] During the period that started in 2005 and ended in 2008, Mr. Bernstein, who was then president of FFI, executed on behalf of FFI several Forms 872-I, Consent to Extend the Time to Assess Tax As Well As Tax Attributable to Items of a Partnership, in which FFI consented to the extension to various dates of the period of assessment of FFI's Federal income tax for its taxable years 2001. The last of those forms that Mr. Bernstein executed around the end of July 2008 extended the time for assessment of that tax to December 31, 2009.

Around October 27, 2006, respondent assigned the same revenue agent who was examining FFI's taxable years 2001 and 2002 to begin a transferee liability examination with respect to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser as the stockholders of FFI before the closing of the transactions under the SPRA on December 20, 2001. Since the IRS' examination of FFI's taxable years 2001 and 2002 was still ongoing and respondent had not yet initiated an examination of FFI's taxable year 2003 from which FFI had carried a loss back to its taxable year 2001, that transferee liability examination remained inactive until the IRS had completed its examination of FFI's taxable years 2001, 2002, and 2003 and had undertaken collection efforts relating to the respective tax liabilities for those years with which, as discussed below, FFI agreed.

[*88] On May 31, 2008, the IRS opened a collection file with respect to any unpaid Federal tax liabilities of FFI and assigned the matter to one of its revenue officers.

On March 4, 2009, Mr. Bernstein executed on behalf of FFI Form 906, Closing Agreement (FFI closing agreement), in which FFI and respondent agreed to certain adjustments to FFI's Federal income tax for certain of its taxable years, including its taxable years 2001, 2002, and 2003. Pursuant to the FFI closing agreement, FFI consented to respondent's (1) allowance for its taxable year 2001 of a T-bill loss of $147,229, which was only 10 percent of the total T-bill claimed loss of $1,472,287, (2) disallowance for its taxable year 2001 of (a) rent expenses of $225, (b) professional expenses of $350,000, (c) management fee expenses of $35,000, and (d) legal and professional expenses of $10,000, (3) disallowance for its taxable year 2002 of the 2002 NOL of $902,722, and (4) disallowance for its taxable year 2003 of the 2003 NOL of $5,813. In the FFI closing agreement, FFI also consented to the imposition of an accuracy-related penalty under section 6662(a) for its taxable year 2001 that was to be calculated by multiplying one-half of the 20 percent imposed by that section (or 10 percent) by the amount of the underpayment for that taxable year that was attributable to respondent's dis-

[*89] allowance of FFI's claimed deductions of (1) professional fee expenses of $350,000, (2) management fee expenses of $35,000, and (3) $650,961 of the 2002 NOL of $902,722, $871,674 of which FFI had carried back to its taxable year 2001. As a result, FFI agreed in the FFI closing agreement to an accuracy-related penalty under section 6662(a) of $15,126. In addition, FFI consented in the FFI closing agreement to an accuracy-related penalty under section 6662(a) and (h) for its taxable year 2001 that was to be calculated by multiplying one-half of the 40 percent imposed by section 6662(h) (or 20 percent) by the amount of the under-payment for that taxable year that was attributable to respondent's disallowance of 90 percent (i.e., $1,325,058) of the total claimed T-bill loss of $1,472,287. As a result, FFI agreed in the FFI closing agreement to an accuracy-related penalty under section 6662(a) and (h) of $70,356.

On January 15, 2009,[51] Mr. Bernstein executed on behalf of FFI Form 4549, Income Tax Examination Changes (Form 4549), in which FFI consented to the assessment for, inter alia, its taxable year 2001 of a deficiency in tax of $622,265

---

[51]The parties stipulated that it was on March 15, 2009, that Mr. Bernstein executed on behalf of FFI Form 4549. That stipulation is clearly contrary to the facts that we have found are established by the record, and we shall disregard it. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989). The record establishes, and we have found, from our review of Form 4549, which Mr. Bernstein executed and which is part of the record, that he signed that form on January 15, 2009.

[*90] and an accuracy-related penalty under section 6662 totaling $85,482 (collectively, FFI's unpaid 2001 tax liability).

On June 2, 2009, Mr. Bernstein completed on behalf of FFI Form 433-B, Collection Information Statement for Businesses (Form 433-B). Form 433-B is a statement that the IRS requests a taxpayer that operates a business to complete and that shows the business's income, expenses, assets, liabilities, and certain other financial information.[52]

As part of the revenue officer's attempt to collect FFI's unpaid 2001 tax liability, he performed certain searches for any assets belonging to FFI, but he did not find any such assets.

On June 2, 2009, respondent filed a notice of Federal tax lien in Marion County, Indiana, with respect to FFI's unpaid 2001 tax liability and interest thereon as provided by law.

On January 13, 2010, respondent sent eight levies to certain banks and other companies that might have held accounts in FFI's name or that might have owed FFI money.[53] Those eight levies pertained, inter alia, to any assets of FFI that Mr.

---

[52]Form 433-B that FFI submitted to the IRS is not part of the record, and nothing in the record establishes the information that was set forth in that form.

[53]The U.S. Postal Service returned to respondent a ninth levy that respon-

(continued...)

**[*91]** Bernstein had shown in FFI's Form 433-B.  Respondent recovered no funds as a result of the eight levies.

On March 9, 2010, the revenue officer searched respondent's database for any income that had been reported as having been paid to FFI.  The revenue officer found no such income reported for any year after 2007.

On March 10, 2010, the revenue officer prepared, and on the next day his manager signed, Form 53, Report of Currently Not Collectible Taxes (Form 53), with respect to what that form described as "Cur[rently] Not Collectible Assessed Balance" totaling $1,144,684.03 for FFI's taxable years 1997 (assessment of $77,549.64), 2001 (assessment of $1,066,735.70), and 2007 (assessment of $398.69).  Form 53 showed that certain searches and sources had been checked on March 9, 2010, in order to determine whether FFI had any assets or income.

On April 2, 2010, the revenue officer prepared a memorandum known as a "Collectibility Determination Report".  (We shall sometimes refer to the IRS' collectibility determination report as the CDR.)  In the CDR, the revenue officer discussed the assessments totaling $1,144,684.03 that the IRS had made against FFI for its taxable years 1997 (assessment of $77,549.64), 2001 (assessment of

---

[53](...continued)
dent had sent because the addressee was no longer at the address that respondent had used, and respondent was unable to find a better address.

[*92] $1,066,735.70), and 2007 (assessment of $398.69). In the CDR, the revenue officer stated in pertinent part: "The assessed tax liabilities of FFI * * * have been deemed to be currently not collectible * * *. In addition to this finding, FFI was also deemed to be insolvent." The revenue officer indicated in the CDR that on October 26, 2009, certain searches relating to whether FFI owned motor vehicles, aircraft, watercraft, or real property had been performed on the Accurint database, which had information from public sources. Those searches disclosed that FFI owned none of those items except the Elmwood Avenue property. However, a subsequent review by the revenue officer of Accurint property assessment and property deeds records revealed that that property had been sold on August 31, 2001. The CDR indicated that certain additional searches had been made to determine whether FFI owned any assets or had any income, but those searches disclosed no such assets or income. The revenue officer concluded the CDR with the following statement: "All reasonable efforts and all required actions have been taken to determine that the taxes cannot be collected from FFI".

The revenue officer did not search the State of Indiana's Web site for unclaimed property or funds belonging to FFI. The IRS did not attempt to collect FFI's unpaid 2001 tax liability from any of the following individuals who was an

[*93] officer and/or director of FFI after the closing of the SPRA on December 20, 2001: Mr. Bernstein, Ms. Shapiro (or her estate), Mr. Shapiro, or Ms. Parra.

The revenue agent whom respondent assigned to conduct the transferee liability examination with respect to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser found no evidence that FFI was active in the asset recovery business after December 20, 2001.

In 2010, after the IRS had undertaken its collection efforts with respect to FFI's unpaid 2001 tax liability and concluded that that liability was currently not collectible, the IRS reactivated its transferee liability examination with respect to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser. It was at that time that Mr. Fankhauser first learned that FFI's tax liability for its taxable year 2001 had not been paid and was informed by the IRS that it was seeking to collect that unpaid liability from, inter alia, him as a transferee of FFI.

On July 14, 2011, during a so-called fast track Appeals Office conference, Mr. Fankhauser advised the Appeals Office representative at that conference that Ms. Fankhauser had recently discovered that the State of Indiana was holding in excess of $40,000 of unclaimed funds in the name of FFI. Those unclaimed funds consisted of the Prudential demutualization funds of $43,926.57 that FFI had never claimed. Thereafter, respondent levied on those funds.

[*94] On December 8, 2011, respondent timely issued respective notices of liability to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser with respect to FFI's total liability for its taxable year 2001 of $694,519.43 (FFI's 2001 tax liability). FFI's total liability consisted of a deficiency in tax of $609,037.43 and an accuracy-related penalty under section 6662 totaling $85,482, as well as interest thereon as provided by law.

Respondent denied in the respective answers in these cases that "the remaining unpaid tax deficiency of FFI that is set forth in the Notice of Liability as the amount of $609,037.43" is correct. In the answers, respondent alleged that that "remaining unpaid tax deficiency * * * is actually $578,338.43, plus I.R.C. § 6662 penalty in the amount of $85,482.00, plus applicable interest." Respondent's concession in the respective answers in these cases reflects that respondent collected from the State of Indiana the Prudential demutualization funds of $43,926.57 to which FFI had been entitled. In order to arrive at what respondent alleges in the answers is "the remaining unpaid tax deficiency of FFI", respondent reduced the deficiency in tax of $622,265 for taxable year 2001 to which Mr. Bernstein had consented on behalf of FFI in Form 4549 by the Prudential demutualization funds of $43,926.57 to which FFI had been entitled. (We shall refer to FFI's revised unpaid 2001 deficiency in tax of $578,388.43 and FFI's unpaid 2001

[*95] accuracy-related penalty of $85,482 as FFI's unpaid 2001 deficiency liability and FFI's unpaid 2001 penalty liability, respectively.)

On March 14, 2013, the office of the Indiana secretary of state administratively dissolved FFIA. On April 12, 2013, that office administratively dissolved FFI.

## OPINION

### Petitioners' Motion in Limine

Petitioners filed a motion in limine (petitioners' motion) to exclude the purported expert report and the purported expert testimony set forth in the report (purported expert report) of Scott Hakala (Mr. Hakala). After voir dire, we found Mr. Hakala qualified as an expert in financial economics and financial analysis.

We took petitioners' motion under advisement and admitted conditionally into the record Mr. Hakala's purported expert report and his other testimony at trial pending our ruling on petitioners' motion. In the purported expert report, Mr. Hakala stated in pertinent part:

> The purpose of this report is to assist the court in assessing whether the purported stock sale by the Shareholders of FFI [Mr. Weintraut, Mr. Fankhauser, and Ms. Fankhauser] to FFI Acquisition, LLC, is in substance a distribution of cash by FFI to its Shareholders. My report is being prepared in this regard for use as my direct testimony in US Tax Court. No other use is implied or intended.

**[*96]**     I have been requested by you [respondent], as part of our assignment, to address four questions.

*     *     *     *     *     *     *

1)     Did the shareholders/officers use appropriate due diligence in investigating the potential purchaser prior to entering into the transaction?  **No.**

Given the structure of the Sale Purchase and Redemption Agreement, it was highly likely (if not obvious) that the cash paid to the selling Shareholders of FFI at closing would come from the cash in the Company and the remainder of the consideration would be paid in the form of receipt of an assignment of the prepaid federal income taxes of FFI in 2001.  This is confirmed in the closing documents, particularly in Exhibit B:  FFI Acquisition, L.L.C./ffi Corporation-- Cash Reconciliation & Disbursement Schedule of Escrow Funds by Leagre Chandler & Millard L.L.P. * * *

It is customary for a seller to preform due diligence to ascertain the source and uses of funds of the purchaser prior to a sale of material assets or the company, determine the purchaser's reputation and financial resources, and to obtain certain assurances and guarantees from the purchaser that the seller will not face potential future contingent liabilities in connection with the sale.  This is done both to: (i) ensure that the purchaser has the financial capabilities and reputation to close the transaction and honor any outstanding guarantees; and (ii) to ensure the solvency of the Company for sufficient time to avoid a risk to the seller of payments and assets received by the seller being regarded as preferential payments in the event of a finding of insolvency at or near the date of the transaction.  This is especially important in potential "asset-stripping" acquisitions, such as this case, where it is likely or possible that the buyer will use or distribute some of the existing assets of the company acquired and, thus, potentially render the company insolvent at the time of the acquisition.  A seller

[*97] would want to be assured that sufficient resources would be retained within FFI or set aside th[r]ough guarantees or pledges of collateral to pay any future potential notice of deficiency amounts or taxes in dispute that might arise as a result of federal or state tax audits.  Absent such assurances, there would be a risk that the payments to the selling Shareholders of FFI would be regarded as preference payments in the event of a determination of corporate insolvency.  If FFI were found to have been insolvent or rendered insolvent, the seller could be required to return to the corporate estate a portion of or all of the cash and assets received as part of the transaction in order to satisfy the claims of creditors with greater priority.

I found no evidence of due diligence by the Shareholders and officers of FFI with respect to MidCoast Credit or the principals and affiliates of MidCoast Credit in any of the materials produced to date. By contrast, some evidence of such due diligence was observed in materials produced by Ice Miller, LLP and in certain other materials with respect to the sale of certain assets and business operations by FFI to The GSI Group, Inc. effective January 2, 2001.  Furthermore, in their recorded interviews on August 7, 2007, it was clear that no effort was made by the Shareholders of FFI to perform any such due diligence on the purchaser of FFI.  I similarly found no evidence of significant due diligence in the materials produced by counsel (Ice Miller, LLP) for the Shareholders and officers of FFI and FFI relating to this transaction.  The closing presented evidence * * * that the cash portion of the purchase price of $530,766.15 was paid from the cash balances of FFI.  Additionally, no identified plan or transaction was available to demonstrate the ability of FFI to avoid federal and state income taxes as of December 20, 2001.  Thus, the use of cash within FFI to pay the Shareholders of FFI raised a number of issues regarding the ongoing credit-worthiness and solvency of FFI in the future. These issues would ordinarily be affirmatively addressed in this type of transaction.

[*98] 2) Was it commercially reasonable for the Shareholders of FFI to believe that, after the company had significant capital gains from the liquidation of its assets, the income tax liability on that gain could be avoided by the sale of the company stock to another person or entity? **No.**

I assume in this opinion certain understandings as to the limited ability of a corporation with taxable income and capital gains to offset prior taxable income and capital gains with subsequent losses and, thus, to recover prior prepaid and paid taxes. That understanding is obtained by research and prior experience with these issue in the relevant time period. I offer no opinions as an expert on these issues

\*          \*          \*          \*          \*          \*          \*

3) Was the stock sale commercially reasonable--did it have a legitimate business purpose? **No.**

I assume in this opinion certain understandings with respect to the limited ability of a corporation to offset prior capital gains with subsequent losses and recover prior prepaid and paid taxes as set forth in my answer to question 2. I offer no opinions as an expert on these issues.

\*          \*          \*          \*          \*          \*          \*

4) Did the terms of the Share Purchase and Redemption Agreement result in the corporation's [FFI's] insolvency? **Yes**.

A post-closing estimated balance sheet for FFI is summarized in Exhibit B-3. The closing documents show a net cash balance for FFI of $345,089.34. With the assignment of the prepaid federal

[*99] corporate income taxes to the prior Shareholders of FFI, the only other asset of FFI was $157,700 in prepaid state corporate income taxes. As of December 20 and 21, 2001, FFI's estimated total federal corporate income taxes for fiscal 2001 were $794,949.13, and FFI's estimated state corporate income taxes for fiscal 2001 were $231,151.56. That represents a total estimated liability of approximately $1,026,000 for FFI's corporate income taxes in 2001. Net of cash and prior state income tax deposits, the shareholders' equity of FFI was approximately negative $523,000 as of December 21, 2001. Thus, FFI fails the balance sheet test for solvency. Additionally, with no credible evidence of successful operations and ability to avoid most of the federal and state corporate income taxes by legitimate and undisputed means, the business fails the cash flow test and capital adequacy tests.

In support of petitioners' motion, petitioners argue that the purported expert report of Mr. Hakala "(1) consists of legal conclusions, (2) contains advocacy, and (3) is unreliable."

Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

**[*100]**     (c) the testimony is the product of reliable principles and methods; and

     (d) the expert has reliably applied the principles and methods to the facts of the case.

Testimony of a proffered expert that expresses a legal conclusion does not assist the trier of fact and is not admissible. Alumax, Inc. v. Commissioner, 109 T.C. 133, 171 (1997), aff'd, 165 F.3d 822 (11th Cir. 1999); Hosp. Corp. of Am. v. Commissioner, 109 T.C. 21, 59 (1997). An expert who is merely an advocate of a party's position does not assist the trier of fact in understanding the evidence or in determining a fact in issue. Sunoco, Inc. & Subs. v. Commissioner, 118 T.C. 181, 183 (2002); Snap-Drape, Inc. v. Commissioner, 105 T.C. 16, 20 (1995), aff'd, 98 F.3d 194 (5th Cir. 1996). The determination of whether proffered expert testimony is helpful to the trier of fact is a matter within our sound discretion. See Laureys v. Commissioner, 92 T.C. 101, 127 (1989).

In support of their first argument that the purported expert report of Mr. Hakala "consists of legal conclusions," petitioners contend that Mr. Hakala's respective answers (quoted above) to the four questions in the purported expert report that respondent asked him to address are conclusions that "are all the product of legal analysis." In determining whether we agree with that contention

**[*101]** of petitioners, we consider Mr. Hakala's respective answers to those four questions.

We turn to Mr. Hakala's answer (quoted above) to the first question in the purported expert report. The question of whether the due diligence efforts of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser and their attorneys with respect to the SPR transactions were adequate is a question of fact that we shall consider in determining what Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser knew or should have known with respect to those transactions. We do not believe that Mr. Hakala's view regarding the adequacy of those due diligence efforts or his comparison of those efforts with what is "customary for a seller" in similar transactions is the result or "the product of legal analysis." We reject petitioners' argument that Mr. Hakala's answer to the first question "consists of legal conclusions" and is the "product of legal analysis."[54]

We turn next to Mr. Hakala's respective answers (quoted above) to the second question and the third question in the purported expert report. Mr. Hakala's answer to the second question regarding whether it was "commercially

---

[54]We have considered, and also reject, each of petitioners' two remaining arguments that Mr. Hakala's answer to the first question in the purported expert report should be excluded from the record because those answers represent "advocacy" and are "unreliable".

[*102] reasonable" for Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser to believe that MidCoast would be able to defer FFI's 2001 anticipated tax liability and his answer to the third question regarding whether there was a "legitimate business purpose" for the purported sale of their stock in the SPR transactions both depended on "certain understandings" that he had. Mr. Hakala described those understandings in the purported expert report as "understandings as to the limited ability of a corporation with taxable income and capital gains to offset prior taxable income and capital gains with subsequent losses and, thus, recover prior prepaid and paid taxes". According to Mr. Hakala, "[t]hat understanding is obtained by research and prior experience with these issues in the relevant time period. I offer no opinions as an expert on these issues." We agree with petitioners that Mr. Hakala's respective answers to the second question and the third question should be excluded because those answers depended on legal conclusions that in turn depended on legal analysis.[55]

We consider finally Mr. Hakala's answer (quoted above) to the fourth question in the purported expert report. The question of whether the terms of the

_____

[55]Since we agree with petitioners' first argument as to why we should exclude from the record Mr. Hakala's respective answers to the second question and the third question in the purported expert report, we did not consider their remaining two arguments as to why those respective answers should be excluded.

**[*103]** SPRA resulted in FFI's insolvency required Mr. Hakala to compare FFI's assets and liabilities after the closing of the SPR transactions with its assets and liabilities before the closing of those transactions. In making that comparison, Mr. Hakala treated the repayment of the Shaprio funds and the payment of the purchase price to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser as occurring simultaneously. Mr. Hakala's treatment of those events as occurring simultaneously did not assume, as petitioners argue, "that the [SPR] transaction will be collapsed, which is a legal conclusion." Both the SPRA and the SPRA escrow agreement required that the repayment of the Shaprio funds and the payment of the purchase price to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser occur simultaneously, and they did. We reject petitioners' argument that Mr. Hakala's answer to the fourth question "consists of legal conclusions" and is the "product of legal analysis."[56]

We shall grant petitioners' motion in that Mr. Hakala's respective answers to the second question and the third question and any materials in the purported expert report of Mr. Hakala or any testimony of Mr. Hakala at the trial in these

---

[56]We have considered, and also reject, each of petitioners' two remaining arguments that Mr. Hakala's answer to the fourth question in the purported expert report should be excluded from the record because that answer represents "advocacy" and is "unreliable".

**[*104]** cases relating to those answers are deemed stricken from the record. We shall deny petitioners' motion in that Mr. Hakala's respective answers to the first question and the fourth question and any materials in the purported expert report of Mr. Hakala or any testimony of Mr. Hakala at the trial in these cases relating to those answers are unconditionally admitted into the record.[57]

Evaluation of Witnesses

At trial, petitioners and respondent called as witnesses Mr. Weintraut, Mr. Fankhauser, Mr. Thrapp, and Mr. Hupfer. Respondent called two additional witnesses, Mr. Hakala, whose purported expert report and purported expert testimony we addressed above, and Richard Wolf (Mr. Wolf), the revenue agent who conducted the examination of FFI's taxable years 2001, 2002, and 2003 and who conducted the transferee liability examination with respect to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser. We found the respective testimonies of Mr. Weintraut, Mr. Fankhauser, and Mr. Thrapp to be in certain material respects contrary to common sense and/or incredible. We shall not rely on any such portions of their respective testimonies. See, e.g., Tokarski v. Commissioner,

---

[57]Although we have ruled on petitioners' motion, we note that, in reaching our findings and holdings herein, we did not rely on any portion of the purported expert report and testimony of Mr. Hakala that we unconditionally admitted into the record.

**[*105]** 87 T.C. 74, 77 (1986). Generally, we found the respective testimonies of Mr. Hupfer and Mr. Wolf to be credible but not material to our resolution of the issues presented.

Transferee Liability

Section 6901

Respondent bears the burden of establishing that each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser is liable under section 6901 as a transferee of property of FFI for FFI's unpaid 2001 deficiency liability and FFI's unpaid 2001 penalty liability (to the extent of the net asset value of the assets (i.e., fair market value derived by reducing value of assets of FFI by its liabilities) that each received from FFI), as well as interest thereon as provided by law.[58] See sec. 6902(a); see also Rule 142(d).

---

[58]Petitioners bear the burden of establishing that respondent erred in concluding that FFI is liable for the Federal income tax and the accuracy-related penalty under sec. 6662 for its taxable year 2001, to which FFI consented in Form 4549. See Rule 142(a), (d). Although petitioners claimed in their respective petitions that those conclusions are erroneous, they stipulated in the stipulation of facts that they do not take a position with respect to them, and they do not dispute them on brief. We conclude that petitioners have abandoned the allegations in their respective petitions that respondent erred in concluding that FFI is liable for the Federal income tax and the accuracy-related penalty under sec. 6662 for its taxable year 2001, to which FFI consented in Form 4549.

**[*106]** Section 6901 provides in pertinent part:

SEC. 6901.  TRANSFERRED ASSETS.

(a) Method of Collection.--The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred:

(1) Income, estate, and gift taxes.--

(A) Transferees.--The liability, at law or in equity, of a transferee of property--

(i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes),

\*        \*        \*        \*        \*        \*        \*

(h) Definition of Transferee.--As used in this section, the term "transferee" includes donee, heir, legatee, devisee, and distributee \* \* \*.

The Supreme Court of the United States held in Commissioner v. Stern, 357 U.S. 39, 42 (1958), that section 6901 does not create or define a substantive liability; that section merely provides a procedure by which the Government may collect from a transferee of property unpaid taxes owed by the transferor of the property.  The existence and the extent of a transferee's liability are determined under applicable State law.  See id. at 42-45; Hagaman v. Commissioner, 100 T.C. 180, 183-185 (1993).

**[*107]** <u>Feldman v. Commissioner</u>

Before considering the transferee liability issues that are presented here, we shall summarize <u>Feldman v. Commissioner</u>, 779 F.3d 448, 457, 459 (7th Cir. 2015), <u>aff'g</u> T.C. Memo. 2011-297, 2011 WL 6781006, an opinion of the U.S. Court of Appeals for the Seventh Circuit (Court of Appeals), the court in which appeal in these cases would normally lie.[59]  In <u>Feldman</u>,[60] the Court of Appeals held that the taxpayers involved there were liable under section 6901 for a certain Federal income tax liability of a C corporation, Woodside Ranch Resort, Inc. (Woodside).  In reaching that holding, the Court of Appeals first held that for purposes of section 6901 the taxpayers involved there were transferees of property of Woodside, the stock of which they had owned before they engaged in a purported sale of that stock to one of the companies owned or controlled by MidCoast Acquisition Corp. and/or MidCoast Credit Corp.[61]  <u>See</u> <u>Feldman v. Commissioner</u>,

---

[59]Because the Court of Appeals issued <u>Feldman</u> after the parties had filed their respective briefs in the instant cases, we allowed them to file supplemental briefs in order to address that opinion.

[60]Unless otherwise indicated, our references to <u>Feldman</u> are to the Court of Appeals opinion in <u>Feldman v. Commissioner</u>, 779 F.3d 448 (7th Cir. 2015), <u>aff'g</u> T.C. Memo. 2011-297, 2011 WL 6781006.

[61]Certain courts, including this Court, that have considered transferee liability under sec. 6901 have first addressed whether the taxpayer was liable under

(continued...)

[*108] 779 F.3d at 457. The Court of Appeals next turned to the applicable law of the State of Wisconsin[62] and held (1) that for purposes of that applicable State law those taxpayers were transferees of property of Woodside, see id. at 459, and (2) that those taxpayers were liable under that applicable law for Woodside's unpaid Federal income tax liability in question, see id. at 457-461.

In reaching its first holding that the taxpayers in Feldman were transferees of property of Woodside for purposes of section 6901, the Court of Appeals concluded that under the well-established Federal tax law doctrines known as the substance over form doctrine (Federal substance over form doctrine) and the economic substance doctrine (Federal economic substance doctrine) the purported sale by those taxpayers to MidCoast of their stock in Woodside should be recast or

---

[61](...continued)
applicable State law for certain unpaid taxes. See, e.g., Starnes v. Commissioner, 680 F.3d 417 (4th Cir. 2012), aff'g T.C. Memo. 2011-63. In that case, the court held that the taxpayers were not liable under applicable State law. As a result, it was irrelevant whether the taxpayers were transferees for purposes of sec. 6901.

[62]The applicable law of the State of Wisconsin in Feldman v. Commissioner, 779 F.3d at 457, regarding transferee liability was the Uniform Fraudulent Transfer Act (UFTA) in effect in Wisconsin (Wisconsin UFTA). See Wis. Stat. Ann. secs. 242.01 to 242.13 (West 2015). According to the Court of Appeals, the Wisconsin UFTA is by its terms expressly supplemented by "principles of law and equity". See Feldman v. Commissioner, 779 F.3d at 459 (quoting Wis. Stat. Ann. sec. 242.10).

[*109] recharacterized as a liquidation in which those taxpayers received cash from Woodside.  See id. at 454-457.

In reaching its second holding that the taxpayers in Feldman were transferees of property of Woodside for purposes of the applicable law of the State of Wisconsin, the Court of Appeals first rejected an argument that the Commissioner of Internal Revenue (Commissioner) had advanced regarding the role of Federal law in determining transferee status under applicable State law.  The Commissioner argued in Feldman, as respondent initially argued here, that if the Court of Appeals were to recharacterize the transaction in question in Feldman in order to ascertain transferee status for purposes of section 6901, substantive liability under State law should be determined by applying that State law to the transaction as recharacterized under Federal law.[63]  See id. at 457.  The Court of Appeals held in Feldman v. Commissioner, 779 F.3d at 457-458, that under Commissioner v. Stern, 357 U.S. 39, the existence and the extent of a transferee's liability, including the question of transferee status, are determined under applicable State

---

[63]Respondent acknowledges in respondent's supplemental brief that the Court of Appeals in Feldman v. Commissioner, 779 F.3d at 457-460, "agreed with other circuit courts to require independent determinations of transferee status under federal law and substantive liability under state law."  In respondent's supplemental brief filed in these cases after the Court of Appeals decided Feldman, respondent no longer advances that argument.

[*110] law.   Having so held, the Court of Appeals turned to an examination of the applicable law of the State of Wisconsin.

After analyzing the applicable law of Wisconsin, the Court of Appeals held that under that law (1) the purported sale by the taxpayers to MidCoast of their stock in Woodside should be recast or recharacterized as a liquidation in which those taxpayers received cash from Woodside and consequently those taxpayers were transferees of Woodside, and (2) those transferees were liable for Woodside's unpaid Federal income tax liability in question.  See id. at 457-460.

The applicable State law in the instant cases is the UFTA in effect in Indiana (Indiana UFTA), Ind. Code Ann. secs. 32-2-7-1 to 32-2-7-21 (West 2002), and not the Wisconsin UFTA that was applicable in Feldman.[64]  Nonetheless, as

_____

[64]After 2002, the Indiana UFTA was placed in another section of the Indiana Code, namely, Ind. Code Ann. secs. 32-18-2-1 to 32-18-2-21 (West 2015).  Ind. Code Ann. secs. 32-18-2-1 to 32-18-2-21 (West 2015) is virtually identical to its predecessor, Ind. Code Ann. secs. 32-2-7-1 to 32-2-7-21 (West 2002).  For convenience, we generally refer to Ind. Code Ann. secs. 32-18-2-1 to 32-18-2-21 (West 2015).

In 1984, the National Conference of Commissioners on Uniform State Laws (National Conference) approved and promulgated the Uniform Fraudulent Transfer Act that had been drafted by a committee that it had appointed to study the Uniform Fraudulent Conveyance Act (UFCA), which the National Conference had promulgated in 1918.  When promulgated in 1984, UFTA sec. 11, 7A (Part II) U.L.A. 203 (2006), provided that that act "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject

(continued...)

[*111] pertinent here and as discussed in detail below, the Indiana UFTA applicable in the instant cases and the Wisconsin UFTA applicable in Feldman are virtually identical in all material respects. As a result, we find Feldman to be instructive in resolving various questions under the Indiana UFTA that we shall consider in determining whether each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser is liable under section 6901 as a transferee of property of FFI for FFI's unpaid 2001 deficiency liability.[65] In considering the issues presented in these cases, we shall follow the order in which the Court of Appeals in Feldman addressed the issues presented to it in deciding whether the taxpayers involved

---

[64](...continued)
of this [Act] among states enacting it." The respective Indiana UFTA and Wisconsin UFTA have provisions that are virtually identical to UFTA sec. 11. See Ind. Code Ann. sec. 32-18-2-21 ("This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it."); Wis. Stat. Ann. sec. 242.11 ("This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it.").

[65]Certain unpaid additions to tax and interest as provided by law were also involved in Feldman v. Commissioner, 779 F.3d 448. However, we do not find the opinion of the Court of Appeals or the opinion of this Court to be instructive or helpful in resolving various questions that we shall consider in determining whether each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser is liable under sec. 6901 as a transferee of property of FFI for FFI's unpaid 2001 penalty liability, as well as for interest thereon as provided by law.

**[\*112]** there were liable as transferees of property of Woodside for its Federal income tax liability in question.

Transferee Status for Purposes of Section 6901

It is respondent's position that each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser is a transferee of property of FFI for purposes of section 6901 with respect to the SPR redemption transaction and the SPR sale transaction under the SPRA. In support of that position, respondent argues that in substance FFI made various distributions or transfers to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in each of those SPR transactions.[66]

With respect to the SPR redemption transaction under the SPRA, respondent argues that in form and in substance FFI made distributions or transfers of FFI's property to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in that transaction.[67] As a result, respondent maintains, each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser is a transferee of property of FFI for

---

[66]Respondent characterizes the distributions or transfers that respondent claims FFI made to its stockholders in the SPR redemption transaction and in the SPR sale transaction under the SPRA as in substance liquidating distributions or transfers. We do not use that characterization. See infra note 107.

[67]Immediately following FFI's distributions of FFW's membership interests to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser, they owned 68 percent, 22 percent, and 10 percent, respectively, of those interests.

**[*113]** purposes of section 6901 with respect to the SPR redemption transaction under the SPRA.

Petitioners do not address whether, let alone dispute that, in the SPR redemption transaction under the SPRA each of them received a distribution or transfer of property of FFI, namely, a proportionate ownership interest in FFW. Nor do petitioners address whether, let alone dispute that, each of them is a transferee of property of FFI for purposes of section 6901 with respect to that redemption transaction. Instead, as we understand petitioners' arguments with respect to the SPR redemption transaction under the SPRA, their focus is on why they believe that they are not liable as transferees under the Indiana UFTA with respect to that redemption transaction.

In the light of petitioners' failure to address whether, and to dispute that, in the SPR redemption transaction under the SPRA they received distributions or transfers of property of FFI, namely, respective proportionate ownership interests in FFW, we conclude that FFI made distributions or transfers of property to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR redemption trans-

**[\*114]** action under the SPRA and that each of them is a transferee of property of FFI for purposes of section 6901 with respect to that transaction.[68]

With respect to the SPR sale transaction under the SPRA, respondent argues that in substance FFI made additional liquidating distributions of FFI's cash to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in that transaction. As a result, respondent maintains, each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser is a transferee of property of FFI for purposes of section 6901 with respect to the SPR sale transaction under the SPRA.

Respondent also argues with respect to the SPR sale transaction that

[t]he "loan" from Shapiro [to FFIA] was a "ruse, recycling, a sham." Feldman, 2015 WL 759250, at *8. Remove the Shapiro "loan" from this transaction [SPR sale transaction] and nothing of consequence changes--the shareholders [of FFI] get paid the same amount, [$530,766.15] from the same trust [escrow] account. Id. In the same way, what remains after disregarding the Shapiro "loan" in FFI is a transfer of cash from FFI to petitioners via the trust [escrow] account. In reality, the only money that changed hands was FFI's cash.

As a result, respondent maintains, each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser is a transferee of property of FFI for purposes of section 6901 with respect to the SPR sale transaction under the SPRA.

---

[68]The record fully supports our conclusion that FFI made distributions or transfers of property to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR redemption transaction under the SPRA and that each of them is a transferee of property of FFI for purposes of sec. 6901 with respect to that transaction.

**[\*115]**    Petitioners do not address whether, let alone dispute that, in the SPR sale transaction under the SPRA in substance FFI made additional distributions or transfers of FFI's cash to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser and that consequently each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser is a transferee of property of FFI for purposes of section 6901 with respect to the SPR sale transaction under the SPRA. Instead, as we understand petitioners' arguments with respect to the SPR sale transaction under the SPRA, like their arguments with respect to the SPR redemption transaction under the SPRA, their focus is on why they believe that they are not liable as transferees under the Indiana UFTA with respect to that sale transaction.

Petitioners also do not address whether, let alone dispute that, in the SPR sale transaction under the SPRA the purported loan from Ms. Shapiro was "a sham" and that "what remains after disregarding the Shapiro 'loan' * * * is a transfer of cash from FFI to * * * [Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser] via the trust [Leagre escrow] account" and that consequently each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser is a transferee of property of FFI for purposes of section 6901 with respect to the SPR sale transaction under the SPRA. Instead, as we understand petitioners' arguments with respect to the SPR sale transaction under the SPRA, like their arguments with respect to the SPR

**[*116]** redemption transaction under the SPRA, their focus is on why they believe that they are not liable as transferees under the Indiana UFTA with respect to that sale transaction.

In the light of petitioners' failure to address whether, and to dispute that, in the SPR sale transaction under the SPRA they received distributions of cash of FFI, namely, respective proportionate portions of $530,766.15, we conclude that each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser is a transferee of property of FFI for purposes of section 6901 with respect to the SPR sale transaction under the SPRA.[69] Nonetheless, for the sake of completeness we shall consider whether each of them received a distribution or transfer of cash of FFI in the SPR sale transaction under the SPRA, namely, a proportionate portion of $530,766.15, the purchase price for the purported sale of their FFI stock to MidCoast, and whether each of them is a transferee of property of FFI for purposes of section 6901 with respect to that sale transaction.[70]

---

[69]As discussed in detail below, the record fully supports our conclusion that FFI made distributions of cash to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR sale transaction under the SPRA and that each of them is a transferee of property of FFI for purposes of sec. 6901 with respect to that transaction.

[70]We address in detail only the SPR sale transaction, and not the SPR redemption transaction, under the SPRA. That is because in form each of Mr. Fank-

(continued...)

**[*117]** Respondent contends in respondent's supplemental brief that "[p]etitioners' transaction with MidCoast is in all material respects identical to the transaction in Feldman" and that "[t]he Seventh Circuit Court of Appeals decision in Feldman strongly supports" respondent's position with respect to the SPR sale transaction under the SPRA.

Petitioners contend in their supplemental brief that "Feldman is factually distinguishable from the material facts in this case [sic]" and that "although the equities in Feldman justified the collapse of the transactions at issue there, they do not do so here". According to petitioners, "in Feldman * * * the evidence showed that taxpayer-shareholders knew or should have known that the corporation's taxes resulting from its asset sale would not be paid. In this case [sic], however, the evidence is otherwise."[71] We believe that petitioners' contentions regarding the alleged material factual differences between Feldman v. Commissioner, 779

[70](...continued)
hauser, Mr. Weintraut, and Ms. Fankhauser received property directly from FFI in the SPR redemption transaction--facts that they do not dispute.

[71]In their supplemental brief, petitioners point to other alleged differences between the respective facts in Feldman and in these cases. Most of those alleged differences appear to relate to whether the taxpayers there and here knew or should have known that the respective Federal income taxes realized from the respective sales by the respective C corporations in which the taxpayers there and here had been stockholders would not be paid.

[*118] F.3d 448, and the instant cases regarding whether they knew or should have known that FFI's "taxes from its asset sale would not be paid" are not relevant to whether they are transferees of property of FFI for purposes of section 6901 with respect to the SPR sale transaction under the SPRA. We shall, however, consider below in determining whether petitioners are liable as transferees of FFI under the Indiana UFTA with respect to the SPR sale transaction under the SPRA whether those contentions are relevant to that determination.

We turn now to the dispute between respondent and petitioners as to whether, as respondent maintains, the Court of Appeals opinion in Feldman "strongly supports" respondent's position that each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser is a transferee of property of FFI for purposes of section 6901 with respect to the SPR sale transaction under the SPRA because the material facts in Feldman, as they relate to that issue, are "identical" to the material facts in these cases. In order to resolve that dispute, we compare below certain relevant facts, including material facts, which we found there, see Feldman v. Commissioner, 2011 WL 6781006, and on which the Court of Appeals relied in

[*119] Feldman v. Commissioner, 779 F.3d at 449, and certain relevant facts, including material facts, which we have found here.[72]

In Feldman and in these cases, the stockholders of a C corporation that owned certain appreciated assets, who also were its officers or related to those officers, decided that it was time to terminate the business of the C corporation and to sell its stock or its assets. See id. at 450. There and here, the stockholders were aware that the C corporation's sale of appreciated assets would generate significant Federal and State income taxes. See id. In Feldman and in the instant cases, however, prospective buyers were interested in purchasing the C corporation's assets, not its stock. See id. at 450-451. In both instances, the stockholders agreed to sell the C corporation's operating assets. In Feldman, one buyer purchased the C corporation's assets during the year at issue there. See id. at 451. In the instant cases, different buyers purchased different assets of the C corporation at different times during the year at issue here. In Feldman, the sale of the C corporation's assets caused it to realize income that would have resulted in Federal and State income taxes totaling $750,000. See id. In the instant cases, the sales of

---

[72]We shall usually cite the Court of Appeals' opinion in Feldman v. Commissioner, 779 F.3d at 449, for our recitation of certain facts which we found and on which the Court of Appeals relied unless the Court of Appeals does not expressly restate in its opinion a fact that we discuss herein. In that event, we shall cite our opinion in Feldman v. Commissioner, 2011 WL 6781006.

**[\*120]** the C corporation's assets caused it to realize income that would have resulted in Federal and State income taxes totaling $1,026,100.69.

In Feldman, after the sale of the C corporation's assets the C corporation had ceased carrying on any active business and had no operating assets; it was "an 'empty shell' consisting of cash on hand along with a few notes and receivables." Id. at 451. In Feldman, the C corporation planned to liquidate and distribute those nonoperating assets to its stockholders. See id. at 449-450, 451. In the instant cases, after the sales of the C corporation's assets the C corporation had ceased carrying on any active business, had no operating assets (except certain oxidation technology), and had nonoperating assets consisting of cash, a note from the buyer of the Elmwood property, certain interest receivable on that note, a few other receivables, and certain real property in Minnesota.[73] In these cases, the C

---

[73]Ms. Fankhauser learned around July 2011 that the C corporation had another receivable of which no one associated with FFI or MidCoast was aware in 2001, namely, the Prudential demutualization funds receivable of $43,926.57 that FFI had never claimed and that the State of Indiana was holding in the name of FFI. None of the parties to the SPRA knew about that receivable at the time they were negotiating that agreement or at the closing of the transactions thereunder. We conclude that that receivable is not material to, and we shall not consider it, in our discussion of the issues presented. See supra note 28.

[*121] corporation not only had planned but also had taken formal corporate actions to liquidate and to distribute those nonoperating assets to its stockholders.[74]

In Feldman and in these cases, the C corporation did not, as planned, formally liquidate and distribute its assets to its stockholders. In both instances, a representative of the C corporation (in Feldman, the C corporation's accountant and financial advisor and in the instant cases, the C corporation's attorney) introduced the C corporation's stockholders to certain representatives of MidCoast because MidCoast was interested in buying the stock of the C corporation. See Feldman v. Commissioner, 779 F.3d at 451. In Feldman and in these cases, the C

---

[74]Specifically, on December 19, 2000, the FFI stockholders and the FFI directors held respective special meetings at which they approved a plan to liquidate and dissolve FFI (i.e., the December 19, 2000 plan of liquidation) in the event and only in the event that the FFI asset sale to GSI closed on January 2, 2001, as provided in the FFI asset sale agreement. On January 2, 2001, the FFI asset sale closed pursuant to the FFI asset sale agreement. Consequently, on January 2, 2001, the condition precedent to the December 19, 2000 plan of liquidation was satisfied. On October 5, 2001, the FFI stockholders voted to dissolve FFI in accordance with the December 19, 2000 plan of liquidation. On October 19, 2001, the day on which FFI sold the Elmwood property, it took certain steps in preparation for its planned liquidation and dissolution, including (1) filing articles of dissolution with the Indiana Secretary of State; (2) informing the Indiana Attorney General and the Department of Workforce Development of Indiana that it was dissolving; (3) mailing Form IT-966 to the Department of Revenue of Indiana; and (4) mailing Form 966 to the IRS. Form 966 that FFI completed and mailed to the IRS indicated that FFI's "(anticipated ) [l]ast month, day, and year of final tax year" was December 31, 2002.

[*122] corporation's stockholders were informed that MidCoast was interested in buying their stock in a way that would eliminate (in Feldman) or defer (in these cases) the Federal income tax and State income tax resulting from the sale of the C corporation's assets. In Feldman and in these cases, the MidCoast proposal would enable those stockholders to receive a greater amount, a so-called premium, from the sale of their stock of the C corporation than they would receive from the planned liquidation of the C corporation after the payment of all of the C corporation's Federal income tax and State income tax attributable to the asset sales. See id.

In Feldman and in the instant cases, MidCoast sent a letter of intent to the C corporation's stockholders in which it proposed a structure to effect the proposed purchase by it and the proposed sale by those stockholders of their stock in the C corporation. Under the proposed structure in Feldman, the C corporation was to redeem 20 percent of its stock that the C corporation's stockholders owned. In addition, those stockholders were to sell the remainder of their C corporation stock to MidCoast (or its designee) for a purchase price that was equal to the amount of the C corporation's cash as of the closing reduced by a stated percentage (70 percent) of the C corporation's anticipated Federal and State income tax liabilities attributable to the sale of its assets. See id. Under the proposed structure in these

[*123] cases, the C corporation was to redeem 75 percent of its stock that the C corporation's stockholders owned. In addition, those stockholders were to sell the remainder of their C corporation stock to MidCoast (or its designee) for a purchase price that was equal to the total amount as of the closing of the C corporation's cash and the amount of a refund of the FFI State 2001 income tax payments reduced by a stated percentage (49 percent) of the C corporation's anticipated Federal and State income tax liabilities attributable to the sales of its assets during 2001.

In Feldman and in the instant cases, the stockholders of the C corporation understood that the corporation's anticipated Federal and State income taxes would not be paid. In Feldman, although MidCoast promised to pay those Federal and State income tax liabilities, the stockholders understood that MidCoast intended to use certain bad debts and losses that it had purchased from certain credit card companies in its so-called asset recovery business in order to eliminate those tax liabilities. See Feldman v. Commissioner, 779 F.3d at 451. In the instant cases, MidCoast made a qualified promise in the SPRA to "pay the applicable tax authorities the Deferred Tax Liability, if any, resulting from such gain in light of other post-closing activities of the Company." However, in these cases MidCoast also represented, and the stockholders of the C corporation understood, that MidCoast

[*124] intended to buy and use charged off debt portfolios in its asset recovery business in order to defer the C corporation's anticipated Federal and State income tax liabilities.

In Feldman and in these cases, the stockholders of the C corporation did little or no due diligence. In Feldman, the stockholders obtained a Dunn & Bradstreet report on MidCoast and called a few references. See id. at 452. Here, petitioners themselves did no due diligence. Mr. Thrapp, one of petitioners' attorneys, read some promotional materials that MidCoast had prepared. Before the closing of the SPR transactions Mr. Thrapp concluded that as of that closing the Leagre escrow account contained the funds needed to effect the closing of those transactions, which included the $550,000 that he (and, as discussed below, Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser) knew Ms. Shapiro was to deposit into the Leagre escrow account on the day of the closing.[75] Mr. Thrapp

---

[75]All of the distributions to FFIA (or its designee, FFI), the FFI stockholders, and Ms. Shapiro that were required to implement the SPRA and the related agreements (namely, the SPRA escrow agreement, the Shapiro escrow agreement, and the cash reconciliation agreement) were deemed to be made as of the closing of the SPRA. The closing of the SPR transactions under the SPRA was to be deemed effective as of 11:59 p.m. on December 20, 2001, the date of the closing. Moreover, the SPRA provided that all of the events that were to occur at the closing under the SPRA, including but not limited to, the delivery of the FFI stock certificates and the payment of the purchase price and "all other related exchanges" were to be deemed to occur simultaneously.

[*125] reached that conclusion even though he (and, as discussed below, Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser) knew that that $550,000 was to be returned to Ms. Shapiro as of that closing.[76]

In Feldman and in the instant cases, the redemption of a portion of the C corporation's stock and the sale of the balance of that stock to MidCoast were effected in essentially the same manner. In both instances, the parties to the transactions used one escrow agent and two escrow agreements. See Feldman v. Commissioner, 779 F.3d at 452. In Feldman, the parties to the transactions involved there used a share purchase agreement and two escrow agreements. The parties to the first escrow agreement were the C corporation's stockholders, MidCoast, and the law firm of Foley & Lardner, which was the escrow agent. The parties to the second escrow agreement in Feldman were MidCoast, Ms. Shapiro (a 50-percent owner of MidCoast), her attorney, and Foley & Lardner, which was the escrow agent. See Feldman v. Commissioner, 2011 WL 6781006, at *6. In the instant cases, the parties to the SPRA transactions used a share purchase and redemption

---

[76]Because the closing of the transactions under the SPRA was deemed to occur as of 11:59 p.m. on December 20, 2001, Mr. Thrapp (and, as discussed below, Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser) knew that the distributions required by that agreement and the related agreements, including the $550,000 that was required to be returned to Ms. Shapiro, were to be made by wire transfers on the day after the closing.

[*126] agreement (SPRA) and two escrow agreements. The parties to the first escrow agreement were the C corporation's stockholders (petitioners), the C corporation, MidCoast,[77] and Leagre, which was the escrow agent. The first escrow agreement in the instant cases incorporated a second escrow agreement. The parties to that second escrow agreement were FFIA, MidCoast, Ms. Shapiro, and Leagre, which was the escrow agent.

The parties to the respective transactions (i.e., the redemption transaction and the sale transaction) in Feldman and in these cases used a newly formed limited liability company as part of those respective transactions. In Feldman, the stockholders formed a limited liability company to receive the respective proceeds of the redemption transaction and the sale transaction. See Feldman v. Commissioner, 779 F.3d at 452. The sole members of the limited liability company were the stockholders of the C corporation, whose respective percentage membership

_____

[77]In these cases, MidCoast had designated FFIA, a limited liability company, as the buyer of the C corporation (FFI) stock. FFIA was a company which Mr. Bernstein, the president of MidCoast, had organized under the laws of the State of Indiana two days before the closing of the SPR transactions under the SPRA and of which he was the sole member. The record does not establish that Mr. Bernstein contributed to FFIA the $1,000 that its operating agreement required him to contribute in return for his interest as its sole member. Nor does the record establish that FFIA had any assets as of the closing of the transactions under SPRA. The record also does not establish that after that closing FFIA had any assets other than the stock of FFI.

[*127] interests in that company were the same as their respective percentage stock ownership interests in the C corporation. See Feldman v. Commissioner, 2011 WL 6781006, at *6.

In the instant cases, the C corporation formed a limited liability company that it wholly owned to serve, inter alia, as a vehicle to transfer to its stockholders (petitioners) certain of its cash and certain of its noncash assets and all of its liabilities except its Federal and State income tax liabilities in exchange for a specified percentage of the outstanding stock of the C corporation that they owned. The C corporation contributed to the newly formed limited liability company the bulk of its assets, which consisted of certain cash, a note from the buyer of the Elmwood property, certain interest receivable on that note, a few other receivables, certain real property in Minnesota, certain oxidation technology, and the right to a refund to be claimed by the C corporation of certain Federal income tax payments totaling $628,592 (i.e., the FFI Federal 2001 income tax payments) for its taxable year 2001. In these cases, the C corporation also contributed to the limited liability company certain nontax liabilities. The net value of the assets (i.e., assets less

[*128] liabilities) that the C corporation contributed to the limited liability company was at least $1,797,918.16.[78]

In Feldman, immediately before the closing of the redemption transaction and the sale transaction the C corporation held certain cash and certain anticipated Federal and State income tax liabilities.[79] See Feldman v. Commissioner, 779 F.3d at 452. In these cases, immediately before the closing of the SPR transactions the C corporation held all of the membership interests in the limited liability company to which, as discussed above, it had contributed most of its assets (including the right to a refund of the FFI 2001 income tax payments), certain cash, and the right to a refund of State income tax payments (i.e., the State 2001 income tax payments) that it had made for its taxable year 2001[80] and had certain anticipated

---

[78]The record does not establish a value for the real estate in Minnesota or a value for the oxidation technology that FFI contributed to FFW in anticipation of the closing of the transactions under the SPRA.

[79]As stated previously, in Feldman v. Commissioner, 779 F.3d at 451, the total amount of the Federal and State income tax liabilities of the C corporation was estimated to be $750,000.

[80]In these cases, the C corporation also held $11,955.46 in a bank account that offset a liability in the same amount consisting of outstanding checks. See supra note 28.

[*129] Federal and State income tax liabilities.[81] In addition, in <u>Feldman</u> and in these cases, immediately before the closing of the respective transactions there and here the C corporation had no operations, no employees engaged in operations, no income, no operational assets (except certain oxidation technology in these cases), and no liabilities except the anticipated Federal and State income tax liabilities. See <u>id.</u>

In <u>Feldman</u> and in the instant cases, the redemption transaction as well as the sale transaction took place. <u>See id.</u> There and here, virtually identical steps were taken in quick succession in order to effect the closing of the redemption of a portion of the C corporation stock and the purported sale to MidCoast by the C corporation's stockholders of the remaining portion of the C corporation stock that they owned.

In <u>Feldman</u>, the C corporation redeemed from its stockholders 20 percent of its outstanding stock and transferred the proceeds from that redemption (i.e., $293,728) to the limited liability company in which those stockholders owned the

---

[81]In these cases, the total amount of the anticipated Federal and State income tax liabilities remaining in the C corporation was estimated to be $1,026,100.69, which consisted of the anticipated FFI Federal and State 2001 income tax liabilities of $794,949.13 and $231,151.56, respectively.

[*130] membership interests.[82]  See Feldman v. Commissioner, 2011 WL 6781006, at *6. The parties to the transactions in Feldman then signed on the same date (closing date) the stock purchase agreement and the two escrow agreements involved there.  At 12:09 p.m. on that date, the C corporation deposited its cash reserves of $1.83 million into the escrow agent's trust account.  At 1:34 p.m. on the closing date, Ms. Shapiro deposited $1.4 million into the same trust account purportedly as a loan to MidCoast to fund the stock purchase transaction.[83]  At 3:35 p.m. on the closing date, $1,344,451, the purchase price for the C corporation stock that the C corporation stockholders agreed in the stock purchase agreement to sell to MidCoast, was wired from the escrow agent's trust account to the limited liability company as payment to them for that sale.  One minute later at 3:36 p.m. on the closing date, $1.4 million was returned to Ms. Shapiro from that trust account as repayment of the loan that she had purportedly made to MidCoast.  See Feldman v. Commissioner, 779 F.3d at 452.  The day after the date of the redemption transaction and the closing of the sale transaction, $452,728.84 was

---

[82]In Feldman, the share purchase agreement between the stockholders of the C corporation and MidCoast was executed immediately after the redemption transaction took place.  See Feldman v. Commissioner, 779 F.3d at 452.

[83]In Feldman, there was no promissory note or other writing evidencing Ms. Shapiro's purported loan, and it did not bear interest.  See Feldman v. Commissioner, 779 F.3d at 456.

[*131] withdrawn from the escrow trust account and deposited into a newly created bank account of the C corporation that MidCoast, the C corporation's new owner, controlled.  See id.

In these cases, on December 20, 2001, in accordance with the terms of the SPRA, the SPRA escrow agreement, the Shapiro escrow agreement, and the cash reconciliation agreement, FFI deposited $875,855.49 into the Leagre escrow account.  Thereafter, on the same day, Ms. Shapiro deposited $550,000 into the Leagre escrow account purportedly as a loan[84] to FFIA (MidCoast's designee).[85] On December 20, 2001, MidCoast deposited into the Leagre escrow account $20,000, the maximum amount of professional fees that it had agreed in the SPRA to pay on behalf of the FFI stockholders.

---

[84]The purported loan of $550,000 that Ms. Shapiro was to make to Mid-Coast as part of the SPR transactions was not evidenced by a promissory note or any other writing, and it did not bear interest.

[85]Paragraph 1 of the SPRA escrow agreement provided that the $550,000 which the so-called investor (Ms. Shapiro) was to transfer into the Leagre escrow account as a purported loan was to be transferred by wire into that account only after FFI transferred its remaining cash of $875,855.49 into that account. Consistently, paragraph 3 of the Shapiro escrow agreement provided that Ms. Shapiro was not to transfer any funds into the Leagre escrow account until FFI had transferred into that account "sufficient funds * * * [for the escrow agent] to immediately initiate a wire transfer of the sum of $550,000.00 to the account of Shapiro".

[*132]      Also on December 20, 2001, in accordance with the terms of the SPRA, the SPRA escrow agreement, the Shapiro escrow agreement, and the cash reconciliation agreement, the following events occurred simultaneously as of 11:59 p.m.:[86]  (1) the C corporation distributed its membership interests in the limited liability company to its three stockholders (petitioners) in exchange for 75 percent of the outstanding stock of the C corporation (SPR redemption transaction);[87] (2) the C corporation's stockholders sold the remaining 25 percent of the outstanding stock of the C corporation that they owned (SPR sale transaction) in exchange for cash; (3) the escrow agent returned $550,000 from the Leagre escrow account to Ms. Shapiro; (4) the escrow agent distributed a total of $530,766.15 from the Leagre escrow account to the C corporation's stockholders; (5) the escrow agent withdrew $345,089.34 from the Leagre escrow account and

---

[86]Section 1.3 of the SPRA provided that the closing thereunder was deemed to be effective as of 11:59 p.m. on December 20, 2001.  Section 7.1 of the SPRA provided that "[a]ll of the events which are to occur at the Closing under this Agreement, including but not limited to, the delivery of the Share certificates and the payment of the Purchase Price and all other related exchanges shall be deemed to have occurred simultaneously."

[87]In these cases, on December 19, 2001, in preparation for the closing of the SPRA transactions on December 20, 2001, the C corporation transferred to the limited liability company that it had formed three days before the closing date certain assets, including the right to a refund of the FFI 2001 income tax payments of $628,592, and certain nontax liabilities.

[*133] deposited those funds into a newly created bank account of FFIA's designee, the C corporation that FFIA and Michael Bernstein, MidCoast's president, controlled; and (6) the escrow agent distributed $20,000 from the Leagre escrow account to the law firm that had represented the C corporation's stockholders.[88]

In Feldman and in the instant cases, after the transactions involved there and here the C corporation had anticipated Federal and State income tax liabilities in a total amount that exceeded the value of its assets. See Feldman v. Commissioner, 779 F.3d at 452. After the redemption transaction and the sale transaction in Feldman, the C corporation had (1) $452,728.84 in cash on hand that, as discussed above, had been withdrawn from the escrow trust account and deposited into a

---

[88]The various deposits into, and the various distributions from, the Leagre escrow account were effected via wire transfers. The respective bank statements showed those deposits into the Leagre escrow account as having occurred on December 20, 2001. Those bank statements showed those distributions from the Leagre escrow account as having occurred on December 21, 2001. As discussed above, under the SPRA, the SPRA escrow agreement, the Shapiro escrow agreement, and the cash reconciliation agreement the various distributions that those respective agreements required were considered to occur simultaneously as of the closing of the SPRA, which was deemed to occur at 11:59 p.m. on December 20, 2001. For example, the SPRA escrow agreement, which incorporated by reference the Shapiro escrow agreement and to which the Shapiro escrow agreement and the cash reconciliation agreement were attached, provided that "[a]t the Closing, the Escrow Agent shall pay an amount equal to the Investor Funds [$550,000] to the Investor [Ms. Shapiro], and shall pay the balance in the Escrow Account to FFI Acquisition or its designee."

[*134] newly created bank account of the C corporation that MidCoast controlled[89] and (2) anticipated Federal and State income tax liabilities totaling approximately $750,000, or a negative net asset value of approximately $297,271. See id. After the redemption transaction and the sale transaction in these cases, the C corporation had (1) assets totaling $502,789.34, which consisted of cash of $345,089.34[90] and the right to a refund of $157,700 of the FFI State 2001 income tax payments, and (2) anticipated Federal income tax liabilities and anticipated State income tax liabilities totaling $1,026,100.69, or a negative net asset value of $523,311.35.[91]

---

[89]Four days after the closing of the transactions involved in Feldman, MidCoast withdrew $442,000 of the $452,728.84 that had been deposited from the escrow trust account into a newly created bank account of the C corporation that MidCoast, the C corporation's new owner, controlled. See Feldman v. Commissioner, 779 F.3d at 452.

[90]The funds distributed to FFI, FFIA's designee, were wired into a new account in FFI's name at SunTrust Bank that FFIA and Mr. Bernstein controlled. On December 26, 2001, six days after the closing of the SPR transactions, Mr. Bernstein had $340,000 wired from FFI's SunTrust Bank account to a MidCoast account at the Bank of New York.

[91]After the redemption transaction and the sale transaction in these cases, the C corporation also had $11,955.46 in a bank account, but that asset offset a liability consisting of outstanding checks in the same amount. In addition, as noted above, after those transactions the C Corporation had another receivable, which consisted of the Prudential demutualization funds of $43,926.57, that FFI had never claimed and that the State of Indiana was holding in the name of the C

(continued...)

**[\*135]**      In <u>Feldman</u> and in these cases, after the closing of the respective

transactions there and here the C corporation did not have any business operations

and did not commence any asset recovery business operations or any asset

receivable collection business operations.  <u>See</u> <u>id.</u> at 452.

In <u>Feldman</u> and in the instant cases, after the closing of the respective

transactions there and here the C corporation claimed certain losses to offset the

gains from the sale of its appreciated assets that had taken place before the

respective transactions involved occurred.  <u>See</u> <u>id.</u> at 453.  In <u>Feldman</u>, the Com-

missioner denied the losses claimed and issued a notice of deficiency to the C

corporation.  The C corporation did not respond to the notice of deficiency, and

the Commissioner assessed the deficiency, certain additions to tax, and the

accuracy-related penalty under section 6662(a) determined in that notice.  Thereaf-

ter, the Commissioner issued notices of liability to the respective former stock-

holders of the C corporation.  <u>See</u> <u>Feldman v. Commissioner</u>, 779 F.3d at 453.  In

<u>Feldman</u>, those former stockholders stipulated that the "distressed asset/debt tax

shelter" that MidCoast used in an attempt to shelter the gain that the C corporation

had realized from the sale of its appreciated assets was "illegal", and they did not

---

[91](...continued)
corporation.  <u>See</u> <u>supra</u> note 28.

[*136] challenge the assessment of the Federal income tax liability against the C corporation. See id.

In the instant cases, respondent denied the losses that the C corporation claimed. The C corporation entered into a closing agreement with respondent with respect to, inter alia, those disallowed losses. The C corporation also consented to the assessment and the collection of Federal income tax of $622,265 and an accuracy-related penalty under section 6662(a) and (h) of $85,482 for its taxable year 2001. Thereafter, respondent issued respective notices of liability to the respective former stockholders of the C corporation (Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser) for FFI's total income tax liability for its taxable year 2001 of $694,519.43 that consisted of Federal income tax of $609,037.43[92] and an accuracy-related penalty under section 6662(a) and (h) totaling $85,482, as well as interest thereon as provided by law. Petitioners do not dispute on brief that FFI is liable for that tax and that penalty, and we concluded that they have abandoned contesting them. See supra note 58.

---

[92]Respondent conceded in the respective answers in these cases that "the remaining unpaid tax deficiency of FFI that is set forth in the Notice of Liability as the amount of $609,037.43 is actually $578,338.43, plus I.R.C. § 6662 penalty in the amount of $85,482.00, plus applicable interest." Respondent's concession reflects that respondent collected from the State of Indiana the Prudential demutualization funds of $43,926.57 to which FFI had been entitled.

**[\*137]**     In <u>Feldman</u> and in the instant cases, the C corporation was administratively dissolved by the appropriate State authority.  <u>See</u> <u>id.</u> at 453.

We have compared relevant facts, including material facts, which we found in <u>Feldman</u> and on which the Court of Appeals relied, and relevant facts, including material facts, which we have found in these cases.  As a result of that comparison, we reject petitioners' contention that the facts in <u>Feldman</u> are not the same in material respects as the facts that we have found in these cases.[93]

Moreover, as a result of our comparison of certain facts in <u>Feldman</u> and certain facts in these cases, we conclude that the Court of Appeals' opinion in <u>Feldman</u> strongly supports a finding in these cases that each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser is a transferee of property of FFI for purposes of section 6901 with respect to the SPR sale transaction under the SPRA.  We shall restate certain of the facts that we have found in the instant cases that lead us to that conclusion.

---

[93]As indicated previously, we believe that petitioners' contentions regarding the alleged material factual differences between <u>Feldman v. Commissioner</u>, 779 F.3d 448, and the instant cases regarding whether petitioners knew or should have known that FFI's "taxes from its asset sale would not be paid" are not relevant to whether they are transferees of property of FFI for purposes of sec. 6901 with respect to the SPR sale transaction under the SPRA.

[*138]    After the sales of its operating assets, FFI ceased carrying on any active business, had no operating assets (except certain oxidation technology), and had certain nonoperating assets, which consisted of cash, a note from the buyer of the Elmwood property, certain interest receivable on that note, a few other receivables, and certain real property in Minnesota.  Moreover, after FFI sold its operating assets, it not only had planned but also had taken formal corporate actions to liquidate and to distribute its nonoperating assets to its stockholders, Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser.  In addition, during 2001, after FFI's 2001 asset sales, FFI made total Federal and State income tax payments of $786,292 that were to be applied against its total Federal and State income tax liabilities for its taxable year 2001, which were attributable to the gains that it had realized as a result of the FFI 2001 asset sales.

Although Mr. Thrapp was aware of FFI's situation as of early December 2001, nonetheless on December 7, 2001, he informed the FFI officers (Mr. Fankhauser and Mr. Weintraut) that MidCoast might be interested in purchasing the stock of FFI at a so-called premium; that is to say, MidCoast might be interested in purchasing the stock of FFI for an amount that was greater than the posttax liquid-

[*139] ation value of FFI, i.e., the value of FFI's assets after the payment of its liabilities, including its Federal and State income liabilities for its taxable year 2001.[94]

Mr. Thrapp informed Mr. Weintraut and Mr. Fankhauser that the purchase price for the stock that MidCoast usually paid in deals like the one that it was suggesting was calculated by using a percentage of the acquired company's total Federal and State income tax liabilities, which varied from acquisition to acquisition but was within a range that MidCoast had established. Mr. Thrapp, who was not a tax professional, also advised the FFI officers that it was his understanding that MidCoast had a tax strategy that it considered to be proprietary and that it had used in connection with its acquisition methodology in which it acquired C corporations with cash and certain Federal and State income tax liabilities. Mr. Thrapp did not know any of the details of MidCoast's acquisition methodology or its tax strategy.[95] However, it was Mr. Thrapp's understanding, which he shared

---

[94]Mr. Thrapp had some familiarity with MidCoast because it was a client of Ice Miller on a prior occasion in a transaction that was unrelated to the transactions herein and that closed in November 2001. Mr. Thrapp considered the information that Ice Miller obtained as a result of that representation to be privileged.

[95]Even if Mr. Thrapp had known, through Ice Miller's representation of MidCoast, some or all of the details regarding MidCoast's acquisition methodology and its tax strategy, he would not have been able to disclose any such

(continued...)

[*140] with the FFI officers, that MidCoast used the cash of an acquired C corporation in order to buy charged-off debt securities that MidCoast intended to use in its so-called asset recovery business, but he had no understanding of how MidCoast used those securities as part of its tax strategy.

Mr. Weintraut and Mr. Fankhauser made only certain limited inquiries of Mr. Thrapp with respect to MidCoast's overall acquisition methodology, including its tax strategy, of acquiring C corporations. However, Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser knew, directly or through Mr. Thrapp, that Mid-Coast's pricing in its acquisition methodology was inextricably intertwined with its tax strategy.

On December 7, 2001, the same day on which Mr. Thrapp informed the FFI officers about MidCoast's possible interest in purchasing the stock of FFI, the FFI officers, Mr. Thrapp, and FFI's accountants, Mr. Burns and Mr. Vernick of the Katz accounting firm, held a conference call with certain representatives of MidCoast.

---

[95](...continued)
details to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser. That was because MidCoast was a client of Ice Miller of which Mr. Thrapp was a partner, and Mr. Thrapp was subject to certain ethical constraints with respect to the disclosure of any client information.

**[\*141]** Neither Mr. Thrapp nor any of the FFI stockholders saw any need to, and did not, press MidCoast's representatives regarding the details of its tax strategy. Nor did Mr. Thrapp or any of the FFI stockholders see any need to, or in fact, inquire through their respective contacts whether there were persons who were not employed by MidCoast or by Ice Miller and who might be familiar with MidCoast's acquisition methodology and its tax strategy.[96]

On December 11, 2001, Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser executed an engagement letter dated December 11, 2001, in which they retained Ice Miller to represent FFI and them as stockholders of FFI with respect to MidCoast's proposal to purchase the stock of FFI.

On December 11, 2001, Mr. Bernstein sent to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser on behalf of MidCoast a nonbinding letter of intent with respect to a proposed acquisition of the stock of FFI by MidCoast that required FFI as part of that proposed acquisition to redeem 75 percent of its stock from its stockholders. Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser (through Mr. Fankhauser) knew, directly or through Mr. Thrapp, that the transactions that

---

[96]The record does not establish why Mr. Thrapp and the FFI stockholders did not inquire through their respective contacts whether there were persons who were not employed by MidCoast or by Ice Miller and who might be familiar with MidCoast's tax strategy.

[*142] MidCoast had proposed in the letter of intent would result in their receiving a so-called premium, i.e., a greater amount of assets than they would receive if FFI were to liquidate and the respective Federal and State income tax liabilities that FFI had as a result of the FFI 2001 asset sales were to be paid in full. That was why on December 12, 2001, the day after MidCoast had sent the FFI stockholders the letter of intent, those stockholders signed and accepted the terms of that letter. When they accepted MidCoast's letter of intent Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser knew, as did Mr. Thrapp, that the only reason that the FFI stockholders would be able to receive that so-called premium was that FFI's total anticipated 2001 tax liability, which was attributable to the sales of its assets in 2001, would not be paid. In other words, Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser knew, as did Mr. Thrapp, that if and only if that total anticipated 2001 tax liability was not paid would they receive the so-called premium that MidCoast had proposed in the letter of intent.

After the FFI stockholders accepted the letter of intent, Mr. Thrapp was responsible for negotiating in large part the agreement among those parties regarding the transactions that MidCoast had proposed in that letter. Mr. Weintraut, however, negotiated directly with certain of MidCoast's representatives as to the percentage of FFI's total Federal and State income tax liabilities for its taxable

[*143] year 2001 that MidCoast would pay to purchase the stock of the FFI stockholders. In doing so, Mr. Weintraut attempted to have MidCoast agree to pay a percentage that was at the high end of the range of percentages to which he understood MidCoast had agreed in the past as part of its acquisition methodology.

Around December 18, 2001, after Mr. Weintraut completed negotiating with certain of MidCoast's representatives as to the percentage of FFI's total Federal and State income tax liabilities for its taxable year 2001 that MidCoast would pay to purchase the stock of the FFI stockholders, Mr. Weintraut prepared a balance sheet for FFI (i.e., the December 18, 2001 balance sheet) that reflected its assets and its liabilities as of that date on the assumption that the transactions proposed in the letter of intent were to occur. According to the December 18, 2001 balance sheet, FFI was to have the following assets and the following liabilities after it distributed membership interests in FFW[97] to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in exchange for 75 percent of the FFI stock that they owned: (1) cash of $875,855.49, (2) the right to a refund of the FFI State 2001 income tax

_____

[97]FFI formed FFW to serve, inter alia, as a vehicle to transfer to the FFI stockholders certain of FFI's cash and noncash assets and all of its liabilities except its Federal and State income tax liabilities for its taxable year 2001 in exchange for 75 percent of the outstanding stock of FFI that they owned.

[*144] payments of $157,700, (3) an anticipated Federal income tax liability for FFI's taxable year 2001 of $794,949.13, and (4) an anticipated State income tax liability for FFI's taxable year 2001 of $231,151.56.  Pursuant to a formula set forth in the December 18, 2001 balance sheet, the stock purchase price for the stock of FFI that MidCoast was to purchase from the FFI stockholders was to be determined, as shown in that balance sheet, by reducing those total assets (i.e., $1,033,555.49) by 49 percent (i.e., by $502,789.34) of those total liabilities (i.e., $1,026,100.69).  The balance of $530,766.15 was to be the purchase price for the stock of FFI.

On December 20, 2001, FFIA (MidCoast's designee to serve as the purchaser of the FFI stock),[98] FFI, and the FFI stockholders entered into the SPRA, the terms of which were similar but not identical to the terms that MidCoast had proposed in the letter of intent.  The only reason that FFI and the FFI stockholders decided to, and did, execute the SPRA and the related agreements (i.e., the SPRA escrow agreement and the cash reconciliation agreement that was attached to the

[98]On December 18, 2001, in preparation for the transactions contemplated in the letter of intent, Mr. Bernstein organized under the laws of the State of Indiana FFIA as a limited liability company to enter into those transactions as MidCoast's designee.  Immediately before the closing of the SPR transactions, FFIA had no assets, and immediately thereafter its only asset was the stock of FFI.

[*145] SPRA escrow agreement)[99] was that those stockholders wanted to, and MidCoast agreed that they would, receive a substantially greater amount, a so-called premium, from the transactions to which they agreed pursuant to those documents that than they would receive from the liquidation of FFI after FFI's total anticipated 2001 tax liability of $1,026,100.69, which was attributable to FFI's 2001 asset sales, had been paid. Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser knew, as did Mr. Thrapp, that the only reason that the FFI stockholders would be able to receive that substantially greater amount was that FFI's total anticipated 2001 tax liability of $1,026,100.69 would not be paid. In other words, Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser knew, as did Mr. Thrapp, that if and only if that total anticipated 2001 tax liability was not paid would they receive the so-called premium.[100]

---

[99]The Shapiro escrow agreement also was attached to the SPRA escrow agreement.

[100]The respective amounts of the Federal and State income tax liabilities of FFI for its taxable year 2001 that were attributable to the sales of its assets were estimated to be $794,949.13 and $231,151.56, respectively. Under the SPRA, the stockholders of FFI were to retain, through their respective ownership interests in FFW that FFI was to distribute to them under that agreement, the right to a refund of the FFI Federal 2001 income tax payments of $628,592, which MidCoast guaranteed FFI would pay to FFW after FFI received it from the Federal Government. FFI, and thus MidCoast, was to retain after the transactions in the SPRA were effected the right to a refund of the FFI State 2001 income tax payments of

(continued...)

[*146]      Each of the FFI stockholders also knew, as did Mr. Thrapp, that the so-called loan of $550,000 that Ms. Shapiro was to make to FFIA (MidCoast's designee) to fund the so-called purchase of the FFI stock was not evidenced by a promissory note or other written document and did not bear interest.  Each of those stockholders also knew, as did Mr. Thrapp, that that so-called loan of Ms. Shapiro was to be deposited into the Leagre escrow account on December 20, 2001, but only after FFI had deposited its cash of $875,855.49 into that account on that day, and that it was to be returned to her as of the closing of the transactions under the SPRA at 11:59 p.m. on December 20, 2001, which, pursuant to the SPRA, was deemed to occur simultaneously.[101]  Moreover, each of Mr. Fank-

_____

[100](...continued)
$157,700.  Because of those anticipated refunds of the FFI Federal 2001 income tax payments and the FFI State 2001 income tax payments, Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser knew, as did Mr. Thrapp, that none of FFI's total anticipated 2001 tax liability of $1,026,100.69 would be paid, thereby enabling them to receive a substantially greater amount, a so-called premium, from the transactions to which they agreed in the SPRA than they would receive from the liquidation of FFI to which they had agreed before Mr. Thrapp told them about MidCoast's interest in buying their FFI stock.  See supra note 34.

[101]Each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser also knew that although Ms. Shapiro's so-called loan of $550,000 to FFIA was to be deemed repaid as of the closing of the SPR transactions, the wire transfer to Ms. Shapiro's bank account of $550,000 from the escrow was not to occur until the day after the closing of those transactions.  Similarly, each of them knew that although they were deemed to receive as of the closing of the SPR transactions their respective

(continued...)

[*147] hauser, Mr. Weintraut, and Ms. Fankhauser knew, as did Mr. Thrapp, that pursuant to the SPRA, the SPRA escrow agreement, and the cash reconciliation agreement, FFI was to deposit $875,855.49 into the Leagre escrow account on December 20, 2001, but it was to receive only $345,089.34 from that Leagre escrow account as of the closing of the SPRA at 11:59 p.m. on that date.[102] Each of the FFI stockholders also knew, as did Mr. Thrapp, that the difference between the amount that FFI was to deposit into the Leagre escrow account (i.e., $875,855.49) and the amount that it was to receive from the Leagre escrow account (i.e., $345,089.34) was equal to $530,766.15, which each of them knew, as did Mr. Thrapp, was the amount of the purchase price that they were to receive from, according to the terms of the SPRA, FFIA. In addition, each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser understood, as did Mr. Thrapp, that MidCoast through FFIA was purporting to purchase FFI stock from them in order to acquire FFI so that MidCoast would be able to use FFI's cash in order to buy

---

[101](...continued)
proportionate portions of the purchase price for the transfer of their FFI stock to FFIA, the wire transfers to their respective bank accounts of those proportionate portions were not to occur until the day after the closing of those transactions.

[102]As was true of the respective wire transfers to Mr. Fankhauser, Mr. Weintraut, Ms. Fankhauser, and Ms. Shapiro, FFI, FFIA's designee, received a wire transfer on the day after the closing of the SPR transactions.

[*148] charged-off debt securities that MidCoast intended to use in its so-called asset recovery business. However, each of the FFI stockholders knew, as did Mr. Thrapp, that MidCoast through FFIA agreed in the SPRA to pay them $530,766.15 in cash for their FFI stock and that as of the closing of the SPR transactions FFIA was to receive only $345,089.34 of cash and the right to a refund of the FFI State 2001 income tax payments of $157,700, or a total of $502,789.34. In other words, each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser knew, as did Mr. Thrapp, that MidCoast through FFIA agreed in the SPRA to pay $530,766.15 of cash to acquire the FFI stock from them in order to have access for purported use in its asset recovery business to only a total of $502,789.34 (i.e., $345,089.34 of cash and the right to a refund of the FFI State 2001 income tax payments of $157,700).

In addition, each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser knew, as did Mr. Thrapp, or should have known, as Mr. Thrapp should have known, that Ms. Shapiro's so-called loan of $550,000 to FFIA was not needed or used in order to effect the SPR sale transaction under the SPRA and that that so-called loan was mere window dressing designed to make it appear that FFIA, not FFI, was providing the funds to be paid to them for the transfer of their FFI stock to FFIA. In other words, each of the FFI stockholders knew, as did Mr. Thrapp, or

**[*149]** should have known, as Mr. Thrapp should have known, that Ms. Shapiro's so-called loan of $550,000 to FFIA was devoid of any economic substance--a sham that was designed and intended to make it appear as though FFIA, not FFI, was providing the funds to be paid to the FFI stockholders for the transfer of their FFI stock to FFIA. Moreover, each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fank-hauser knew, as did Mr. Thrapp, or should have known, as Mr. Thrapp should have known, that the source of the funds that they were to receive for the transfer of their FFI stock to FFIA was FFI, not FFIA. That is to say, each of the FFI stockholders, as well as Mr. Thrapp, knew, or should have known, that FFI, not FFIA, was to, and did, pay each of those stockholders each such stockholder's proportionate portion of the so-called purchase price (i.e.,$530,766.15) that each was to receive under the SPRA.

In reaching its holding that the taxpayers in Feldman v. Commissioner, 779 F.3d 448, were transferees of property of Woodside for purposes of section 6901, the Court of Appeals first observed that the analysis that we had undertaken in Feldman v. Commissioner, 2011 WL 6781006, which looks beyond the formalities of certain transactions,

> implicates several related, overlapping doctrines used in tax cases and in other areas of the law for the protection of creditors. Known by different names--e.g., the "substance over form" doctrine, the

**[*150]** "business purpose" doctrine, the "economic substance" doctrine--the animating principle of each is that the law looks beyond the form of a transaction to discern its substance. * * *[ Feldman v. Commissioner, 779 F.3d at 454.]

Under the Federal substance over form doctrine, it is the substance, not the form, of a transaction which determines its Federal tax consequences. See generally Frank Lyon Co. v. Commissioner, 435 U.S. 561, 573 (1978); Gregory v. Helvering, 293 U.S. 465 (1935); Feldman v. Commissioner, 779 F.3d at 455; Grojean v. Commissioner, 248 F.3d 572 (7th Cir. 2001), aff'g T.C. Memo. 1999-425. The Court of Appeals affirmed our finding, see Feldman v. Commissioner, 2011 WL 6781006, at *10-*14, that in substance the purported stock sale involved there was a liquidation. See Feldman v. Commissioner, 779 F.3d at 455-457.

Under the Federal economic substance doctrine, a transaction that does not have economic substance, that is to say, a transaction which does not change a taxpayer's position "in a meaningful way" and for which the taxpayer does not have a nontax business purpose, will not be respected for Federal tax purposes.[103] See Feldman v. Commissioner, 779 F.3d at 455; see also Gregory v.

---

[103]According to the Court of Appeals in Feldman v. Commissioner, 779 F.3d at 455, the Federal economic substance doctrine "borrows heavily from both the business-purpose and substance-over-form doctrines." Under the business pur-pose doctrine, a transaction must have a valid nontax business purpose in order to be respected for Federal tax purposes. See Gregory v. Helvering, 293 U.S. 465, 469 (1935); Feldman v. Commissioner, 779 F.3d at 455.

**[*151]** Helvering, 293 U.S. 465; Grojean v. Commissioner, 248 F.3d 572.  The

Court of Appeals affirmed our findings, see Feldman v. Commissioner, 2011 WL

6781006, at *10-*14, that the purported stock sale involved there had no nontax

business purpose and no economic substance.  See Feldman v. Commissioner, 779

F.3d at 455-457.

Under the so-called sham transaction doctrine established in Federal tax law

(Federal sham transaction doctrine),[104] a transaction that is devoid of any economic

substance and with no nontax purpose[105] is a sham which will not be respected for

Federal tax purposes.[106]  See generally Frank Lyon Co. v. Commissioner, 435 U.S.

---

[104]Although the Court of Appeals did not mention that we relied on the Federal sham transaction doctrine in Feldman, we did.  See Feldman v. Commissioner, 2011 WL 6781006, at *10-*14.

[105]In determining whether a transaction is an economic sham, certain courts consider the factors of lack of economic substance and no nontax purpose to be disjunctive.  Other courts consider those factors to be conjunctive.  We need not decide which test for the economic sham transaction doctrine to apply here.  That is because we find below both lack of economic substance and no nontax purpose.

[106]In Falsetti v. Commissioner, 85 T.C. 332, 347 (1985) (citing Frank Lyon Co. v. Commissioner, 435 U.S. 561, 572 (1978)), we defined the term "sham in substance", also known as economic sham, as "the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits."  In other words, a sham in substance is merely a mislabeling of what actually occurred.  See Glass v. Commissioner, 87 T.C. 1087, 1176 (1986), aff'd sub nom. Yosha v. Commissioner, 861 F.2d 494 (7th Cir. 1988).

(continued...)

**[*152]** at 572-573; <u>Knetsch v. Commissioner</u>, 364 U.S. 361 (1960); <u>Gregory v. Helvering</u>, 293 U.S. 465; <u>Karr v. Commissioner</u>, 924 F.2d 1018 (11th Cir. 1991), aff'g <u>Smith v. Commissioner</u>, 91 T.C. 733 (1988).  The Court of Appeals affirmed our finding, <u>see</u> <u>Feldman v. Commissioner</u>, 2011 WL 6781006, at *12-*14, that the purported loan of Ms. Shapiro involved there was a sham that was "devoid of substance".  <u>See</u> <u>Feldman v. Commissioner</u>, 779 F.3d at 456.

We consider each of the Federal substance over form doctrine, the Federal economic substance doctrine, and the Federal sham transaction doctrine, although closely related and overlapping doctrines in Federal tax law, to be an independent or alternative basis under which we shall reach our ultimate findings as to whether each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser is a transferee of property of FFI for purposes of section 6901 with respect to the SPR sale trans-action under the SPRA.

---

[106](...continued)
As is true of other doctrines established in Federal tax law that look to the substance, and not the form, of a transaction, the Federal economic substance doctrine and the Federal sham transaction doctrine are closely related to, and borrow from, each other.  In fact, some courts believe that the Federal sham trans-action doctrine is another name for the Federal economic substance doctrine.  <u>See, e.g.</u>, <u>Superior Trading, LLC v. Commissioner</u>, 728 F.3d 676, 680-681 (7th Cir. 2013), <u>aff'g</u> 137 T.C. 70 (2011); <u>Yosha v. Commissioner</u>, 861 F.2d at 497-498.

[*153]     Based upon our examination of the entire record before us, we find that, in determining whether each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser is a transferee of property of FFI in the SPR sale transaction under the SPRA for purposes of section 6901, under each of the Federal substance over form doctrine, the Federal economic substance doctrine, and the Federal sham transaction doctrine (1) Ms. Shapiro's purported loan here, like Ms. Shapiro's purported loan in Feldman v. Commissioner, 779 F.3d at 456, was a sham that was devoid of any economic substance; (2) the SPR sale transaction under the SPRA, like the purported stock sale involved in Feldman v. Commissioner, 779 F.3d at 455-457, had no nontax business purpose; (3) Ms. Shapiro's purported loan here, like Ms. Shapiro's purported loan in Feldman v. Commissioner, 779 F.3d at 456, had no nontax business purpose; (4) the SPR sale transaction under the SPRA, like the purported stock sale involved in Feldman v. Commissioner, 779 F.3d at 455-457, had no economic substance; (5) Ms. Shapiro's purported loan here, like Ms. Shapiro's purported loan in Feldman v. Commissioner, 779 F.3d at 456, should be disregarded; (6) the SPR sale transaction under the SPRA, like the purported stock sale involved in Feldman v. Commissioner, 779 F.3d at 455-457, should be disregarded; and (7) FFI, not FFIA, made a distribution or transfer of FFI's funds in the SPR sale transaction under the SPRA to each of Mr. Fankhauser, Mr. Wein-

[*154] traut, and Ms. Fankhauser, like the C corporation, not MidCoast, made to each of its stockholders in <u>Feldman v. Commissioner</u>, 779 F.3d at 459, of each such stockholder's proportionate portion of the purchase price (i.e., $530,766.15) that each such stockholder was to receive for their stock under the SPRA.[107]

Based upon our examination of the entire record before us, we find that under each of the Federal substance over form doctrine, the Federal economic substance doctrine, and the Federal sham transaction doctrine each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser is a transferee of property of FFI for purposes of section 6901 with respect to the SPR sale transaction under the SPRA.

<u>Liability Under Indiana UFTA</u>

It is respondent's position that each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser is liable under the Indiana UFTA as a transferee of property of FFI with respect to the SPR redemption transaction and the SPR sale transaction under the SPRA for FFI's unpaid 2001 deficiency liability and FFI's unpaid 2001

---

[107]Respondent characterizes the distributions or transfers made to the FFI stockholders in the SPR sale transaction under the SPRA as in substance liquidating distributions or transfers from FFI. We do not have to characterize those distributions or transfers as "liquidating" or any other type of distributions or transfers in order to conclude, as we do, that FFI made a distribution or transfer of its property to each of the FFI stockholders as part of the SPR sale transaction under the SPRA and that each of them is a transferee of FFI's property for purposes of sec. 6901 with respect to that transaction.

[*155] penalty liability.[108]  In support of that position, respondent argues (1) that for purposes of the Indiana UFTA in substance FFI made various distributions or transfers to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR redemption transaction and the SPR sale transaction under the SPRA and (2) that those distributions or transfers were fraudulent under each of the two so-called constructive fraud provisions in Ind. Code Ann. secs. 32-18-2-14(2) and 32-18-2-15.

Transfers for Purposes of the Indiana UFTA

With respect to the SPR redemption transaction under the SPRA, respondent argues that for purposes of the Indiana UFTA in form and in substance FFI made a distribution or transfer of its property, namely, a proportionate ownership interest in FFW, to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in that transaction.[109]

---

[108]Respondent also claims that each petitioner is liable for interest as provided by law with respect to FFI's unpaid 2001 deficiency liability and FFI's unpaid 2001 penalty liability.

[109]As of the closing of the SPR redemption, which pursuant to the terms of the SPRA was deemed to occur simultaneously with the closing of the SPR sale transaction, Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser owned 68 percent, 22 percent, and 10 percent, respectively, of FFW's membership interests.

**[*156]** Petitioners do not address whether, let alone dispute that, in the SPR redemption transaction under the SPRA each of them received a distribution or transfer of property of FFI, namely, a proportionate ownership interest in FFW. Instead, as we understand petitioners' arguments with respect to the SPR redemption transaction under the SPRA, their focus is on why they believe that any such transfers that FFI made to them were not fraudulent under either of the constructive fraud provisions in the Indiana UFTA.

In the light of petitioners' failure to address whether, and to dispute that, in the SPR redemption transaction under the SPRA they received distributions or transfers of property of FFI, namely, respective proportionate ownership interests in FFW, we conclude that for purposes of the Indiana UFTA FFI made a distribution or transfer of property to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR redemption transaction under the SPRA.[110]

With respect to the SPR sale transaction under the SPRA, respondent argues that for purposes of the Indiana UFTA in substance FFI made a distribution or transfer of its property, namely, a proportionate portion of $530,766.15 (the total purchase price for their FFI stock), to each of Mr. Fankhauser, Mr. Weintraut, and

---

[110]The record fully supports our findings that FFI made distributions or transfers of property to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR redemption transaction under the SPRA.

[*157] Ms. Fankhauser in that transaction.[111]  In support of that argument, respondent relies on Feldman v. Commissioner, 779 F.3d 448, and advocates the use in these cases of the type of State law equitable principles on which the Court of Appeals relied in that case.

In considering respondent's arguments with respect to the SPR sale transaction under the SPRA, we bear in mind, and respondent and petitioners agree, that resolution of the issue of whether for purposes of the Indiana UFTA in substance FFI made a distribution or transfer of its property to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR sale transaction under the SPRA depends on the law of the State of Indiana.  We also bear in mind, and the parties also agree, that in resolving that issue we must apply the law of the State of Indiana in the manner in which the Supreme Court of Indiana (Indiana Supreme Court) has indicated it would apply that law.  See Commissioner v. Estate of Bosch, 387 U.S. 456, 465 (1967).  If the Indiana Supreme Court has not addressed the issue, we must apply what we find to be the law of the State of Indiana after

_____

[111]As of the closing of the SPR sale transaction, which pursuant to the terms of the SPRA was deemed to occur simultaneously with the closing of the SPR redemption transaction, distributions of $360,920.98, $116,768.55, and $53,076.62 totaling $530,766.15 were deemed made to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser, respectively.  That is to say, as of that closing, distributions of 68 percent, 22 percent, and 10 percent of the purchase price of $530,766.15 were deemed made to those respective FFI stockholders.

**[\*158]** having given "proper regard" to relevant rulings of other courts of the State of Indiana. See id.

In considering respondent's arguments with respect to the SPR sale transaction under the SPRA, we also bear in mind, and respondent and petitioners also agree, that (1) the issue of whether for purposes of the Indiana UFTA it is appropriate to use certain equitable principles to disregard the form of certain transactions (here, the SPR sale transaction under the SPRA) in order to ascertain whether there was a transfer of a debtor's property (here, FFI's property) to its stockholders (here, Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser) is an issue that the Indiana Supreme Court has not addressed;[112] (2) the definition of the term "transfer" in the Indiana UFTA, like the definition of that term in the Wisconsin UFTA involved in Feldman v. Commissioner, 779 F.3d 448, is very broad, compare Ind. Code Ann. sec. 32-18-2-10 with Wis. Stat. Ann. sec. 242.01(12); (3) the Indiana UFTA, like the Wisconsin UFTA involved in Feldman, is flexible and expressly incorporates equitable principles that look to substance, rather than form, compare

---

[112]As discussed below, however, certain Federal courts construing the Indiana UFTA have addressed that question in Boyer v. Crown Stock Distrib. (In re Crown Unlimited Mach., Inc.), Adv. No. 04-1085, 2006 WL 6401548 (Bankr. N.D. Ind. Oct. 13, 2006), aff'd, Boyer v. Crown Stock Distrib., Inc., 2009 WL 418275 (N.D. Ind. Feb. 17, 2009), aff'd in part, rev'd in part, 587 F.3d 787 (7th Cir. 2009).

[*159] Ind. Code Ann. sec. 32-18-2-20 <u>with</u> Wis. Stat. Ann. sec. 242.10; and (4) the Indiana Supreme Court would, and therefore we should, look to certain equitable principles in determining whether for purposes of the Indiana UFTA in substance FFI made a distribution or transfer of its property to each of the FFI stockholders in the SPR sale transaction under the SPRA.

At least as far as petitioners are concerned, the parties disagree over which equitable principles the Indiana Supreme Court would use in order to determine whether for purposes of the Indiana UFTA in substance FFI made a distribution or transfer of its property to each of the FFI stockholders in the SPR sale transaction under the SPRA.[113] Petitioners believe that which equitable principles the Indiana

---

[113]In an attempt to distinguish the holdings of the Court of Appeals in <u>Feldman v. Commissioner</u>, 779 F.3d 448, petitioners advance many of the arguments that we address here in a supplemental brief that the Court allowed petitioners, as well as respondent, to file after that opinion was issued. We did not give the parties the opportunity to file responsive briefs to their respective supplemental briefs. Consequently, we do not know whether respondent believes that which equitable principles the Indiana Supreme Court would use is material to resolving the issues under the Indiana UFTA presented here. Nor do we know whether respondent considers the so-called equitable collapsing doctrine that petitioners maintain is the only equitable doctrine that the Indiana Supreme Court would apply to be materially different from the equitable substance over form principles and the equitable sham transaction principles, which are established in the law of Indiana and on which, as discussed below, respondent relies, or from any other equitable principles that are consistent with Ind. Code Ann. sec. 32-18-2-20 that "the principles of * * * equity * * * supplement this chapter [of the Indiana Code codifying the Indiana UFTA]."

**[*160]** Supreme Court would use is critical to their position that in substance FFI did not make any such distribution or transfer. That is because, petitioners maintain, the substance over form equitable principles established in Wisconsin law (Wisconsin substance over form principles) that the Court of Appeals used in Feldman v. Commissioner, 779 F.3d at 458-460, and the "equitable doctrines from federal tax law, such as step transaction and substance over form"[114] that respondent advocates we use in these cases "differ from the equitable collapsing

---

[114]Petitioners assert in various places in their supplemental brief that respondent is arguing that certain equitable tax doctrines established in the Federal tax law are to be used in determining whether for purposes of the Indiana UFTA in substance FFI made a distribution or transfer of its property to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR sale transaction under the SPRA transaction. Those assertions are unfounded, see supra note 63, and we reject them.

[*161] doctrine[115] [that petitioners advocate we use here] in that they do not require any showing of knowledge".[116]

Before turning to petitioners' argument, we note that we have serious reservations regarding petitioners' contention that the equitable collapsing doctrine that they urge we use here is materially different from the equitable substance over form principles established in Indiana law (Indiana substance over form principles) that respondent advocates we use in these cases and that we conclude are materially the same as the Wisconsin substance over form principles that the Court of Appeals used in Feldman. In fact, in Boyer v. Crown Stock Distrib. (In re

---

[115]Petitioners provide the following description of the equitable collapsing doctrine, also known as the collapsing doctrine, which they found in an opinion of the U.S. Bankruptcy Court of the District of New Jersey that that court had marked "NOT FOR PUBLICATION": "The 'collapsing' doctrine is essentially an equitable doctrine allowing a court to dispense with the structure of a transaction or series of transactions." Route 70 & Mass., L.L.C. v. Bank (In re Route 70 & Mass., L.C.C.), Adv. No. 09-01473 (MBK) 2011 WL 1883856, at *5 (Bankr. D. N.J. May 17, 2011) (We shall refer to the equitable doctrine that petitioners urge we use in these cases as the equitable collapsing doctrine.)

[116]As discussed more fully below, petitioners contend that "case law from other jurisdictions * * * utilizes the equitable collapsing doctrine which, in this case [sic], requires that Respondent prove that Petitioners knew or should have known that FFIA and/or MidCoast was going to cause FFI's taxes to not be paid." According to petitioners, respondent has failed to carry that burden of proof. (For convenience, we shall often refer to the requirement that petitioners contend should be imposed on respondent in these cases and that, as discussed below, certain courts have imposed on creditors in certain other cases as the knowledge requirement.)

[*162] <u>Crown Unlimited Mach., Inc.</u>), Adv. No. 04-1085, 2006 WL 6401548, at *3 (Bankr. N.D. Ind. Oct. 13, 2006), <u>aff'd</u>, <u>Boyer v. Crown Stock Distrib., Inc.</u>, 2009 WL 418275, at *7 (N.D. Ind. Feb. 17, 2009), <u>aff'd in part, rev'd in part</u>, 587 F.3d 787 (7th Cir. 2009), a case involving the application of the same constructive fraud provisions of the Indiana UFTA (i.e., Ind. Code Ann. secs. 32-18-2-14(2) and 32-18-2-15) on which respondent is relying here and which we discuss in detail below, the U.S. Bankruptcy Court (bankruptcy court) and the U.S. District Court (District Court) described "collapsing" or "recharacterizing" the transactions involved there as what would occur if Indiana substance over form principles that require that the substance of a transaction to prevail over its form were determined to be appropriate principles to use given the facts and circumstances of the case.[117]  See <u>Alterman v. Commissioner</u>, T.C. Memo. 2015-231, at *47-*48 (referring interchangeably to the equitable principle in Florida law of "collapsing transactions" and "the equitable doctrine of substance over form" under the Florida UFTA).

---

[117]In interpreting the Indiana UFTA, we may rely on, inter alia, the interpretation by a bankruptcy court or other Federal court.  See, e.g., <u>Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.)</u>, 139 F.3d 574, 577 (7th Cir. 1998).

**[\*163]**       We also have serious reservations regarding petitioners' contention

that only cases using the equitable collapsing doctrine have, before applying that

doctrine, required a creditor to show that a purported transferee of the debtor knew

or should have known that the debt would not be paid.  See id. at \*48 (requiring

the Commissioner to show "actual or constructive knowledge" by the purported

transferee before applying "the equitable doctrine of substance over form" under

the Florida UFTA).

Despite the serious reservations that we have, we turn now to petitioners'

argument regarding the equitable principles which they contend the Indiana

Supreme Court would use and which we believe they are advocating in an effort to

persuade us that Feldman v. Commissioner, 779 F.3d 448, is materially distin-

guishable from, and thus inapposite to, the instant cases.  We start by summarizing

the parties' respective positions as to which equitable principles they maintain the

Indiana Supreme Court would use in determining whether for purposes of the

Indiana UFTA in substance FFI made a distribution or transfer of its property to

each of the FFI stockholders in the SPR sale transaction under the SPRA.

Respondent argues that Indiana courts, including the Indiana Supreme

Court, use Indiana substance over form principles in various contexts, including

most notably Indiana tax cases.  Respondent maintains that those courts, including

**[*164]** the Indiana Supreme Court, would use those same principles in determin-

ing whether for purposes of the Indiana UFTA the SPR sale transaction under the

SPRA in substance was a liquidation of FFI in which FFI made distributions or

transfers of its cash totaling $530,766.15 to Mr. Fankhauser, Mr. Weintraut, and

Ms. Fankhauser. According to respondent, the Indiana Supreme Court's use of

Indiana substance over form principles would lead it to conclude that for purposes

of the Indiana UFTA that SPR sale transaction in substance was a liquidation of

FFI in which FFI made distributions or transfers of its cash totaling $530,766.15

to the FFI stockholders.

We understand respondent also to be arguing in the alternative that the

Indiana Supreme Court would use the equitable principles of the sham transaction

doctrine established in the law of Indiana (Indiana sham transaction doctrine) in

various contexts, including Indiana tax cases.[118] According to respondent,

---

[118]Even if respondent were not relying in the alternative on the Indiana sham transaction doctrine, we would, and we do, nonetheless consider it here in determining whether for purposes of the Indiana UFTA in substance FFI made a distribution or transfer of its property to each of the FFI stockholders in the SPR sale transaction under the SPRA. In this connection, while respondent is relying principally on Indiana substance over form principles, certain of the arguments that respondent advances in relying on those principles overlap with the equitable principles of the Indiana sham transaction doctrine (discussed in more detail below). We note that the Indiana Supreme Court held in Ind. Dep't of State Revenue v. Belterra Resort Ind., LLC, 935 N.E.2d 174, 179 (Ind. 2010), that

(continued...)

**[*165]** [t]he "loan" from Shapiro [to FFIA] was a "ruse, recycling, a sham."
Feldman, 2015 WL 759250, at *8. Remove the Shapiro "loan" from
this transaction [SPR sale transaction] and nothing of consequence
changes--the shareholders [of FFI] get paid the same amount,
[$530,766.15] from the trust same [escrow] account. Id. In the same
way, what remains after disregarding the Shapiro "loan" in FFI is a
transfer of cash from FFI to petitioners via the trust [escrow] account.
In reality, the only money that changed hands was FFI's cash.

Petitioners counter that, in determining whether for purposes of the Indiana

UFTA in substance FFI made a distribution or transfer of its property to each of

---

[118](...continued)
"'[a] transaction structured solely for the purpose of avoiding taxes with no other
legitimate business purpose will be considered a sham for [Indiana] taxation
purposes.' Belterra, 900 N.E.2d at 517 (citing Gregory v. Helvering, 293 U.S.
465, 469-70, 55 S.Ct. 266, 79 L.Ed. 596 (1935))." As is true in Federal tax law,
the Indiana sham transaction doctrine is similar in material respects to Indiana
substance over form principles. As is also true in Federal tax law, the Indiana
sham transaction doctrine also is similar in material respects to the so-called step
transaction doctrine established in Indiana law (Indiana step transaction doctrine).
Indeed, the Indiana Supreme Court concluded in Belterra Resort Ind., LLC, 935
N.E.2d at 179 (citing Mason Metals Co. v. Ind. Dep't of State Revenue, 590
N.E.2d 672, 675 (Ind. T.C. 1992), and Bethlehem Steel Corp. v. Ind. Dep't of
State Revenue, 597 N.E.2d 1327, 1331 (Ind. T.C. 1992)): "In Indiana, the sub-
stance, rather than the form, of transactions determines their tax consequences.
* * * In this case the [Indiana use] tax consequences * * * must be analyzed under
the judicially created 'step transaction' doctrine to determine their substance."
(Citation omitted.) (citing Gregory v. Helvering, 293 U.S. at 469-470). All of the
different Indiana equitable principles or doctrines that the Indiana Supreme Court
uses in a variety of cases, including different types of Indiana tax cases, were
developed because the Indiana courts, including the Indiana Supreme Court,
believed it necessary and appropriate to look beyond the form of a transaction to
its substance. This is precisely what the UFTA, including the Indiana UFTA and
the Wisconsin UFTA that the Court of Appeals applied in Feldman v. Commis-
sioner, 779 F.3d 448, requires.

[*166] Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR sale transaction under the SPRA transaction, the Indiana Supreme Court would use the equitable collapsing doctrine. In advancing that position, petitioners acknowledge that, in the absence of any authority in Indiana law expressly addressing whether a transfer has occurred for purposes of the Indiana UFTA, "the Indiana Supreme Court could look to the statute and reason by analogy as was done in Feldman." However, petitioners maintain that the Indiana Supreme Court would not do what the Court of Appeals did in Feldman v. Commissioner, 779 F.3d 448. That is because, petitioners contend, when faced with an issue like the issue under the Indiana UFTA presented in these cases, the Indiana Supreme Court would, and the Court of Appeals for the Seventh Circuit would "presumes that the Indiana Supreme Court will", (1) ascertain the majority view regarding that issue of other jurisdictions that have adopted the UFTA and (2) follow that majority view. According to petitioners, the majority view is that the equitable collapsing doctrine would be applied in determining whether in substance there was a transfer of a debtor's property for purposes of the UFTA. In contrast, the Wisconsin substance over form principles that the Court of Appeals used in Feldman represents, according to petitioners, a minority view that is distinguishable from that majority

[*167] view.  As a result, petitioners maintain:  "Feldman is distinguishable as a matter of law and has no application here."

An additional reason offered by petitioners in support of their position that the Indiana Supreme Court would use the equitable collapsing doctrine is that that court would want to avoid the conflict that petitioners claim would be created if respondent's equitable doctrines were used between (1) Ind. Code Ann. sec. 32-18-2-20, which incorporates equitable principles into the Indiana UFTA, and (2) Ind. Code Ann. sec. 32-18-2-21, which requires the application and the construction of the Indiana UFTA in a manner that effectuates the general purpose of the model UFTA of making that law uniform among the jurisdictions that enact it.

Before addressing petitioners' argument that the Wisconsin courts' use of equitable substance over form principles under the Wisconsin UFTA, see Feldman v. Commissioner, 779 F.3d at 459, represents a minority view, we note that the equitable collapsing doctrine, as described by petitioners in their supplemental brief, see supra note 115, would appear to allow a court to do in material respects essentially the same thing as Wisconsin substance over form principles, Indiana substance over form principles, and the Indiana sham transaction doctrine (as well as other Indiana equitable principles such as the Indiana step transaction doctrine) allow a court to do; that is to say, all of those equitable principles or doctrines

[*168] allow a court to look beyond the form of a transaction to the substance of the transaction.[119]

We turn now to petitioners' argument that the Wisconsin courts' use of equitable substance over form principles under the Wisconsin UFTA, see Feldman v. Commissioner, 779 F.3d at 459, represents a minority view. In Feldman, the Court of Appeals held: "In light of the broad definition of 'transfer' in Wisconsin fraudulent-transfer law and the general applicability of substance-over-form analysis, the shareholders are properly deemed to be transferees under state law as well as federal." Id. Before the Court of Appeals declared that holding, it set out the legal framework in which it reached it. That framework consisted of the following legal principles established by the UFTA and adopted by the Wisconsin UFTA: (1) the term "transfer" in the Wisconsin UFTA, like the definition of that term in the UFTA adopted by other jurisdictions, is defined "very broadly"; (2) "state fraudulent-transfer law is itself flexible and looks to equitable principles like 'substance over form,' just like the federal tax doctrines [substance over form, business purpose, and economic substance]"; (3) Wisconsin, like other jurisdictions that have adopted the UFTA, "has long followed the general rule that '[e]quity looks to substance and not to form'"; and (4) "Wisconsin courts use the

_____

[119]See supra note 118.

**[\*169]** 'substance over form' principle in a variety of contexts, most notably including tax cases."[120]  Id. at 458-459 (quoting Cunneen v. Kalscheuer, 206 N.W. 917, 918 (Wis. 1926)).

As for the first principle that the term "transfer" in the Wisconsin UFTA, like the definition of that term in the UFTA adopted by other jurisdictions, is defined "very broadly" and the third principle that Wisconsin, like other jurisdictions that have adopted the UFTA, "has long followed the general rule that '[e]quity looks to substance, and not to form'", petitioners do not dispute, and we conclude, that they are valid principles under the Indiana UFTA.[121]

---

[120]In support of its conclusion that "Wisconsin courts use the 'substance over form' principle in a variety of contexts, most notably including tax cases", the Court of Appeals cited examples of Wisconsin caselaw involving not only Wisconsin tax issues, as petitioners allege, but also Wisconsin nontax issues. Feldman v. Commissioner, 779 F.3d at 459.

[121]Ind. Code Ann. sec. 32-2-7-10 (West 2002) in effect in 2001 defined the term "transfer" to mean "any mode of disposing of or parting with an asset or an interest in an asset whether direct or indirect, absolute or conditional, or voluntary or involuntary.  The term includes payment of money, release, lease, and creation of a lien or other encumbrance."  That definition of the term "transfer" was in all material respects identical to the definition of that term in Ind. Code Ann. sec. 32-18-2-10 (West 2015) that was in effect after 2001.  The definition of the term "transfer" in the Indiana UFTA in effect in and after 2001 is in all material respects identical to the definition of that term in the Wisconsin UFTA.  Compare Ind. Code Ann. sec. 32-2-7-10 (West 2002) and Ind. Code Ann. sec. 32-18-2-10 (West 2015) with Wis. Stat. sec. 242.01(12).

(continued...)

**[*170]** As for the second principle that "state fraudulent-transfer law is itself flexible and looks to equitable principles like 'substance over form,' just like the federal tax doctrines [substance over form, business purpose, and economic substance]", in positing that principle the Court of Appeals relied on <u>Boyer</u>, 587 F.3d at 793, a case that it had decided under the Indiana UFTA. <u>See</u> <u>Feldman v. Commissioner</u>, 779 F.3d at 459. The Court of Appeals had concluded in <u>Boyer</u> that the "[f]raudulent conveyance doctrine . . . is a flexible principle that looks to substance, rather than form, and protects creditors from any transactions the debtor engages in that have the effect of impairing their rights, while ensuring that the debtor can continue to do business and assuring third parties that transactions done with the debtor at arm's length will not be second-guessed." <u>Boyer</u>, 587 F.3d at 793 (alteration in <u>Boyer</u>) (quoting Douglas G. Baird, Elements of Bankruptcy 153-154 (4th ed. 2006)).[122] We agree with the Court of Appeals' conclusion in <u>Boyer</u>

---

[121](...continued)

The Indiana Supreme Court, like the Supreme Court of Wisconsin that the Court of Appeals cited in <u>Feldman v. Commissioner</u>, 779 F.3d at 459, has long followed the general principle that equity looks to substance, and not to form (the third principle set forth above). <u>See, e.g.</u>, <u>State ex rel. McGonigle v. Madison Circuit Court</u>, 193 N.E.2d 242, 250 (Ind. 1963); <u>Otis v. Gregory</u>, 13 N.E. 39, 43 (Ind. 1887).

[122]In <u>Boyer</u>, 587 F.3d 787, the Court of Appeals did not even mention, let alone use, what petitioners call the collapsing doctrine or the equitable collapsing

(continued...)

**[*171]** involving the Indiana UFTA, on which it relied in <u>Feldman v. Commissioner</u>, 779 F.3d at 459, involving the Wisconsin UFTA, that the second principle set forth above in <u>Feldman</u> is a valid principle under the Indiana UFTA.

As for the fourth principle that "Wisconsin courts use the 'substance over form' principle in a variety of contexts, most notably including tax cases" (Wisconsin substance over form principles), petitioners do not dispute, and we conclude, that Indiana courts, like Wisconsin courts, "use the substance over form principle in a variety of contexts, most notably including tax cases."[123] Petitioners do, however, contend that respondent is wrong in asserting that we may rely on

---

[122](...continued)
doctrine in determining whether in substance there was a transfer of the debtor's property to certain persons for purposes of applying the constructive fraud provisions of the Indiana UFTA. However, as discussed previously, in the proceedings below in that case, both the bankruptcy court and the District Court described "collapsing" or "recharacterizing" the transactions involved there as what would occur if Indiana substance over form principles that require that the substance of a transaction to prevail over its form were determined to be appropriate principles to use given the facts and circumstances of the case. See <u>Boyer v. Crown Stock Distrib., Inc.</u>, 2009 WL 418275, at *7; <u>In re Crown Unlimited Mach., Inc.</u>, 2006 WL 6401548, at *3.

[123]<u>See, e.g.</u>, <u>Belterra Resort Ind., LLC</u>, 935 N.E.2d at 179 (citing <u>Belterra Resort Ind., LLC v. Ind. Dep't of State Rev.</u>, 900 N.E.2d 513, 517 (Ind. 2010)); <u>Walter v. Balogh</u>, 619 N.E.2d 566, 568 (Ind. 1993); <u>Bethlehem Steel Corp. v. Ind. Dep't of State Rev.</u>, 597 N.E.2d 1327, 1331-1332 (Ind. T.C. 1992); <u>Monarch Beverage Co. Inc. v. Ind. Dep't of State Rev.</u>, 589 N.E.2d 1209, 1215 (Ind. T.C. 1992).

[*172] Indiana tax cases as support for using Indiana substance over form principles for purposes of the Indiana UFTA.  We believe that the Court of Appeals, which decided Feldman v. Commissioner, 779 F.3d 448, would, and we do, reject petitioners' contention.  In determining whether each of the C corporation's stockholders involved in Feldman was a transferee of property of the C corporation for purposes of the Wisconsin UFTA with respect to the purported sale transaction involved in that case, the Court of Appeals relied on, inter alia, Wisconsin tax cases that had applied substance over form principles.[124]

We have examined the holding and the rationale of the Court of Appeals that "[i]n light of the broad definition of 'transfer' in Wisconsin fraudulent-transfer law and the general applicability of substance-over-form analysis, the shareholders [of the debtor-C corporation in question] are properly deemed to be transferees under state law as well as federal." Id. 459.  We have also examined the legal framework in which it reached that holding and rationale.  See id. at 458-459.  We conclude that nothing in that holding, that rationale, or that legal framework provides any support for petitioners' argument that the Wisconsin courts' use of Wisconsin substance over form principles under the Wisconsin UFTA

---

[124]See supra note 120.

[*173] represents a minority view.[125] In fact, the holding and the rationale of the Court of Appeals and the legal framework in which it reached that holding in Feldman refute that argument, and we reject it.[126]

We conclude that, in determining whether for purposes of the Indiana UFTA in substance FFI made a distribution or transfer to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR sale transaction under the SPRA, the Indiana Supreme Court would use the same type of analysis that the Court of Appeals used in Feldman v. Commissioner, 779 F.3d 448, when it was making a similar determination under the Wisconsin UFTA. That is to say, the Indiana Supreme Court would use Indiana substance over form principles. We further conclude in the alternative that, in making that determination, the Indiana Supreme Court would use the same type of analysis that the Court of Appeals used in

---

[125]In the light of the conclusions of the Court of Appeals in Feldman v. Commissioner, 779 F.3d at 458-460, that the principles under the Wisconsin UFTA are consistent with the principles of the UFTA, we believe that if the Court of Appeals had believed that the Wisconsin courts' use of Wisconsin substance over form principles under the Wisconsin UFTA reflected a minority view, it would have expressly so stated. It did not.

[126]We also reject the second argument of petitioners regarding the alleged conflict that would be created between Ind. Code Ann. secs. 32-18-2-20 and 32-18-2-21 if Indiana substance over form principles, and not the equitable collapsing doctrine, were used. That argument is premised upon petitioners' view, which we have rejected, that the law of Wisconsin, as articulated by the Court of Appeals in Feldman v. Commissioner, 779 F.3d at 459, represents a minority view.

[*174] <u>Boyer</u>, 587 F.3d at 793, with respect to the Indiana UFTA. That is to say, the Indiana Supreme Court would use the equitable "'flexible principle [under the Indiana UFTA] that looks to substance, rather than form, and protects creditors from any transactions the debtor engages in that have the effect of impairing their rights, while ensuring that the debtor can continue to do business and assuring third parties that transactions done with the debtor at arm's length will not be second-guessed.'" <u>Id.</u> (quoting Baird, <u>supra</u>, at 153-154); <u>see also</u> <u>Cont'l Cas. Co. v. Symons</u>, 817 F.3d 979, 993 (7th Cir. 2016) ("[A] basic precept of fraudulent-transfer doctrine  * * * [is] substance trumps form." (citing <u>Boyer</u>, 587 F.3d at 793)). In addition, we conclude in the alternative that, in determining whether for purposes of the Indiana UFTA in substance FFI made a distribution or transfer to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR sale trans-action under the SPRA, the Indiana Supreme Court would use the same type of analysis that it and other Indiana courts have used in a variety of cases under which a transaction that is a sham and devoid of economic substance is disre-garded. That is to say, the Indiana Supreme Court would use the Indiana sham transaction doctrine.[127]

---

[127]There are other equitable principles, e.g., the Indiana step transaction doctrine, that we conclude in the alternative the Indiana Supreme Court would use

(continued...)

[*175]     We address next whether petitioners are correct in their contention that only the equitable collapsing doctrine "requires that Respondent prove that Petitioners knew or should have known that FFIA and/or MidCoast was going to cause FFI's taxes to not be paid." As we indicated previously, the equitable collapsing doc-trine relies on equitable principles that are not materially different from, inter alia, Indiana substance over form principles, which in turn are materially the same as Wisconsin substance over form principles that the Court of Appeals used in Feldman v. Commissioner, 779 F.3d 448. In fact, as also noted above, some courts have referred interchangeably to the equitable principles of collapsing transactions and the equitable principles of substance over form. See, e.g., Alterman v. Com-missioner, T.C. Memo. 2015-231 at *47-*48 (involving the Florida UFTA); In re Crown Unlimited Mach., Inc., 2006 WL 6401548, at *3 (involving the Indiana UFTA), aff'd, Boyer, 2009 WL 418275, at *7. Moreover, as we also indicated above, in certain cases that have referred interchangeably to the equitable principles of collapsing transactions and the equitable principles of substance over form, certain courts have, before using those principles under the

---

[127](...continued)
under the Indiana UFTA, provided that those other Indiana equitable principles do what the equitable principles that the Indiana UFTA, as well as the UFTA adopted by other jurisdictions, do; that is to say, look to substance, rather than form. See Boyer, 587 F.3d at 793.

[*176] applicable State UFTA, required a creditor to show that a purported

transferee of the debtor knew or should have known that the debt would not be

paid.  See, e.g., Alterman v. Commissioner, at *48 (involving the Florida UFTA).

Furthermore, as petitioners point out, in certain cases that have referred only to the

equitable principles of collapsing transactions, certain courts have, before using

those principles under the applicable State UFTA, required a creditor to show that

a purported transferee of the debtor knew or should have known that the debt

would not be paid.  See, e.g., Starnes v. Commissioner, 680 F.3d 417 (4th Cir.

2012) (involving the North Carolina UFTA), aff'g T.C. Memo. 2011-63; HBE

Leasing Corp. v. Frank, 48 F.3d 623 (2d Cir. 1995) (involving the New York

Uniform Fraudulent Conveyance Act).[128]  However, none of the cases imposing

the knowledge requirement involved the Indiana UFTA.[129]

The only cases that we have found involving the Indiana UFTA in which

the court used equitable principles that look to substance, rather than form, in

determining whether there was a transfer of the debtor's property to certain

---

[128]Certain jurisdictions, such as the State of New York, did not adopt the UFTA but retained the UFCA that, like the UFTA, is designed to protect creditors from fraudulent conveyances or transfers

[129]Nor did any of the cases imposing the knowledge requirement involve the Wisconsin UFTA.

[*177] persons are <u>Boyer</u>, 587 F.3d 787, and <u>Cont'l Cas. Co.</u>, 817 F.3d 979.  We discuss only <u>Boyer</u>, 587 F.3d 787.  That is because the Court of Appeals in <u>Cont'l Cas. Co.</u>, 817 F.3d at 991-997, relied on the so-called alter ego theory, and not on the Indiana UFTA, to hold certain individuals liable for fraudulent transfers to certain corporations that they owned and controlled.

In <u>Boyer</u>, a bankruptcy proceeding, Crown Unlimited Machine, Inc. (old Crown), sold all of its assets to a newly formed corporation (new Crown), which changed its name after that sale (Crown sale) to the name of the seller, in exchange for $3.1 million in cash and a $2.9 million promissory note (note) that was secured by all of the company's assets.  (We shall sometimes refer to (1) the cash and the note that new Crown transferred to old Crown as the sales proceeds and (2) the payment of the cash proceeds by new Crown to old Crown as the cash sales proceeds payment.)  Pursuant to an understanding of the parties to the Crown sale, immediately before the closing old Crown transferred $590,328 from its bank account to a separate bank account and then distributed those funds as dividends to its stockholders (preclosing dividend distributions).  See <u>Boyer</u>, 587 F.3d at 790-791.  At the closing, new Crown transferred the sales proceeds to old Crown in exchange for its then remaining assets.  After the closing, old Crown distributed the cash that it had received as part of the sale price to its stockholders and ceased

[*178] being an operating company. In each of the two years after the closing, pursuant to the terms of the note, new Crown made a payment to old Crown of $100,000 on the note (collectively, postclosing note payments), which it distributed to its stockholders. See id.; see also In re Crown Unlimited Mach., Inc., 2006 WL 6401548, at *1-*2. (We shall refer to all of the events that occurred relating to the old Crown sale, including those that are not recited herein but are recited in In re Crown Unlimited Mach., Inc., as the old Crown sale transaction.)

After the closing of the Crown sale, new Crown began operating the business in which old Crown had been engaged before the sale of old Crown's assets, but new Crown was not successful. New Crown began bankruptcy proceedings about three and a half years after it purchased old Crown's assets. There were not enough funds in new Crown to pay its unsecured creditors, and the trustee in bankruptcy (trustee) brought an adversary action against old Crown as the initial transferee and its stockholders (old Crown stockholders)[130] as the subsequent and immediate or mediate transferees. In that action, the trustee acknowledged (1) that in form new Crown had purchased old Crown's assets and made transfers of certain funds to old Crown to pay for those assets and (2) that if the form of the trans-

---

[130]The old Crown stockholders were members of the same family. See In re Crown Unlimited Mach., Inc., 2006 WL 6401548, at *1.

[*179] action were to be respected, (a) old Crown would be the initial transferee to whom an affirmative defense might be available under Ind. Code Ann. sec. 32-18-2-18 and (b) the old Crown stockholders would be subsequent and immediate or mediate transferees to whom an affirmative defense might be available under 11 U.S.C. sec. 550(b) (2012). However, the trustee maintained (1) that the substance of the Crown sale of assets should prevail over its form[131] and (2) that if the substance were to prevail, the transaction should be collapsed and recharacterized as a stock sale by the old Crown stockholders to new Crown that was financed by encumbering the assets of old Crown, i.e., a leveraged buyout (LBO). In that event, according to the trustee, new Crown, the debtor, would be considered to have purchased the stock of the old Crown stockholders with funds secured by old Crown's assets, thereby allowing those stockholders to "cash out any equity" in old Crown, which served as a mere conduit for those stockholders of the stock purchase price and whose business remained burdened with the resulting debt. As a result, the trustee contended, (1) new Crown, the debtor, would be considered to have made distributions to the old Crown stockholders that were fraudulent transfers under each of the constructive fraud provisions in Ind. Code Ann. secs.

---

[131]We shall refer to the trustee's theory that the substance of the Crown sale of its assets should prevail over its form as the trustee's substance over form theory.

[*180] 32-18-2-14(2) and 32-18-2-15,[132] and (2) those stockholders would be considered initial transferees (not subsequent and immediate or mediate transferees) to whom no affirmative defenses would be available under 11 U.S.C. sec. 550(b). See Boyer, 2009 WL 418275, at *3.

Before considering the trustee's substance over form theory, the bankruptcy court did not first require, as petitioners urge we must do in these cases, a showing by the trustee that the old Crown stockholders knew or should have known that new Crown's debts would not be paid. Id. at *3-*4. Although the bankruptcy court was unwilling to accept, and in fact rejected, the trustee's substance over form theory under which the entire transaction would be collapsed and recharacterized as an LBO, it did so for the following reasons. The bankruptcy court had concluded that acceptance of the trustee's substance over form theory "not only unnecessarily complicates this matter, but also inaccurately characterizes what transpired, overlooks significant facts and would operate to deprive the individual defendants [i.e., the old Crown stockholders] of the defenses that [11 U.S.C.]

---

[132]The constructive fraud provisions of the Indiana UFTA on which the trustee relied in Boyer, 587 F.3d 787, In re Crown Unlimited Machine, Inc., 2006 WL 6401548, aff'd, Boyer, 2009 WL 418275, are the same constructive fraud provisions on which, as discussed herein, respondent relies in these cases.

**[*181]** §550(b) gives to subsequent transferees [but not to initial transferees]."[133]

In re Crown Unlimited Mach., Inc., 2006 WL 6401548, at *3.

Having rejected the trustee's substance over form theory, and having accepted the form of the entire old Crown sale transaction, the bankruptcy court held that the preclosing dividend distributions did not involve "property of the debtor [new Crown]. * * * [and that] [a]t the time that dividend was paid, the money belonged to the debtor's seller [old Crown] * * * and not to the debtor. Thus, it was not 'a transfer made * * * by [the] debtor' and, as such, cannot be avoided as fraudulent under either I.C. 32-18-2-14 or I.C. 32-18-2-15." Id. at *11.

The bankruptcy court then addressed whether, having accepted the form of the entire old Crown sale transaction, the transfers by new Crown, the debtor, to old Crown were "avoidable transfers" under each of the two constructive fraud provisions in Ind. Code Ann. secs. 32-18-2-14(2) and 32-18-2-15. In addressing that issue, the bankruptcy court observed that "since fraudulent conveyance laws are intended to protect a debtor's creditors, the transaction is to be evaluated from their perspective, not that of the defendant/transferee." Id. at *6. After a thorough

---

[133]The bankruptcy court stated that "[c]ollapsing the transaction would transform the individual defendants from subsequent transferees into initial transferees and deprive them of * * * defenses [available only to subsequent transferees under 11 U.S.C. sec. 550(b)]." In re Crown Unlimited Mach., Inc., 2006 WL 6401548, at *4.

[*182] analysis of the facts and the law, the bankruptcy court held that the cash sales proceeds payment and the postclosing note payments were fraudulent transfers by new Crown, the debtor, to old Crown.[134]  See id. at *4-*14.

The bankruptcy court next turned to the questions under 11 U.S.C. sec. 550 as to what the trustee was entitled to recover and from whom.  That court concluded that old Crown was the initial transferee and that the old Crown stockholders were the subsequent and immediate or mediate transferees under that provision. The bankruptcy court observed:  "Just because a [fraudulent] transfer is recoverable, as here, from the initial transferee [old Crown] does not automatically mean

_____

[134]We note that, in considering each of the constructive fraud provisions in the Indiana UFTA, the bankruptcy court indicated that, in determining whether a debtor made a transfer "without receiving a reasonably equivalent value in exchange for the transfer" under Ind. Code Ann. secs. 32-18-2-14(2) and 32-18-2-15(1), it must consider all of the facts and circumstances, including "the good faith of the transferee and whether the * * * [transfer] was the result of an arms length transaction".  In re Crown Unlimited Mach., Inc., 2006 WL 6401548, at *8. However, the bankruptcy court concluded that those other considerations are not determinative of whether reasonable equivalent value was given by the transferee under those provisions.  See id.  In support of that conclusion, that court cited Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L. (In re R.M.L., Inc.), 92 F.3d 139, 148-154 (3d Cir. 1996).  In In re R.M.L., Inc., a bankruptcy proceeding involving 11 U.S.C. sec. 548, the U.S. Court of Appeals for the Third Circuit held that the debtor involved in that case did not receive reasonably equivalent value, despite the good faith of the transferee, the arms length nature of the transaction, and the charging of market rates for the fees in the transaction.  See id.; see also In re Crown Unlimited Mach., Inc., 2006 WL 6401548, at *8.

**[*183]** that it is also recoverable from the subsequent transferees. Section 550(b)

[of 11 U.S.C.] gives immediate and mediate transferees affirmative defenses that

are not available to the initial transferee." In re Crown Unlimited Mach., Inc.,

2006 WL 6401548, at *14.

The affirmative defense (good faith defense) that the old Crown stock-

holders (the immediate or mediate transferees) raised was that they took property

of new Crown, the debtor, "for value, * * * in good faith, and without knowledge

of the voidability of the transfer".[135]  11 U.S.C. sec. 550(b).  The old Crown stock-

---

[135]Old Crown claimed an affirmative defense under Ind. Code Ann. sec. 32-18-2-18(d), which allows, inter alia, "a good faith transferee or obligee * * * to the extent of the value given the debtor for the transfer or obligation, * * * a right to retain any interest in the asset transferred * * * [or]  a reduction in the amount of the liability on the judgment." See In re Crown Unlimited Mach., Inc., 2006 WL 6401548, at *12-*13.  The bankruptcy court rejected that affirmative defense because it found that old Crown was not a good faith transferee under Ind. Code Ann. sec. 32-18-2-18(d). Id.  In reaching that finding, the bankruptcy court noted that "[w]hether the recipient of a fraudulent conveyance qualifies as a good faith transferee is a question of fact * * * which largely turns on * * * [the] knowledge [of the transferee] at the time of the transaction sought to be avoided." In re Crown Unlimited Mach., Inc., 2006 WL 6401548, at *13.  The bankruptcy court indicated that although there was little agreement among courts as to the appropriate legal standard for the affirmative defense under Ind. Code Ann. sec. sec. 32-18-2-18(d) and similar provisions under the UFTA enacted by other jurisdictions, a court must take "an objective approach to determine what the transferee knew or should have known such that the transferee does not act in good faith when it has sufficient knowledge to place * * * [the transferee] on inquiry notice of the void-ability of the transfer." Id.  (quoting Dobin v. Hill (In re Hill), 342 B.R. 183, 203 (Bankr. D.N.J. 2006)).  As discussed below, the bankruptcy court applied a similar

(continued...)

**[*184]** holders had the burden of proving their entitlement to that affirmative

defense. The bankruptcy court expressly found that, except for one of the old

Crown stockholders named Steven Stroup II (Mr. Stroup II), who was old Crown's

president and its majority stockholder and who negotiated the sale of old Crown's

assets to new Crown, see In re Crown Unlimited Mach., Inc., 2006 WL 6401548,

at *1, the old Crown stockholders did not have a "high degree of involvement in

the transaction or his [Mr. Stroup II] knowledge of its details." Id. at *14. The

bankruptcy court further found that "it appears that they [old Crown stockholders

except Mr. Stroup II] were more or less content to let Mr. Stroup II make the

necessary decisions and run things." Accordingly, the bankruptcy court found that

those stockholders "had no reason to know of the possibly fraudulent nature of the

transaction that resulted in the distributions they received". Id. at *14.

The findings of the bankruptcy court that the old Crown stockholders took

property "in good faith" for purposes of 11 U.S.C. sec. 550(b) did not, however,

lead that court to conclude that the old Crown stockholders, except for Mr. Stroup

II, had proved their entitlement to the affirmative defense under that provision.

---

[135](...continued)
test in determining whether the old Crown stockholders, as immediate or mediate
transferees, took property "in good faith" for purposes of the affirmative defense
under 11 U.S.C. sec. 550(b) (2012).

**[\*185]** That was because those stockholders also had to prove that they took property "for value". With respect to that question, the bankruptcy court concluded that "value for the purpose of [11 U.S.C.] § 550(b)(1) 'looks to what the transferee gave up'". Id. at \*15 (quoting Bonded Fin. Servs., Inc. v. European Am. Bank, 838 F.2d 890, 897 (7th Cir. 1988)). The bankruptcy court found that the old Crown stockholders "gave nothing in exchange for their distributions from Crown Stock [old Crown]". According to that court, "[t]hose distributions were made, not in return for some exchange of property or services, or the payment of an antecedent debt, but solely on account of their status as shareholders in the company. Such distributions are not an exchange of anything and do not constitute value for purposes of [11 U.S.C.] § 550(b)." Id. at \*15. Consequently, the bankruptcy court held that none of the old Crown stockholders was entitled to the affirmative defense under 11 U.S.C. sec. 550(b). Id. at \*15.

The bankruptcy court decision in Boyer was appealed to the U.S. District Court for the Northern District of Indiana. The District Court affirmed the bankruptcy court decision.[136] See Boyer, 2009 WL 418275. The District Court, like

[136]The District Court did not reach the issue presented on appeal by old Crown and the old Crown's stockholders that the bankruptcy court had erred in holding that the transfers by new Crown to old Crown in the old Crown sale transaction were avoidable transfers under the constructive fraud provisions in

(continued...)

**[\*186]** the bankruptcy court, rejected the trustee's substance over form theory and as a result found, as the bankruptcy court had found, that the preclosing dividend dis-tributions were paid when the funds with which those distributions were made belonged to old Crown, and not to new Crown, the debtor. Consequently, the District Court held, as the bankruptcy court had held, that those distributions were not transfers made by new Crown, the debtor, and therefore may not be avoided as fraudulent under Ind. Code Ann. sec. 32-18-2-14(2). See Boyer, 2009 WL 418275, at \*8.

The District Court judgment in Boyer was appealed to the Court of Appeals for the Seventh Circuit. The Court of Appeals affirmed in part and reversed in part that judgment. See Boyer, 587 F.3d 787. The reversal was with respect to the District Court's holding that the preclosing dividend distributions were not trans-fers made by new Crown, the debtor, to the old Crown stockholders and therefore may not be avoided as fraudulent under Ind. Code Ann. sec. 32-18-2-14(2). As was true of the bankruptcy court and the District Court, the Court of Appeals began its analysis of the issues presented with what it described as "the trustee's

---

[136](...continued)
Ind. Code Ann. sec. 32-18-2-15. That was because it had affirmed the bankruptcy court's decision that those transfers were avoidable transfers under the construc-tive fraud provisions in Ind. Code Ann. sec. 32-18-2-14(2). See Boyer, 2009 WL 418275, at \*13.

[*187] argument for recharacterizing the [old Crown sale] transaction" as a sale by the old Crown stockholders of the stock of old Crown, i.e., an LBO, instead of a sale by old Crown of its assets. See id. at 791-792. The Court of Appeals acknowledged that the old Crown sale of its assets differed "in two formal respects" from a so-called conventional LBO in which an investor purchases the stock of a corporation from its stockholders with the proceeds of a loan that is secured by the corporation's assets. The first formal difference, according to the Court of Appeals, was that the old Crown sale involved the purchase of old Crown's assets and not its stock. The second formal difference, according to the Court of Appeals, was that "despite a load of debt and a dearth of cash, the corporation [new Crown] limped along for three-and-a-half years before collapsing into the arms of the bankruptcy court." See id. at 793.

Despite the two formal differences from a conventional LBO that the Court of Appeals found in the old Crown sale transaction, it indicated that "whether one calls it an LBO or not is not critical". However, the Court of Appeals indicated that "if one has to call the overall [old Crown sale] transaction something, the something is an LBO." Id. at 787. What was critical to the Court of Appeals was determining when an LBO is legitimate and when it is a fraudulent transfer. The Court of Appeals observed that, in making that determination with respect to the

[*188] old Crown sale transaction, it must bear in mind that the "'[f]raudulent conveyance doctrine . . . is a flexible principle that looks to substance, rather than form, and protects creditors from any transactions the debtor engages in that have the effect of impairing their rights, while ensuring that the debtor can continue to do business and assuring third parties that transactions done with the debtor at arm's length will not be second-guessed'." Boyer, 587 F.3d at 787 (alteration in Boyer) (quoting Baird, supra, at 153-154). As far as the Court of Appeals was concerned, if the preclosing dividend distributions were "part and parcel of the transaction that fatally depleted new Crown's assets, it was part and parcel of a fraudulent conveyance." Id. at 793.

The Court of Appeals then addressed whether there was any significance to the first formal difference between the old Crown sale transaction and a conventional LBO in which the stock, and not the assets, of a corporation is purchased. The court dismissed that formal difference as "of no conceivable significance", pointing out that an LBO can also take the form of an asset purchase. See id. at 793. The Court of Appeals explained that although the acquisition was "nominally of the assets of old Crown * * * [, it was] actually of the ownership of the company; for old Crown distributed the money it received in the sale forthwith to its shareholders and from then on existed only as a shell." Id. at 793-794. The

[*189] Court of Appeals continued its explanation and stated: "New Crown operated under the same name as its predecessor, and its trade creditors and other unsecured creditors were not even told about the transaction. That reticence would be normal if the stock of a corporation were sold, rather than its assets; but in a sale of its assets, the seller's creditors would expect to be notified that they would henceforth be dealing with a different firm." Id. at 794.

The Court of Appeals next addressed what it had called the second formal difference between the old Crown sale transaction and a conventional LBO, i.e., "despite a load of debt and a dearth of cash, the corporation limped along for three-and-a-half years before collapsing into the arms of the bankruptcy court." See id. at 793. The court first explained that a company might be insolvent, that is to say, it liabilities exceeded its assets, and nonetheless might continue to operate as long as it was able to raise enough money to pay its debts as they became due, or perhaps longer if its creditors were forbearing. However, the Court of Appeals concluded that that was not the financial situation in which new Crown found itself as a result of the terms of the old Crown sale transaction. According to the court, that sale transaction reduced new Crown's ability to borrow on favorable terms because, in order to buy old Crown's assets, new Crown had encumbered all of the assets of old Crown that new Crown owned after that transaction as

**[\*190]** collateral for the money that it borrowed to make that purchase.  Moreover, the Court of Appeals continued, "new Crown was forced to engage in continual borrowing during its remaining life, and on unfavorable terms."  Boyer, 587 F.3d at 794.  That was because, according to the Court of Appeals, most of old Crown's cash had been committed to making the preclosing dividend distributions to the old Crown stockholders and the postclosing note payments to old Crown and to paying almost $500,000 annually in order to service the note to the bank repre-senting the loan that financed its purchase of the old Crown assets.  The Court of Appeals pointed out that seven months before it began bankruptcy proceedings new Crown had "run up $8.3 million in debt and its assets were worth less than half that amount."  Id.  As far as the court was concerned, new Crown had made payments and incurred obligations because of the old Crown sale trans-action for which it received nothing in return except the $500 capital contribution of its sole stockholder and certainly did not receive "reasonably equivalent value".  As a result, the Court of Appeals found that even if new Crown was not in fact in-solvent when it started its business after the old Crown sale transaction, it "began life with 'unreasonably small' assets given the nature of its business."  Id.  The court emphasized that it was this difference between insolvency on the day an LBO is effected and having at that time such meager, i.e., "unreasonably small",

**[\*191]** assets that bankruptcy is "a consequence both likely and foreseeable" that is the difference between insolvency and "unreasonably small" assets in the LBO context. Id. The Court of Appeals found that new Crown "was naked to any financial storms that might assail it" because of its commitments as a result of the old Crown sale transaction. The court thus affirmed the bankruptcy court's finding that new Crown survived for three and a half years after the old Crown sale transaction "only on 'life support'". Id. at 794-795. Consequently, the Court of Appeals held that "the statutory condition for a fraudulent conveyance [under Ind. Code Ann. sec. 32-18-2-14(2)] was satisfied--or so at least the bankruptcy judge could and did find without committing a clear error."[137] Id. at 795.

The Court of Appeals then turned to the preclosing dividend distributions, which the lower courts (i.e., the bankruptcy court and the District Court), having rejected the trustee's substance over form theory, had found were payments made by old Crown before that transactions closed and thus were not transfers under the

---

[137]The Court of Appeals had observed earlier in Boyer that a corporate transfer is fraudulent within the meaning of Ind. Code Ann. sec. 32-18-2-14(2), "even if there is no fraudulent intent, if the corporation didn't receive 'reasonably equivalent value' in return for the transfer and as a result was left with insufficient assets to have a reasonable chance of surviving indefinitely." Boyer, 587 F.3d at 792 (citing Rose v. Mercantile Nat'l Bank of Hammond, 844 N.E.2d 1035, 1054 (Ind. Ct. App. 2006), vacated in part on other grounds, 868 N.E.2d 772 (Ind. 2007)).

[*192] Indiana UFTA by new Crown, the debtor, to those stockholders. The Court of Appeals found that those distributions were "an integral part of the LBO". In so finding, the court pointed out that dividends are rare for family-owned companies like old Crown, that they represented 50 percent of its profits for the year before the old Crown sale transaction closed, which was unreasonably large given that company's cash needs, and that the old Crown stockholders had thereby drained old Crown of its cash, a fact which was not known by its then current and future unsecured creditors. See Boyer, 587 F.3d at 794. From those findings, the Court of Appeals held: "These indications that the dividend was part of the fraudulent transfer rather than a normal distribution of previously earned profits--that it wasn't an ordinary dividend but rather the withdrawal of an asset vital to the acquiring firm [new Crown, the debtor]--were sufficient to place a burden on * * * [old Crown and the old Crown stockholders] of producing evidence that it was a bona fide dividend, a burden they failed to carry." Id. at 796.

In so holding with respect to the preclosing dividend distributions, the Court of Appeals did not first impose, let alone make any reference to, the knowledge requirement that petitioners argue is a prerequisite under the Indiana UFTA before it is permissible to apply equitable principles to determine whether in the SPR sale transaction under the SPRA there was a transfer under the Indiana UFTA of FFI's

**[*193]** property to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser. In fact, the knowledge requirement that petitioners urge we adopt for purposes of the Indiana UFTA here was not satisfied in <u>Boyer</u> as to any of the old Crown stockholders except Mr. Stroup II. As discussed previously, the bankruptcy court expressly had found when it was considering the so-called good faith defense under 11 U.S.C. sec. 550(b) raised by the old Crown stockholders that the old Crown stockholders did not have a "high degree of involvement in the transaction or his [Mr. Stroup II] knowledge of its details." <u>In re Crown Unlimited Mach., Inc.</u>, 2006 WL 6401548, at *14. The bankruptcy court further found that "it appears that they [old Crown stockholders except Mr. Stroup II] were more or less content to let Mr. Stroup II make the necessary decisions and run things." <u>Id.</u> Accordingly, the bankruptcy court found that those stockholders "had no reason to know of the possibly fraudulent nature of the transaction that resulted in the distributions they received". <u>Id.</u> The Court of Appeals did not disturb those findings of the bankruptcy court.[138]

Several years after the Court of Appeals for the Seventh Circuit decided <u>Boyer</u>, 587 F.3d 787, it again was asked in <u>Feldman v. Commissioner</u>, 779 F.3d

---

[138]The District Court also did not disturb the findings of the bankruptcy court regarding the lack of knowledge and thus good faith of the old Crown stockholders except Mr. Stroup II. <u>See</u> <u>Boyer</u>, 2009 WL 418275.

[*194] 448, whether the creditor there (the Commissioner) was required to satisfy the knowledge requirement before the court would use applicable State law equitable principles (namely, Wisconsin substance over form principles) in determining whether under the applicable State's (namely, Wisconsin's) UFTA there was a transfer of the debtor's property to the debtor's stockholders in the sale transaction involved in that case. See id. at 459. Consistent with what it had implicitly found in Boyer, 587 F.3d at 787, under the law in Indiana, including the Indiana UFTA, the Court of Appeals explicitly held that under the law of Wisconsin, including the Wisconsin UFTA, "due diligence and lack of knowledge of illegality is simply beside the point" in determining whether the sale transaction involved in that case could be "recast" or "recharacterized" under the Wisconsin UFTA as a transfer by the debtor to its stockholders. See Feldman v. Commissioner, 779 F.3d at 459-460.

In rejecting the knowledge requirement in Feldman, the Court of Appeals relied on Badger State Bank v. Taylor, 688 N.W.2d 439, 447-449 (Wis. 2004). See Feldman v. Commissioner, 779 F.3d at 459. According to the Court of Appeals, "[t]he Wisconsin Supreme Court has explained that subjective intent and good faith play no role in the application of the constructive-fraud provisions of

[*195] Wisconsin's UFTA." (Badger conclusion)[139] Id. We have found no jurisdiction that has enacted the UFTA which has rejected the principle embodied in the Badger conclusion.[140] To the contrary, we have found authority indicating that the Badger conclusion under the Wisconsin UFTA that the Wisconsin Supreme Court articulated in Badger State Bank is generally accepted by the State of Indiana as well as other jurisdictions that have enacted the UFTA.

In Manning v. Wallace (In re First Fin. Assocs., Inc.), 371 B.R. 877, 899 (Bankr. N.D. Ind. 2007), involving, inter alia, the constructive fraud provisions of the Indiana UFTA, the bankruptcy court concluded that "[a] 'constructively fraudulent conveyance' * * * [under the Indiana UFTA] has nothing to do with the intent or motivation surrounding the transfer. Instead, its fraudulent nature is determined solely by the circumstances of the transaction itself."[141]

---

[139]In Badger State Bank v. Taylor, 688 N.W.2d 439, 447-449 (Wis. 2004), the Wisconsin Supreme Court did not have before it the issue of whether to "recast" or "recharacterize" a transaction under the Wisconsin UFTA when it reached the Badger conclusion as restated by the Court of Appeals in Feldman and quoted in the text.

[140]We are persuaded that if the Court of Appeals had believed that other jurisdictions had rejected the Badger conclusion, it would have expressly so stated. It did not. See Feldman v. Commissioner, 779 F.3d at 459-460.

[141]As was true of the Wisconsin Supreme Court in Badger State Bank, 688 N.W.2d 439, the bankruptcy court did not have before it in Manning v. Wallace

(continued...)

**[\*196]** Moreover, the holding of the Court of Appeals in <u>Boyer</u> that there were transfers from new Crown, the debtor, to the old Crown stockholders under the Indiana UFTA when they received the preclosing dividend distributions necessarily was premised on that court's belief that subjective intent and good faith have no role in the application of the constructive fraud provisions of the Indiana UFTA.[142]  <u>See Boyer</u>, 587 F.3d at 796; <u>see also</u> <u>Nesco, Inc. v. Cisco</u>, No. CV 205-142, 2005 WL 2493353 (S.D. Ga. Oct. 7, 2005) (involving Georgia UFTA); <u>Interpool Ltd. v. Patterson</u>, 890 F. Supp. 259, 268 n.7 (S.D.N.Y. 1995) (involving Florida UFTA);  <u>In re Petters Co. Inc.</u>, 494 B.R. 413, 432, n.25 (Bankr. D. Minn. 2013) (involving Minnesota UFTA); <u>Rose v. Mercantile Nat'l Bank of Hammond</u>,

_____

[141](...continued) (<u>In re First Fin. Assocs. Inc.</u>), 371 B.R. 877 (Bankr. N.D. Ind. 2007), the issue of whether to "recast" or "recharacterize" a transaction under the Indiana UFTA when it reached the conclusion quoted in the text.

[142]As discussed above, the Court of Appeals (and the District Court) did not disturb the express findings of the bankruptcy court, when it was considering the so-called good faith defense under 11 U.S.C. sec. 550(b) raised by the old Crown stockholders, that the old Crown stockholders (except Mr. Stroup II) did not have a "high degree of involvement in the transaction or his [Mr. Stroup II] knowledge of its details."  <u>In re Crown Unlimited Mach., Inc.</u>, 2006 WL 6401548, at \*14. Nor did the Court of Appeals (or the District Court) disturb the bankruptcy court's express findings that "it appears that they [old Crown stockholders except Mr. Stroup II] were more or less content to let Mr. Stroup II make the necessary decisions and run things", <u>id.</u>, and that therefore those stockholders "had no reason to know of the possibly fraudulent nature of the transaction that resulted in the distributions they received", <u>id.</u>

**[*197]** 844 N.E.2d 1035, 1054 (Ind. Ct. App. 2006) (involving Indiana UFTA),

vacated in part on other grounds, 868 N.E.2d 772 (Ind. 2007); Orthotec, LLC v.

Healthpoint Capital, LLC, 2013 N.Y. Misc. LEXIS 2340, at *25 (N.Y. Sup. Ct.

2013) (involving California UFTA); Sease v. John Smith Grain Co., 479 N.E.2d

284, 287 (Ohio Ct. App. 1984) (involving Ohio UFTA);[143] UFTA Prefatory Note,

7A (Part II) U.L.A. 5-6 (2006).

We conclude that the Indiana Supreme Court will not impose, and that the

Court of Appeals for the Seventh Circuit will hold that the Indiana Supreme Court

will not impose, the knowledge requirement before using Indiana substance over

form principles in order to determine whether FFI made a distribution or transfer

under the Indiana UFTA of its property to each of Mr. Fankhauser, Mr. Weintraut,

and Ms. Fankhauser in the SPR sale transaction under the SPRA. See Boyer, 587

F.3d 787.

Assuming arguendo that, contrary to our holding, the Court of Appeals for

the Seventh Circuit were to conclude that the Indiana Supreme Court would im-

pose the knowledge requirement before using Indiana substance over form prin-

---

[143] As was true of Badger State Bank, 688 N.W.2d 439, and In re First Fin. Assocs., Inc., 371 B.R. 877, the courts in the cases in the string citation in the text did not have before them the issue of whether to "recast" or "recharacterize" a transaction under the applicable State UFTA. See supra notes 139 and 141.

**[*198]** ciples in order to determine whether FFI made a distribution or transfer under the Indiana UFTA of its property to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR sale transaction under the SPRA, we find on the record before us that that requirement is satisfied with respect to each of them.

Before considering whether each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser knew, or should have known (so-called constructive knowledge), that FFI's Federal income tax liability for its taxable year 2001 would not be paid, we note that constructive knowledge includes so-called inquiry knowledge. See Diebold Found., Inc. v. Commissioner, 736 F.3d 172, 187-190 (2d Cir. 2013) (involving New York UFCA), vacating and remanding Salus Mundi Found. v. Commissioner, T.C. Memo. 2012-61; Starnes v. Commissioner, 680 F.3d at 434 (involving the North Carolina UFTA). A transferee has inquiry knowledge where the transferee was "aware of circumstances that should have led * * * [the trans-feree] to inquire further into the circumstances of the transaction, but * * * failed to make such inquiry." HBE Leasing Corp., 48 F.3d at 636 (involving the New York UFCA); see Diebold Found., Inc. v. Commissioner, 736 F.3d at 187. As the Court of Appeals for the Second Circuit stated in Diebold Found., Inc. v. Commissioner, 736 F.3d at 190:

**[*199]** [W]hen entering into a particular transaction for the express purpose of limiting--or altogether avoiding--tax liability, parties are all the more likely to have this duty to inquire. In such cases, the surround-ing circumstances always include a deliberate effort to avoid liability, and it would be the very rare case indeed where a purchasing party would assume such liability without an appropriate discount in the sale price. In such scenarios, being aware that this is the case, parties have a duty "to inquire further into the circumstances of the trans-action." [Citation omitted.]

There is some ambiguity with respect to the precise test for constructive knowledge in that certain courts define that term as the knowledge that ordinary diligence would have elicited, while other courts require a more active avoidance of the truth. See id. at 187. Because we find that each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser had constructive knowledge under either of those tests, we need not, and do not, resolve which test to apply in these cases.

In order to determine whether each of the FFI stockholders had constructive knowledge, including inquiry knowledge, that FFI's Federal income tax liability for its taxable year 2001 would not be paid, we must examine all of the facts and circumstances. See id. at 187-188. We start with the failure on the part of the FFI stockholders, as well as Mr. Thrapp, to learn anything about the tax strategy of MidCoast in addition to what they understood the results of that tax strategy would be for FFI; namely, FFI's total anticipated 2001 tax liability of $1,026,100.69 would not be paid but would be deferred. Neither the FFI stock-

**[\*200]** holders nor Mr. Thrapp saw any need to, and did not, press MidCoast's representatives regarding the details of its tax strategy, its acquisition strategy, and its asset recovery business, all of which they understood were inextricably intertwined. Nor did the FFI stockholders or Mr. Thrapp see any need to, or in fact, inquire through their respective contacts whether there were persons who were not employed by MidCoast or by Ice Miller and who might be familiar with MidCoast's tax strategy, acquisition methodology, and its asset recovery business.

The only reason offered at trial why none of the FFI stockholders, or Mr. Thrapp, made any inquiries regarding MidCoast's tax strategy was that they understood that that strategy was proprietary and that consequently MidCoast would not share any details about it with them. Petitioners proffered that explanation even though Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser knew, directly or through Mr. Thrapp, that MidCoast's pricing in its acquisition methodology was inextricably intertwined with its tax strategy. Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser, as well as Mr. Thrapp, knew that the transactions that MidCoast had proposed in the letter of intent and to which they agreed in the SPRA would result in their receiving a greater amount of assets--a so-called premium--than they would receive if FFI were to liquidate and the respective Federal and State income tax liabilities that FFI incurred as a result of the FFI

[*201] 2001 asset sales were paid in full. The FFI stockholders, as well as Mr. Thrapp, also knew that the only reason that the FFI stockholders would be able to receive such a premium was that FFI's total anticipated 2001 tax liability of $1,026,100.69 would not be paid. In other words, Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser, as well as Mr. Thrapp, knew that if and only if that total anticipated 2001 tax liability was not paid would the FFI stockholders receive the so-called premium.

On the record before us, we find that the failure on the part of the FFI stockholders, as well as Mr. Thrapp, to learn anything about the tax strategy of Mid-Coast, especially since they understood that the results of that tax strategy purported to be that FFI's total anticipated 2001 tax liability of $1,026,100.69 would not be paid but would be deferred, was willful and unreasonable.[144] On that record, we further find that that failure was an attempt on their part to avoid making any inquiries that would raise red flags.

We turn next to the failure on the part of the FFI stockholders, as well as Mr. Thrapp, to make inquiries about the unusual pricing methodology that Mid-

_____

[144]That MidCoast considered its tax strategy to be proprietary and thus would not be disclosed to them was a red flag, not a reason to make no inquiries regarding that strategy.

[*202] Coast intended to use, which they understood MidCoast had used in the past in establishing the purchase price for its acquisition of the stock of C corporations. The FFI stockholders, as well as Mr. Thrapp, understood that pursuant to MidCoast's pricing methodology the purchase price that it was willing to pay was calculated by using a percentage of the total of the acquired C corporation's Federal income tax liability and State income tax liability, which varied from acquisition to acquisition but was within a range that MidCoast had established. In these cases, Mr. Fankhauser and Mr. Weintraut were experienced businessmen who owned and operated FFI, and Mr. Thrapp was an experienced corporate and business lawyer. In fact, Mr. Weintraut negotiated directly with MidCoast's representatives the percentage of the total of FFI's Federal and State income tax liabilities for its taxable year 2001 that MidCoast would pay to purchase the stock of the FFI stockholders. In doing so, Mr. Weintraut attempted to have MidCoast agree to pay a percentage that was at the high end of the range of percentages to which he understood MidCoast had agreed in the past as part of its acquisition methodology. After some negotiation, the purchase price to which the FFI stockholders and MidCoast agreed was $530,766.15.[145] Each of Mr. Fankhauser,

---

[145]The purchase price of $530,766.15 that Mr. Weintraut negotiated with MidCoast's representatives was equal to the total (i.e., $1,033,555.49) of FFI's

(continued...)

[*203] Mr. Weintraut, and Ms. Fankhauser, as well as Mr. Thrapp, should have known, and would have known, as discussed below, if the FFI stockholders had retained a tax professional, that a buyer interested in purchasing the stock of a C corporation that had substantial total Federal and State income tax liabilities would usually discount the amount that it would be willing to pay to buy the stock of such a corporation in order to take account of those liabilities, not pay the premium that they knew they would receive if they were to enter into the transactions that MidCoast proposed.

On the record before us, we find that the failure on the part of the FFI stockholders, as well as Mr. Thrapp, to make inquiries about the unusual pricing methodology that MidCoast intended to use was willful and unreasonable. On that record, we further find that that failure was an attempt on their part to avoid making any inquiries that would raise red flags.

We consider now the failure on the part of the FFI stockholders to make inquiries regarding the tax consequences to them and FFI from the transactions that MidCoast had proposed by retaining a tax professional to advise them and FFI

---

[145](...continued)
cash of $875,855.49 and the right to a refund of the FFI State 2001 income tax payments of $157,700, which FFI would be considered to have as of the closing of the SPR redemption transaction under the SPRA, reduced by 49 percent (i.e., by $502,789.34) of FFI's total anticipated 2001 tax liability of $1,026,100.69.

[*204] with respect to those transactions. They failed to do so even though FFI had retained tax professionals over the years to provide it with tax advice with respect to certain matters. Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser offer as an explanation for that failure that at no time after MidCoast proposed the transactions in the letter of intent and before the closing of the transactions under the SPRA did Mr. Thrapp or Mr. Hupfer with Ice Miller or Mr. Burns or Mr. Vernick with the Katz accounting firm inform FFI and the FFI stockholders about possible tax problems associated with those transactions. Nor did Mr. Thrapp, Mr. Hupfer, Mr. Burns, or Mr. Vernick recommend to FFI and the FFI stockholders that they retain any tax professional to provide advice with respect to the trans-actions that MidCoast had proposed and the transaction to which they agreed in the SPRA. Petitioners' explanation as to why they did not retain a tax professional rings hollow. The record does not establish that any of the professionals who were advising and working with the FFI stockholders and FFI regarding the MidCoast proposed transactions was a tax professional. Consequently, we believe that, unlike a tax professional, none of them would have been aware of, and sensitive to, any potential tax problems that MidCoast's proposed transactions and the transactions to which the FFI stockholders and FFI agreed in the SPRA posed to those stockholders and that corporation. Moreover, we believe that if the FFI

[*205] stockholders had attempted to retain a tax professional, they probably would have been able to retain one who was familiar with MidCoast and the transactions with C corporations in which it had engaged in the past and which it continued to promote in its promotional materials. We also believe, as discussed above, that if the FFI stockholders had retained a tax professional, that professional would have advised them that a buyer interested in purchasing the stock of a C corporation that had substantial total Federal and State income tax liabilities would usually discount the amount that it would be willing to pay to buy the stock of such a corporation in order to take account of those liabilities, not pay a premium.

On the record before us, we find that the failure on the part of the FFI stockholders to make inquiries regarding the tax consequences to them and FFI from the transactions that MidCoast had proposed by retaining a tax professional to advise them and FFI with respect to those transactions was willful and unreasonable. On that record, we further find that that failure was an attempt on their part to avoid receiving any tax advice that would raise red flags.

We address next the failure on the part of the FFI stockholders, as well as Mr. Thrapp, to make inquiries regarding how MidCoast's planned operation of its asset recovery business in FFI would result in FFI's not paying but deferring FFI's

[*206] total anticipated 2001 tax liability of $1,026,100.69. Each of Mr. Fank-hasuer, Mr. Weintraut, and Ms. Fankhasuer knew, as did Mr. Thrapp, that as of the closing of the respective transactions on December 20, 2001, FFI had no operations, no employees engaged in operations, no income, and no operational assets. Each of them also knew, as did Mr. Thrapp, that on December 20, 2001, after the SPR transactions closed simultaneously at 11:59 p.m., FFI had (1) assets totaling $502,789.34, which consisted of cash of $345,089.34 and the right to a refund of $157,700 of State 2001 income tax payments, and (2) anticipated Federal income tax liabilities and anticipated State income tax liabilities totaling $1,026,100.69, or a negative net asset value of $523,311.35.[146]

In addition, each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser understood, as did Mr. Thrapp, that MidCoast through FFIA was purporting to purchase their FFI stock so that MidCoast would be able to use FFI's cash in order to buy charged-off debt securities that MidCoast intended to use in its so-called

---

[146]The FFI stockholders also knew, as did Mr. Thrapp, that after the SPR transactions under the SPRA closed, they would have, through their respective ownership interests in FFW, the right to a refund of the Federal income tax payments of $628,592 that FFI had made during 2001 as payments toward FFI's anticipated 2001 Federal income tax liability of $794,949.13. In addition, after the SPR transactions under the SPRA closed, FFI would have the right to a refund of the State 2001 income tax payments of $157,700 that FFI had made during 2001 as payments toward FFI's anticipated 2001 State income tax liability of $231,151.56. See supra notes 34 and 100.

[*207] asset recovery business. However, each of the FFI stockholders also knew, as did Mr. Thrapp, that MidCoast through FFIA agreed in the SPRA to pay them $530,766.15 in cash for their FFI stock and that as of the closing of the SPR transactions FFI (FFIA's designee) was to receive only $502,789.34 (i.e., cash of $345,089.34 and the right to a refund of the FFI State 2001 income tax payments of $157,700). In other words, each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser knew, as did Mr. Thrapp, that MidCoast through FFIA agreed in the SPRA to pay $530,766.15 in cash in return for only $502,789.34, which MidCoast purportedly would use in the asset recovery business that it was to operate in FFI. The financial terms of the SPR transactions, on their face, made no business sense for MidCoast's alleged operation of its assets recovery business in FFI and cried out for an explanation.

Inquiries by the FFI stockholders, or by Mr. Thrapp, about MidCoast's plans for the operation of its asset recovery business in FFI would have disclosed that MidCoast intended for FFI to engage in a transaction within approximately one week after the closing on December 20, 2001, of the SPR transactions. In that transaction, FFI was to sell at a very substantial claimed loss certain T-bills that were to be contributed to it by a company, FFI Financial, that FFIA and Willows Holdings had formed on the day after that closing. That T-bill transaction, on its

[*208] face, appeared to be inconsistent with MidCoast's purported intention to operate its asset recovery business in FFI by having FFI acquire charged-off debt securities for use in such a business.[147]  In other words, that transaction raised another red flag.  But because neither the FFI stockholders nor Mr. Thrapp ever asked about MidCoast's plans for the operation of its asset recovery business in FFI, they did not know about the T-bill transaction.  If they had known about that transaction, the FFI stockholders, or Mr. Thrapp, could have then asked what the planned acquisition and the planned sale of T-bills at the end of 2001 had to do with acquiring charged-off debt securities for use in the asset recovery business in

---

[147]Included in the representations which were made for purposes of the Manatt opinion letter and on which Manatt relied for purposes of the opinions expressed in that letter, including that "the carryover tax basis for Subsidiary [FFI] was $2,962,960 for the Treasury Bills Parent [FII Financial] contributed to Subsidiary" were the following representations:

> Both Parent and Subsidiary entered into the Contribution principally with a view toward making an economic profit apart from tax consequences.  The Contribution will strengthen the balance sheet of Subsidiary in preparation for Subsidiary entering into a new line of business.  Subsidiary also will use pre-Contribution assets in its new business.  The new business is that Subsidiary will purchase portfolios of credit card receivables and collect those receivables.
> * * *

The above-quoted representations are inconsistent with FFI's acquisition from FFI Financial of certain T-bills as well as its sale of those T-bills within days after acquiring them at a very substantial claimed loss.

[*209] which they understood MidCoast intended FFI to engage. The answer to that question would have been nothing, thereby raising an additional red flag.

The FFI stockholders, as well as Mr. Thrapp, also could have asked about how the expected significant loss from the sale of the T-bills was calculated. They would have learned that the value of the T-bills was $8,000 and that the very substantial loss that FFI was to claim in its tax return for its taxable year 2001 was premised on the representation, inter alia, by Mr. Bernstein and other interested persons that the basis of the T-bills was $2,962,960. In addition, the FFI stockholders and Mr. Thrapp would have learned, if they had asked, that FFI intended to use the very significant claimed loss from the sale of the T-bills to re-duce the significant gains that FFI had realized from the FFI 2001 asset sales. If the FFI stockholders had retained a tax professional before committing in the SPRA to the transactions that MidCoast proposed in the letter of intent, we believe that any such tax professional would have raised serious concerns regarding the propriety of that significant claimed T-bill loss and would have wanted to make further inquiries about how and why Mr. Bernstein and others were able to represent that the T-bills had a basis of $2,962,960. If the FFI stockholders, or Mr. Thrapp, had inquired about how FFI's basis in the T-bills was determined, the answer could have raised more danger signals.

[*210]     On the record before us, we find that the failure on the part of the FFI

stock-holders, as well as Mr. Thrapp, to make inquiries regarding how MidCoast's

planned operation of its asset recovery business in FFI would result in FFI's not

paying but deferring FFI's total anticipated 2001 tax liability of $1,026,100.69

was willful and unreasonable.  On that record, we further find that that failure was

an attempt on their part to avoid making any inquiries that would raise red flags.

We turn now to the failure on the part of Mr. Fankhauser, Mr. Weintraut,

and Ms. Fankhauser, as well as Mr. Thrapp, to make inquiries or conduct due

diligence regarding FFIA, MidCoast's designee as the purported purchaser of the

FFI stock from the FFI stockholders.  Each was them knew, or should have known

through due diligence,[148] that FFIA was created by Mr. Bernstein on December 18,

---

[148]The FFI stockholders did not personally undertake any due diligence on behalf of FFI or themselves with respect to the transactions that MidCoast had proposed in the letter of intent.  Instead, the FFI stockholders relied on Mr. Thrapp to conduct due diligence with respect to those transactions.  Mr. Thrapp spent some time performing a limited amount of due diligence on behalf of FFI and the FFI stockholders that consisted for the most part of reviewing certain promotional materials that MidCoast had prepared.  Mr. Thrapp did not perform due diligence with respect to FFIA that MidCoast designated to serve as the purchaser of the stock of the FFI stockholders.  Mr. Thrapp claimed to have believed that the limited amount of due diligence that he performed was adequate taking into account the information and the circumstances with respect to the transactions that MidCoast had proposed in the letter of intent and the signatories to that letter about which he had knowledge or an understanding.  Mr. Thrapp further claimed to have believed that the knowledge and the understanding that he had with

(continued...)

[*211] 2001, a few days before the parties were to execute the SPRA and effect the transactions to which they had agreed therein. FFIA had no assets when it agreed to the SPRA on December 20, 2001, apparently not even the $1,000 of capital that Mr. Bernstein was supposed to have contributed to it. Nonetheless, petitioners and Mr. Thrapp want us to believe that they were willing to rely on the covenants, the representations, and the warranties of FFIA because of the indemnification obligations of FFIA in the event of any breaches of any of those covenants, representations, and/or warranties. We refuse to do so. Because of its financial condition, we believe, and so should have the FFI stockholders and Mr. Thrapp, that FFIA would not have been able to satisfy any financial obligations resulting from those covenants, representations, and/or warranties.

On the record before us, we find that the failure on the part of the FFI stockholders, as well as Mr. Thrapp, to make inquiries or conduct due diligence regard-

---

[148](...continued)
respect to the transactions that MidCoast had proposed in the letter of intent and the signatories to that letter enabled him to determine and to assess the risks that he concluded those transactions posed to his clients, FFI and the FFI stockholders. Mr. Thrapp claimed to have held those beliefs even though (1) he did not know any of the details of MidCoast's acquisition methodology, its asset recovery business, or its tax strategy, (2) he was not a tax professional and thus was not qualified to know of, or be sensitive to, any tax risks associated with those transactions, and (3) he knew that the funds that were to be provided by Ms. Shapiro to MidCoast in order to effect the acquisition of the FFI stock were to be returned to her as of the closing of that transaction.

**[\*212]** ing FFIA, MidCoast's designee as the purported purchaser of the FFI stock from the FFI stockholders, was willful and unreasonable. On that record, we further find that that failure was an attempt on their part to avoid making any inquiries that would raise red flags.

We turn finally to the failure on the part of the FFI stockholders, as well as Mr. Thrapp, to make any inquiries regarding the so-called loan by Ms. Shapiro of $550,000 to FFIA (MidCoast's designee), which, according to the terms of the SPRA, FFIA was to use to purchase the FFI stock. Each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser, each of whom had signed the SPRA, the SPRA escrow agreement to which the Shapiro escrow agreement was attached, and the cash reconciliation agreement which also was attached to the SPRA escrow agreement, as well as Mr. Thrapp, knew that that purported loan of Ms. Shapiro was not evidenced by a promissory note or other written document and did not bear interest. Each of the FFI stockholders, as well as Mr. Thrapp, also knew that that purported loan by Ms. Shapiro was to be deemed repaid as of the closing of the transactions under the SPRA, which was deemed to occur simultaneously pursuant to that agreement.[149] Morever, each of them knew, as did Mr. Thrapp, that

---

[149]Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser also knew that because the SPR transactions closed simultaneously at 11:59 p.m. on December

(continued...)

[*213] pursuant to the SPRA and the related agreements FFI was to deposit $875,855.49 into the Leagre escrow account on December 20, 2001, and that FFI as FFI's designee was to receive only $345,089.34 from that escrow account as of the closing of the transactions under the SPRA at 11:59 p.m. on December 20, 2001.[150]  Each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser also knew, as did Mr. Thrapp, that the difference between the amount that FFI was to deposit into the Leagre escrow account (i.e., $875,855.49) and the amount that FFI as FFIA's designee was to receive from that escrow account (i.e., $345,089.34) was equal to $530,766.15.  Each of the FFI stockholders knew, as did Mr. Thrapp, that that difference was equal to the amount of the purchase price that they were to receive for their FFI stock under the SPRA from, according to the terms of that agreement, FFIA.

---

[149](...continued)
20, 2001, the wire transfer from the Leagre escrow account to Ms. Shapiro's bank account of $550,000 and the wire transfers from that same Leagre escrow account to their respective bank accounts of their proportionate portions of the purchase price for their FFI stock were not to occur until the day after the closing of those transactions.

[150]As was true of the respective wire transfers to Mr. Fankhauser, Mr. Weintraut, Ms. Fankhauser, and Ms. Shapiro, FFI received a wire transfer on the day after the closing.

**[*214]** Moreover, each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser knew, as did Mr. Thrapp, or should have known, as Mr. Thrapp should have known, that Ms. Shapiro's so-called loan of $550,000 to FFIA was not needed or used in order to effect the purchase of the FFI stock under the SPRA and that that so-called loan was mere window dressing designed to make it appear that FFIA, not FFI, was providing the funds to be paid to them for the transfer of their FFI stock to FFIA. In other words, each of the FFI stockholders knew, as did Mr. Thrapp, or should have known, as Mr. Thrapp should have known, that Ms. Shapiro's so-called loan of $550,000 to FFIA was devoid of any economic substance--a sham that was designed and intended to make it appear as though FFIA, not FFI, was providing the funds to be paid to the FFI stockholders for the transfer of their FFI stock to FFIA. Moreover, each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser knew, as did Mr. Thrapp, or should have known, as Mr. Thrapp should have known, that the source of the funds that they were to receive for the transfer of their FFI stock to FFIA was FFI, not FFIA. That is to say, each of the FFI stockholders, as well as Mr. Thrapp, knew, or should have known, that FFI, not FFIA, was to, and did, pay each of those stockholders each such stockholder's proportionate portion of the so-called purchase price (i.e., $530,766.15) that each was to, and did, receive under the SPRA.

**[\*215]** On the record before us, we find that the failure on the part of the FFI stockholders, as well as Mr. Thrapp, to make inquiries regarding the so-called loan by Ms. Shapiro of $550,000 to FFIA (MidCoast's designee), which, according to the terms of the SPRA, FFIA was to use to purchase the FFI stock was willful and unreasonable. On that record, we further find that that failure was an attempt on their part to avoid making any inquiries that would raise red flags.

Based upon of our examination of all the facts and circumstances that we have found in these cases, we find that each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser, as well as Mr. Thrapp, willfully and unreasonably avoided making inquiries that they should have made with respect to the transactions which MidCoast proposed and the transactions to which they agreed in the SPRA. We believe that the FFI stockholders instead succumbed to the allure of receiving a so-called premium from those transactions that MidCoast held out enticingly to them, even though they knew that that premium would be paid only if FFI's total anticipated 2001 tax liability of $1,026,100.69 was not paid.

On the basis of all of the relevant facts and circumstances, we find that each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser had inquiry, and thus constructive, knowledge that MidCoast intended to implement a scheme that would leave FFI without sufficient assets to satisfy FFI's total anticipated 2001 tax

[*216] liability of $1,026,100.69. On the basis of those facts and circumstances, we further find that each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser knew, or should have known (i.e., had constructive knowledge), that FFI's Federal income tax liability for its taxable year 2001 would not be paid. To find otherwise would, we believe, "bless the willful blindness [of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser, as well as their attorney, Mr. Thrapp] the constructive knowledge test was designed to root out." Diebold Found., Inc. v. Commissioner, 736 F.3d at 189-190.

We address now whether under the Indiana UFTA in substance FFI made a distribution or transfer of its property to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR sale transaction under the SPRA. In making that determination, we rely on Indiana substance over form principles and, in the alternative, on the Indiana sham transaction doctrine. We consider each of Indiana substance over form principles and the Indiana sham transaction doctrine, although closely related and overlapping in material respects, to be an independent or alternative basis under which we shall reach our ultimate findings as to that issue under the Indiana UFTA.

We restate initially that we concluded above, and the parties agree, that the definition of the term "transfer" in the Indiana UFTA, like the definition of that

[*217] term in the Wisconsin UFTA, is very broad.[151]  Moreover, we concluded above, and the parties agree, that Indiana courts, like Wisconsin courts, use Indiana substance over form principles in a variety of contexts, most notably including tax cases.[152]  Under Indiana substance over form principles, as under Wisconsin substance over form principles, it is the substance, not the form, of a transaction which is controlling.[153]

With respect to the Indiana sham transaction doctrine, Indiana courts allow a transaction to be disregarded as a sham in a variety of contexts, including tax cases.  See, e.g., Belterra Resort Ind., LLC, 935 N.E.2d at 179 (citing Gregory v. Helvering, 293 U.S. at 469-470); Long v. State, 666 N.E.2d 1258, 1261 (Ct. App. Ind. 1996); Bedree v. Bedree, 528 N.E.2d 1128, 1131 (Ct. App. Ind. 1988); Wallace v. Rogier, 395 N.E.2d 297, 300-301 (Ct. App. Ind. 1979).

Based upon our examination of the entire record before us, we find that, in determining whether under the Indiana UFTA FFI made a transfer of its property to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR sale transaction under the SPRA, under each of Indiana substance over form principles

---

[151]See supra note 121.

[152]See supra note 123.

[153]See supra notes 121 and 123.

[*218] and the Indiana sham transaction doctrine (1) Ms. Shapiro's purported loan here, like Ms. Shapiro's purported loan in <u>Feldman v. Commissioner</u>, 779 F.3d at 456, was a sham that was devoid of any economic substance; (2) the SPR sale transaction under the SPRA, like the purported stock sale involved in <u>Feldman v. Commissioner</u>, 779 F.3d at 455-457, had no nontax business purpose; (3) Ms. Shapiro's purported loan here, like Ms. Shapiro's purported loan in <u>Feldman v. Commissioner</u>, 779 F.3d at 456, had no nontax business purpose; (4) the SPR sale transaction under the SPRA, like the purported stock sale involved in <u>Feldman v. Commissioner</u>, 779 F.3d at 455-457, had no economic substance; (5) Ms. Shapiro's purported loan here, like Ms. Shapiro's purported loan in <u>Feldman v. Commissioner</u>, 779 F.3d at 456, should be disregarded; (6) the SPR sale transaction under the SPRA, like the purported stock sale involved in <u>Feldman v. Commissioner</u>, 779 F.3d at 455-457, should be disregarded; and (7) FFI, not FFIA, made in the SPR sale transaction under the SPRA a distribution or transfer of its funds to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser, like the C corporation, not MidCoast, made to each of its stockholders in <u>Feldman v. Commissioner</u>, 779 F.3d at 459, of each such stockholder's proportionate portion

[*219] of the purchase price (i.e., $530,766.15) that each such stockholder was to receive for their stock under the SPRA.[154]

Based upon our examination of the entire record before us, we find that under each of Indiana substance over form principles and the Indiana sham transaction doctrine in substance FFI made a distribution or transfer of its property under the Indiana UFTA to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR sale transaction under the SPRA.[155] On that record, we further find that each of them is a first transferee of property of FFI in that transaction under Ind. Code Ann. sec. 32-18-2-18(b)(1).[156]

---

[154]Respondent characterizes the distributions or transfers made to the FFI stockholders in the SPR sale transaction under the SPRA as in substance liquidating distributions or transfers from FFI. We do not have to characterize those distributions or transfers as "liquidating" or any other type of distributions or transfers in order to conclude, as we do, that under the Indiana UFTA in substance FFI made a distribution or transfer of its property to each of the FFI stockholders in the SPR sale transaction under the SPRA.

[155]We concluded previously that FFI made a distribution or transfer of its property to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR redemption transaction under the SPRA and that each of them is a transferee of property of FFI with respect to that transaction for purposes of the Indiana UFTA.

[156]See infra note 159.

**[\*220]**      <u>Fraudulent Transfers Under the Indiana UFTA</u>

It is respondent's position that FFI's transfers of its property to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR transactions under the SPRA were fraudulent under each of the constructive fraud provisions of the Indiana UFTA. Consequently, respondent maintains, each of them is liable under the Indiana UFTA for respondent's claim for FFI's total liability for its taxable year 2001, which claim consisted of a deficiency in tax of $609,037.43[157] and an accuracy-related penalty under section 6662 totaling $85,482, as well as interest thereon as provided by law (FFI's interest liability).[158] (We shall refer to the liability of each petitioner for FFI's total liability for its taxable year 2001, including FFI's interest liability, that respondent argues each of them has under the Indiana UFTA as transferee liability.) Respondent further maintains that, in addi-

---

[157]Respondent alleged in the respective answers in these cases, and petitioners do not dispute, that the amount of FFI's deficiency in tax for its taxable year 2001 that remains unpaid is $578,338.43.

[158]Respondent did not calculate or show in the respective notices of liability that respondent issued to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser the amount of interest as provided by law on FFI's 2001 tax liability. The record otherwise establishes that as of July 7, 2009, respondent had assessed a total of $368,990.84 of interest with respect to that liability. <u>See</u> discussion <u>infra</u>.

Respondent acknowledges on brief that each petitioner's liability as a transferee is limited to the net value of the assets that FFI transferred to each of them in the SPR transactions under the SPRA. <u>See</u> discussion <u>infra</u>.

**[\*221]** tion to the transferee liability of each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser, each of them is liable for interest (transferee interest), as provided by law.

As we understand respondent's position, respondent maintains that respondent's claim against each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser for FFI's total liability for its taxable year 2001 should be analyzed as a single claim under the constructive fraud provisions of the Indiana UFTA. In other words, we understand respondent to be arguing that we should <u>not</u> analyze separately under those constructive fraud provisions the components of FFI's total unpaid 2001 liability, namely, FFI's unpaid 2001 deficiency liability and FFI's unpaid 2001 penalty liability. Respondent appears to acknowledge that respondent's claim for transferee interest should be analyzed separately from respondent's claim for FFI's total unpaid 2001 liability.

Petitioners appear to disagree with respondent and counter that not only respondent's claim for transferee interest but also respondent's claim for FFI's unpaid 2001 deficiency liability and for FFI's unpaid 2001 penalty liability should be analyzed separately under the constructive fraud provisions of the Indiana UFTA. Although we do not agree with petitioners that respondent's claim for FFI's unpaid 2001 deficiency liability and for FFI's unpaid 2001 penalty liability

[*222] should be analyzed separately, we shall nonetheless analyze each of those separately and explain in our consideration of FFI's unpaid 2001 penalty liability why we disagree with petitioners.

Respondent's Claim for FFI's
Unpaid 2001 Deficiency Liability

Respondent relies on each of the constructive fraud provisions in Ind. Code Ann. secs. 32-18-2-14(2) and 32-18-2-15 in support of respondent's claim that each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser is liable for that FFI's unpaid 2001 deficiency liability.[159] We address only Ind. Code Ann. sec. 32-18- 2-15. That is because our analysis under that provision resolves that issue in respondent's favor as to that claim.

Ind. Code Ann. sec. 32-18-2-15, which applies to a creditor's claim that arose before the transfer was made by the debtor, provides in pertinent part:

---

[159]If a transfer is fraudulent under Ind. Code sec. 32-18-2-14(2) or 32-18-2-15, the transfer is voidable under Ind. Code Ann. sec. 32-18-2-17(a)(1). If a transfer is voidable under Ind. Code Ann. sec. 32-18-2-17(a)(1), under Ind. Code Ann. sec. 32-18-2-18(b)(1) "the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c) [Ind. Code Ann. sec. 32-18-2-18(c)], or the amount necessary to satisfy the creditor's claim, whichever is less." That judgment "may be entered against [inter alia] * * * the first transferee of the asset" transferred. We found above that each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser is a first transferee of FFI under Ind. Code Ann. sec. 32-18-2-18(b)(1).

[*223] A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if:

> (1) the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and

> (2) the debtor:

> (A) was insolvent at the time; or

> (B) became insolvent as a result of the transfer or obligation.

In order to establish that the transfers that FFI made of its property to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR transactions under the SPRA (FFI's transfers) were fraudulent under Ind. Code Ann. sec. 32-18-2-15, respondent must show that (1) respondent had a claim for FFI's unpaid 2001 deficiency liability before FFI made those transfers (preexisting claim requirement); (2) FFI did not receive reasonably equivalent value in exchange for FFI's transfers (reasonably equivalent value requirement); and (3) FFI was insolvent at the time of, or was rendered insolvent as a result of, those transfers (insolvency requirement).

With respect to the preexisting claim requirement, respondent maintains that respondent's claim for FFI's unpaid 2001 deficiency liability "arose on the sale of FFI's assets, which was prior to FFI's transfers to petitioners." As a result,

[*224] respondent argues, respondent's claim for FFI's unpaid 2001 deficiency liability arose before FFI's transfers, as required by Ind. Code Ann. sec. 32-18-2-15.

Petitioners counter that "[b]ecause a tax is considered due and owing on the required tax return filing date, Respondent's alleged claim * * * [for FFI's unpaid 2001 deficiency liability] did not arise until after the December 20, 2001 closing date on [sic] the SPRA". According to petitioners, before "the required tax return filing date" for FFI's 2001 Federal income tax return, its Federal income tax liability for its taxable year 2001 was "contingent". As we understand petitioners' argument, they acknowledge that respondent is correct that respondent's claim for FFI's unpaid 2001 deficiency liability "arose on the sale of FFI's assets, which was prior to FFI's transfers to petitioners"; however, they contend that that claim was a contingent claim and thus does not qualify under Ind. Code Ann. sec. 32-18-2-15 as a claim of respondent that arose before those transfers.

We reject petitioners' argument that respondent's claim for FFI's unpaid 2001 deficiency liability does not qualify under Ind. Code Ann. sec. 32-18-2-15 as a claim of respondent that arose before FFI's transfers. That argument ignores the following definition of the term "claim" for purposes of Indiana UFTA in Ind.

**[*225]** Code Ann. sec. 32-18-2-3, which is virtually identical to Ind. Code Ann. sec. 32-2-7-3 (West 2002) in effect in 2001:

> As used in this chapter [Indiana UFTA], "claim" means a right to payment, whether the right is:
>
> (1) reduced to judgment or not;
>
> (2) liquidated or unliquidated;
>
> (3) fixed or contingent;
>
> (4) matured or unmatured;
>
> (5) disputed or undisputed;
>
> (6) legal or not;
>
> (7) equitable or not; or
>
> (8) secured or unsecured.

On the record before us, we find that respondent's claim for FFI's unpaid 2001 deficiency liability is a contingent claim or an unmatured claim under Ind. Code Ann. sec. 32-18-2-3(3) or (4) that arose before FFI's transfers to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR transactions under the SPRA.  See, e.g., Feldman v. Commissioner, 779 F.3d at 460 ("asset sale--the triggering event for the [Federal income] tax liability--occurred before the transfer of * * * [debtor's cash] to the [debtor's] shareholders" for purposes of Wisconsin

[*226] UFTA); <u>Stuart v. Commissioner</u>, 144 T.C. 235, 258-259 (2015) (same under Nebraska UFTA); <u>Cullifer v. Commissioner</u>, T.C. Memo. 2014-208, at *50 (same under Texas UFTA), <u>aff'd</u>, ___ F. App'x ___, 2016 WL 3057664, (11th Cir. May 31, 2016). On the record before us, we further find that respondent has satisfied the preexisting claim requirement in Ind. Code Ann. sec. 32-18-2-15 with respect to FFI's unpaid 2001 deficiency liability.

With respect to the reasonably equivalent value requirement, petitioners do not claim that FFI received reasonably equivalent value in exchange for FFI transfers.

On the record before us, we find that FFI did not receive reasonably equivalent value for FFI transfers. On that record, we further find that respondent has satisfied the reasonably equivalent value requirement in Ind. Code Ann. sec. 32-18-2-15 with respect to FFI's unpaid 2001 deficiency liability.

With respect to the insolvency requirement, respondent argues that FFI was rendered insolvent by FFI's transfers to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR transactions under the SPRA. That is because, according to respondent, after those transfers FFI "failed the balance sheet test for solvency". In support of that argument, respondent relies on Ind. Code Ann. sec.

**[*227]** 32-18-2-12(c), which provides that '[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."

Petitioners counter that the SPR redemption transaction "was a condition precedent to the sale [SPR sale transaction] of remaining stock. * * * Although FFI transferred its interest in FFW to Petitioners in partial redemption of Petitioners' FFI stock, that transfer was not fraudulent because, after the redemption, FFI was solvent." The only support in the record for petitioners' claim that the SPR redemption transaction under the SPRA "was a condition precedent to the sale" is the testimony of Mr. Thrapp, one of petitioners' attorneys. The testimony of Mr. Thrapp on which petitioners rely disregards and contradicts the terms of the SPRA to which FFI, the FFI stockholders, and FFIA (MidCoast's designee) agreed. The SPRA provided in pertinent part:

> Section 7.1. **Simultaneous Occurrence of Events at Closing.** All of the events which are to occur at the Closing under this Agreement, including, but not limited to, the delivery of all Share certificates and the payment of the Purchase Price and all other related exchanges shall be deemed to have occurred simultaneously.

[*228] On the record before us, we reject Mr. Thrapp's testimony and petitioners' argument that is premised on that testimony that the SPR redemption transaction under the SPRA "was a condition precedent to the sale".[160]

Petitioners further counter respondent's contention that FFI was rendered insolvent by FFI's transfers to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR transactions under the SPRA by contending that "FFI was * * * solvent immediately after closing on December 20, 2001 with $1,095,194.08 of total assets and $1,038,026.15 of total liabilities". It is not clear how petitioners arrived at the conclusion that FFI had "immediately after closing on December 20, 2001 * * * $1,095,194.08 of total assets and $1,038,026.15 of total liabilities". In any event, that contention is not supported by the record, and

---

[160]Assuming arguendo that we had found that the SPR redemption transaction was a condition precedent to the SPR sale transaction, that finding would not change our findings below that FFI became insolvent within the meaning of Ind. Code Ann. sec. 32-18-2-12(c) by FFI's transfers to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR transactions under the SPRA and that respondent has satisfied the insolvency requirement in Ind. Code Ann. sec. 32-18-2-15 with respect to FFI's unpaid 2001 deficiency liability. The SPR redemption transaction and the SPR sale transaction, which by the terms of the SPRA were deemed to occur simultaneously, were inextricably related and interdependent; neither transaction would have occurred unless the other occurred. Each of those transactions under the SPRA must be considered together in determining whether FFI became insolvent within the meaning of Ind. Code Ann. sec. 32-18-2-12(c) by FFI's transfers to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in those transactions.

[*229] we reject it.  We found on the record before us that on December 20, 2001,

after the SPR transactions closed simultaneously at 11:59 p.m.,[161] FFI had (1)

assets totaling $502,789.34, which consisted of cash of $345,089.34 and the right

to a refund of $157,700 of State 2001 income tax payments, and (2) anticipated

Federal and State 2001 income tax liability totaling $1,026,100.69, or a negative

net asset value of $523,311.35.[162]

On the record before us, we find that FFI, the debtor, became insolvent

within the meaning of Ind. Code Ann. sec. 32-18-2-12(c) as a result of FFI's

transfers to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the

SPR transactions under the SPRA.  On that record, we further find that respon-

---

[161]The closing of the SPR transactions under the SPRA was deemed to be effective as of 11:59 p.m. on December 20, 2001.  Moreover, the SPRA provided that all of the events that were to occur at the closing under the SPRA, including but not limited to, the delivery of the FFI stock certificates and the payment of the purchase price and "all other related exchanges" were to be deemed to occur simultaneously.  Consequently, all of the distributions to FFIA (or its designee, FFI), the FFI stockholders, and Ms. Shapiro that were required to implement the SPRA and the related agreements (namely, the SPRA escrow agreement, the Shapiro escrow agreement, and the cash reconciliation agreement) were deemed to be made as of the closing of the SPRA.  Because the closing was deemed to occur as of 11:59 p.m. on December 20, 2001, those distributions were in fact made, in most instances by wire transfers, on the day after the closing.

[162]See supra note 28 regarding FFI's bank account balance of $11,955.46, FFI's outstanding checks of $11,955.46, and the Prudential demutualization funds receivable of $43,926.57 and note 50 regarding the State retail sales tax refunds of $5,756.56.

[*230] dent has satisfied the insolvency requirement in Ind. Code Ann. sec. 32-18-2-15 with respect to FFI's unpaid 2001 deficiency liability.

Based upon our examination of the entire record before us, we find that FFI's transfers to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR transactions under the SPRA were fraudulent transfers under Ind. Code Ann. sec. 32-18-2-15. On that record, we further find that each of them is liable for FFI's unpaid 2001 deficiency liability.[163]

Respondent's Claim for FFI's
Unpaid 2001 Penalty Liability

Before analyzing respondent's claim for FFI's unpaid 2001 penalty liability under the Indiana UFTA, we will explain, as we indicated previously we would, why we believe that respondent's claim under the constructive fraud provisions of the Indiana UFTA for FFI's unpaid 2001 deficiency liability and for FFI's unpaid 2001 penalty liability should be analyzed together, and not separately.

As discussed above, Ind. Code Ann. sec. 32-18-2-3 defines the term "claim" broadly to mean any "right to payment", regardless of whether that right is "contingent" or "unmatured". We believe that respondent may have a claim for FFI's unpaid 2001 penalty liability under the Indiana UFTA regardless of whether that

---

[163]See supra note 158.

**[\*231]** penalty had been asserted at the time of FFI's transfers to each of the FFI stockholders in the SPR transactions under the SPRA. See Tricarichi v. Commissioner, T.C. Memo. 2015-201, at \*62. In addition, the Indiana UFTA does not require that a creditor, here respondent, establish that the debt in question, here FFI's unpaid 2001 penalty liability, was contemplated at the time of the transfer, here FFI's transfers to each of the FFI stockholders. See id.

In any event, we now analyze whether each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser is liable under the constructive fraud provisions of the Indiana UFTA for FFI's unpaid 2001 penalty liability. In support of respondent's position that each of them is so liable, respondent relies on Estate of Glass v. Commissioner, 55 T.C. 543, 575-576 (1970), aff'd per curiam, 453 F.2d 1375 (5th Cir. 1972), and Lee Optical Associated Cos. Pension Plan & Tr. v. Commissioner, T.C. Memo. 1989-152.

Petitioners counter that under Stanko v. Commissioner, 209 F.3d 1082, 1088 (8th Cir. 2000), rev'g T.C. Memo. 1996-530, none of them is liable for FFI's unpaid 2001 penalty liability.

We do not find any of the cases on which the parties rely in support of their respective positions with respect to respondent's claim for FFI's unpaid 2001 penalty liability to be apposite or helpful in resolving whether under the Indiana

[*232] UFTA each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser is liable for that penalty liability. In none of those cases did the court reach its conclusions regarding whether the transferee was liable for additions to tax and/or penalties on the basis of the applicable State UFTA. Indeed, in none of those cases had the State adopted the UFTA as of the period at issue in each of those cases. In fact, in Estate of Glass, one of those cases on which respondent relies, the UFTA had not even been promulgated by the National Conference of Commissioners on Uniform State Laws at the time that case was decided, let alone as of the period at issue in that case. Moreover, the conclusions in the cases on which respondent relies are just that--conclusions with no reasoning which cite other cases that state conclusions with no reasoning. Moreover, the conclusions in the case on which petitioners rely were dependent on the Nebraska UFCA that required the Commissioner to prove that the transfer was made with the intent to defraud future creditors." Stanko v. Commissioner, 209 F.3d at 1088.

We address now, without the benefit of any apposite or helpful cases cited by the parties, the constructive fraud provision in Ind. Code Ann. sec. 32-18-2-14(2)(A) in order to determine whether each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser is liable for FFI's unpaid 2001 penalty liability. We address

[*233] only that provision because our analysis thereunder resolves that issue in

respondent's favor as to that claim.

Ind. Code Ann. sec. 32-18-2-14(2)(A), which applies to a creditor's claim

that arose before or after the transfer was made by the debtor, provides:

> A transfer made or an obligation incurred by a debtor is fraudulent as
> to a creditor, whether the creditor's claim arose before or after the
> transfer was made or the obligation was incurred, if the debtor made
> the transfer or incurred the obligation:
>
> *   *   *   *   *   *   *
>
> (2) without receiving a reasonably equivalent value in
> exchange for the transfer or obligation, and the debtor:
>
> (A) was engaged or was about to engage in a business or a
> transaction for which the remaining assets of the debtor were
> unreasonably small in relation to the business or transaction; * * *

In order to establish that FFI's transfers to each of Mr. Fankhauser, Mr.

Weintraut, and Ms. Fankhauser in the SPR transactions under the SPRA were

fraudulent under Ind. Code Ann. sec. 32-18-2-14(2)(A), respondent must show

that (1) FFI did not receive reasonably equivalent value in exchange for those

transfers (reasonably equivalent value requirement)[164] and (2) at the time of FFI's

---

[164]We use the same defined term "reasonably equivalent value requirement" when referring to the requirement in Ind. Code Ann. sec. 32-18-2-14(2) that we used when referring to the requirement in Ind. Code Ann. sec. 32-18-2-15. That is because that requirement is identical in each of those provisions.

[*234] transfers FFI "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" (unreasonably small asset requirement).

With respect to the reasonably equivalent value requirement in Ind. Code Ann. sec. 32-18-2-14(2)(A), petitioners did not dispute, and we found in our consideration of whether each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser is liable for FFI's unpaid 2001 deficiency liability, that FFI did not receive reasonably equivalent value for FFI transfers and that respondent satisfied the reasonably equivalent value requirement in Ind. Code Ann. sec. 32-18-2-15. We further find that respondent has satisfied the reasonably equivalent value requirement in Ind. Code Ann. sec. 32-18-2-14(2)(A) with respect to FFI's unpaid 2001 penalty liability.

With respect to the unreasonably small assets requirement, we must examine the conditions that existed at the time FFI's transfers were made as of the closing of the SPR transactions under the SPRA at 11:59 p.m. on December 20, 2001, not on what happened thereafter. See Boyer, 587 F.3d at 794-795. In determining whether the unreasonably small asset requirement is satisfied in these cases, we must evaluate on an objective basis whether at the time of those transfers FFI had "such meager assets that bankruptcy * * * [was] a consequence both likely

[*235] and foreseeable". Id. In other words, we must evaluate on an objective basis whether at the time of FFI transfers it had the ability to generate enough cash to pay its debts and remain financially stable.

We have found that FFI became insolvent within the meaning of Ind. Code sec. 32-18-2-12(c) (i.e., FFI's total debts exceeded its assets) as a result of FFI's transfers in the SPR transactions under the SPRA. In this connection, we have found that immediately after the closing at 11:59 p.m. on December 20, 2001, of the SPR transactions under the SPRA the only assets of FFI were cash of $345,089.34 and the right to a refund of $157,700 of State 2001 income tax payments and its only liabilities were FFI's total anticipated 2001 tax liability of $1,026,100.69.[165] Consequently, we found that after that closing FFI had a negative net asset value of $523,311.35.[166] We also found that immediately after the closing of the SPR transactions on December 20, 2001, FFI had no operations, no employees engaged in operations, no income, and no operational assets.

---

[165]See supra notes 34, 100, and 146.

[166]See supra note 28 regarding FFI's bank account balance of $11,955.46, FFI's outstanding checks of $11,955.46, and the Prudential demutualization funds receivable of $43,926.57 and note 50 regarding the State retail sales tax refunds of $5,756.56.

[*236]    On the record before us, we further find that as of the closing of the

SPR transactions under the SPRA FFI did not have the ability to pay FFI's total

anticipated 2001 tax liability, let alone have the ability to generate enough cash to

pay its debts and remain financially stable after FFI's transfers to each of Mr.

Fankhauser, Mr. Weintraut, and Ms. Fankhauser in those transactions.  On that

record, we further find that it was reasonably foreseeable at the time of FFI's

transfer to each of the FFI stockholders that FFI would have insufficient capital or

profits to engage in and sustain any business operations.[167]

On the record before us, we find that respondent has satisfied the unreason-

ably small assets requirement in Ind. Code Ann. sec. 32-18-2-14(2)(A).

Based upon our examination of the entire record before us, we find that

FFI's transfers to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in

the SPR transactions under the SPRA were fraudulent transfers under Ind. Code

---

[167]Our finding that it was reasonably foreseeable at the time of FFI's trans-
fers to each of the FFI stockholders that FFI would have insufficient capital or
profits to engage in and sustain any business operations is reinforced by our
finding that each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser had
inquiry, and thus constructive, knowledge that MidCoast intended through the
SPRA to implement a scheme to leave FFI without sufficient assets to satisfy
FFI's total anticipated 2001 tax liability of $1,026,100.69 and thereby cause it not
to pay that liability.

**[*237]** Ann. sec. 32-18-2-14(2)(A).  On that record, we further find that each of

them is liable for FFI's unpaid 2001 penalty liability.[168]

> Respondent's Claim
> for Transferee Interest

Petitioners do not dispute that if we were to find, which we have, that each

of them is liable for FFI's total unpaid 2001 liability, including interest as required

by law on that liability, to the extent of the net value of the assets that FFI trans-

ferred to each of them, each also would be liable for so-called postnotice inter-

est.[169]  The dispute between the parties is over so-called prenotice interest, i.e.,

interest that begins to accrue on a date before the date on which a notice of

liability is issued to a transferee-taxpayer and that continues to accrue to the latter

date (prenotice interest period).  See Lowy v. Commissioner, 35 T.C. 393, 394-395

(1960).  The date on which prenotice interest begins to accrue depends on the

---

[168]See supra note 158.

[169]Postnotice interest begins to accrue on the date on which a notice of lia-
bility is issued and continues to accrue to the date on which the transferee liability
is fully paid (postnotice interest period).  See Patterson v. Sims, 281 F.2d 577, 580
(5th Cir. 1960); Estate of Stein v. Commissioner, 37 T.C. 945, 959 (1962);
Shockley v. Commissioner, T.C. Memo. 2016-8, at *7.  Postnotice interest
accruing during the postnotice interest period is computed pursuant to sec. 6601.
See Estate of Stein v. Commissioner, 37 T.C. at 959; Shockley v. Commissioner,
at *7.  Sec. 6621 establishes the rate of interest for postnotice interest for the
postnotice interest period.  See Shockley v. Commissioner, at *7.

[*238] amount of assets that the transferor-taxpayers transferred to the transferee-

taxpayer.  See id.

It is respondent's position that respondent is entitled to prenotice interest

from each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser.  In support of

that position, respondent argues:

> For the prenotice period, interest depends on state law.  Lowy v.
> Commissioner, 35 T.C. 393, 395-96 (1960).  But when the transferred
> assets are greater than the liability, as for Mr. Fankhauser, then pre-
> notice interest accrues under federal law.  Estate of Stein v. Com-
> missioner, 37 T.C. 945, 959-61 (1962).  Weintraut and Mrs. Fank-
> hauser are liable for prenotice interest because, under Indiana state
> law, prejudgment interest is proper when the trier of fact does not
> have to exercise judgment in order to assess the amount of damages.
> Larson v. Karagan, 979 N.E.2d 655, 663 (Ind. App. 2012).  The
> amounts of the transfers were agreed under the SPRA to be
> $1,586,638.95 to Fankhauser, $513,324.37 to Weintraut, and
> $233,329.26 to Mrs. Fankhauser.[170] * * * The interest due under

---

[170]It appears that respondent included in the respective amounts of FFI's
transfers to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser that respondent
claims "were agreed under the SPRA" their respective shares (i.e., $3,133.62,
$1,013.82, and $460.83), after withholding for Federal and State income taxes , of
certain State retail sales tax refunds totaling $5,756.56 that FFI received from the
State of Indiana after the closing of the SPR transactions and that FFI sent to FFW
in January 2002 after estimating and deducting those taxes.  We do not believe
that those respective amounts of certain State retail sales taxes "were agreed under
the SPRA", as respondent claims.  See supra note 50.  Nor do we believe that
those respective amounts of certain State retail sales taxes should be included in
the respective amounts of FFI's transfers to Mr. Fankhauser, Mr. Weintraut, and
Ms. Fankhauser under the SPRA.  See supra note 28.  We set forth below the net
value of the assets that we find FFI transferred to each of Mr. Fankhauser, Mr.

(continued...)

[*239] Indiana law accrues from the due date prescribed for payment of the tax.

It is petitioners' position that respondent is not entitled to any prenotice interest on any respective transferee liabilities that we find for Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser.  In support of their position, petitioners rely on Stanko v. Commissioner, 209 F.3d 1082.  The Court of Appeals for the Eighth Circuit indicated in that case that it found "nothing in Nebraska fraudulent conveyance law allowing such a recovery of interest."  The court pointed out that "[u]nder the new Uniform Fraudulent Transfer Act [adopted by Nebraska], the creditor is limited to recovering 'the value of the asset at the time of the [fraudulent] transfer, subject to adjustment as the equities may require.'"[171]  Id. at 1088 (quoting Neb. Rev. Stat. Ann. sec. 36-709(c) (West 1999)).  Although the Court of Appeals concluded in Stanko that the Nebraska UFCA[172] and caselaw thereunder

---

[170](...continued)
Weintraut, and Ms. Fankhauser.  See infra note 179.

[171]The UFTA that Nebraska adopted in 1989 did not apply retroactively to conveyances made before its enactment.  See Stanko v. Commissioner, 209 F.3d 1082, 1084 n.1 (8th Cir. 2000).  The conveyance at issue in Stanko was made before Nebraska's enactment of the UFTA.  See id.

[172]On brief, petitioners mistakenly claim that the Court of Appeals for the Eighth Circuit decided Stanko v. Commissioner, 209 F.3d 1082, under the Nebraska UFTA.  Stanko involved the Nebraska UFCA which was in effect for the

(continued...)

**[\*240]** were silent on the issue, the court nonetheless held: "Because the delay in recovering from the transferee that occurred before the Commissioner assessed transferee liability is attributable to the Commissioner (absent proof of transferee deceit), we conclude the equities do not require an award of interest for that period." Id.

Petitioners' position disregards certain caselaw (discussed below) addressing prenotice interest where a taxpayer to whom another taxpayer transferred assets is liable as a transferee for that transferor-taxpayer's tax liability. Nonetheless, we will address petitioners' argument in support of their position with respect to respondent's claim for prenotice interest.

Petitioners argue that they "any delay in issuing such notice [of transferee liability to each petitioner] was attributable entirely to Respondent's delay in prosecuting this matter." As a result, petitioners maintain, under Ind. Code Ann. sec. 32-18-2-18(c)[173] "the equities do not require an award of [prenotice] interest"

---

[172](...continued)
period at issue therein. See id. at 1084, 1088.

[173]Ind. Code Ann. sec. 32-18-2-18(c) provides that if a creditor is entitled under Ind. Code Ann. sec. 32-18-2-18(b) to a judgment that is based upon the value of the assets that the debtor transfers in a transfer that is fraudulent under the Indiana UFTA, "the judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require."

(continued...)

[*241] in the instant cases, just as "the equities * * * [did] not require an award of [prenotice] interest" in Stanko v. Commissioner, 209 F.3d at 1088. Petitioners' argument assumes that there was a "delay" in the issuance of the respective notices of liability to them and that that delay was "attributable entirely to respondent". We consider whether those assumptions are valid in the face of the facts that we have found.

We have found that around July 22, 2005, respondent began an examination of FFI's taxable year 2001. That examination disclosed that FFI had respective loss carrybacks to that taxable year from its taxable years 2002 and 2003. Around December 2, 2005, respondent began an examination of FFI's taxable year 2002, and around July 31, 2008, respondent began an examination of FFI's taxable year 2003. Although the record does not establish why the examination of FFI's taxable year 2003 began around July 31, 2008, the record does establish, and we have found, that FFI was represented by counsel throughout the IRS' examination of all three taxable years 2001, 2002, and 2003 and the resolution of that examination. The record also establishes, and we also have found, that during the period that started in 2005 and ended in 2008 Mr. Bernstein, who was then president of

---

[173](...continued)
See supra note 159.

[*242] FFI, executed on behalf of FFI several Forms 872-I in which FFI consented to the extension to various dates of the period of assessment of FFI's Federal income tax for its taxable year 2001. Mr. Bernstein executed the last of those forms around the end of July 2008, which was at the same time respondent began an examination of FFI's taxable year 2003. That form extended until December 31, 2009. the time for assessment of FFI's Federal income tax for its taxable year 2001.

We infer and find from our consideration of all of the facts that we have found relating to the respective examinations that respondent conducted with respect to FFI and petitioners that if respondent had unreasonably delayed the examination of FFI's taxable year 2003, FFI, either on its own and/or upon the advice of its counsel, would have been unwilling to continue to consent as late as around the end of July 2008 to the extension until December 31, 2009, of the period of assessment of FFI's Federal income tax for its taxable year 2001.

Around October 27, 2006, respondent assigned the same revenue agent who was examining FFI's taxable years 2001 and 2002 to begin a transferee liability examination with respect to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser as the stockholders of FFI before the closing of the SPRA on December 20, 2001. Since the IRS' examination of FFI's taxable years 2001 and 2002 was still on-

[*243] going and respondent had not yet initiated an examination of FFI's taxable year 2003 from which FFI had carried a loss back to its taxable year 2001, that transferee liability examination remained inactive until the IRS completed its examination of FFI's taxable years 2001, 2002, and 2003 and had undertaken collection efforts with respect to the respective tax liabilities for those years, which the IRS had determined and to which FFI agreed.

On May 31, 2008, the IRS opened a collection file with respect to FFI's unpaid liability for its taxable year 2001 and assigned the matter to one of its revenue officers.

On March 4, 2009, Mr. Bernstein executed on behalf of FFI the FFI closing agreement in which FFI and respondent agreed to certain adjustments to FFI's Federal income tax for certain of its taxable years, including its taxable years 2001, 2002, and 2003. In addition, FFI consented in the FFI closing agreement to an accuracy-related penalty under section 6662.

On January 15, 2009, Mr. Bernstein executed on behalf of FFI Form 4549 in which FFI consented to the assessment for, inter alia, its taxable year 2001 of a deficiency in tax of $622,265 and an accuracy-related penalty under section 6662 totaling $85,482. Respondent thereafter assessed FFI's unpaid 2001 tax liability, as well as interest thereon as provided by law.

[*244]     On June 2, 2009, Mr. Bernstein completed on behalf of FFI Form 433-B, a statement that the IRS requests a taxpayer that operates a business to complete, that shows the business's income, expenses, assets, liabilities, and certain other financial information.[174]

As part of the revenue officer's attempt to collect FFI's unpaid 2001 liability he performed certain searches for any assets belonging to FFI, but he did not find any such assets.

On June 2, 2009, respondent filed a notice of Federal tax lien in Marion County, Indiana, with respect to FFI's 2001 unpaid 2001 tax liability and interest thereon as provided by law.

On January 13, 2010, respondent sent eight levies to certain banks and other companies that might have held accounts in FFI's name or that might have owed FFI money.[175]  Those eight levies pertained, inter alia, to any assets of FFI that Mr. Bernstein had shown in FFI's Form 433-B.  Respondent recovered no funds as a result of the eight levies.

---

[174]See supra note 52.

[175]See supra note 53.

**[*245]** On March 9, 2010, the revenue officer searched respondent's database for any income that had been reported as having been paid to FFI. The revenue officer found no such income reported for any year after 2007.

On March 10, 2010, the revenue officer prepared, and on the next day his manager signed, Form 53 with respect to what that form described as "Cur[rently] Not Collectible Assessed Balance" totaling $1,144,684.03 that the IRS had made for FFI's taxable years 1997 (assessment of $77,549.64), 2001 (assessment of $1,066,735.70), and 2007 (assessment of $398.69). Form 53 showed that certain searches had been made and certain sources had been checked on March 9, 2010, in order to determine whether FFI had any assets or income.

On April 2, 2010, the revenue officer prepared a collectibility determination report. In that CDR, the revenue officer discussed the assessments totaling $1,144,684.03 that the IRS had made against FFI for its taxable years 1997 (assessment of $77,549.64), 2001 (assessment of $1,066,735.70), and 2007 (assessment of $398.69). In the CDR, the revenue officer stated in pertinent part: "The assessed tax liabilities of FFI * * * have been deemed to be currently not collectible * * *. In addition to this finding, FFI was also deemed to be insolvent." The revenue officer indicated in the CDR that on October 26, 2009, certain searches relating to whether FFI owned motor vehicles, aircraft, watercraft, or real prop-

[*246] erty had been performed on the Accurint database, which had information from public sources. Those searches disclosed that FFI owned none of those items except the Elmwood Avenue property. However, a subsequent review by the revenue officer of Accurint property assessment and property deeds records revealed that that property had been sold on August 31, 2001. The CDR indicated that certain additional searches had been made to determine whether FFI owned any assets or had any income but those searches disclosed no such assets or income. The revenue officer concluded the CDR with the following statement: "All reasonable efforts and all required actions have been taken to determine that the taxes cannot be collected from FFI". The revenue officer did not search the State of Indiana's Web site for unclaimed property or funds belonging to FFI.

In 2010, when the IRS had completed its collection efforts with respect to FFI's unpaid 2001 tax liability and concluded that that liability was currently not collectible, the IRS reactivated its transferee liability examination with respect to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser. It was at that time that Mr. Fankhauser first learned about FFI's unpaid 2001 tax liability and was informed by the IRS that it was seeking to collect that unpaid liability from, inter alia, him as a transferee of FFI.

**[\*247]**     On July 14, 2011, the IRS' Appeals Office held a so-called fast track

Appeals Office conference with petitioners regarding the transferee liability ex-

amination that the IRS was conducting with respect to them.

On December 8, 2011, respondent timely issued respective notices of

liability to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser for FFI's unpaid

2001 tax liability of $694,519.43, which consisted of a deficiency in tax of

$609,037.43[176] and an accuracy-related penalty under section 6662 totaling

$85,482.

On the record before us, we reject the assumptions in petitioners' argument

in support of their position that none of them is liable for prenotice interest that

there was a "delay" in the issuance of the respective notices of liability to them

and that that delay was "attributable entirely to respondent".[177]  On that record, we

---

[176]See supra note 2.

[177]Even if we were assume arguendo that respondent were entitled under
Ind. Code Ann. sec. 32-18-2-18(b) to a judgment that is based upon the value of
the assets that FFI transferred to each of Mr. Fankhauser, Mr. Weintraut, and Ms.
Fankhauser in  transfers that we have found to be fraudulent under the construc-
tive fraud provisions of the Indiana UFTA, an assumption the validity of which
with respect to Mr. Fankhauser we consider below, we would not be persuaded on
the record before us that "the equities" to which Ind. Code Ann. sec. 32-18-2-18(c)
refers require us to conclude that respondent is not entitled to prenotice interest
from any of them.

[*248] also reject petitioners' reliance on Stanko v. Commissioner, 209 F.3d 1082.[178] On the record before us, we reject petitioners' arguments in support of their position that respondent is not entitled to prenotice interest from any of them.

We address now respondent's position that respondent is entitled to prenotice interest from each petitioner and that the determination of that interest depends on whether FFI transferred assets to each of them that was greater or less than FFI's total unpaid 2001 liability. We are in general agreement with respondent's position. To understand why, we believe that it would be helpful to set forth the rationale for concluding that a creditor is entitled to prenotice interest and the explanation of the two different types of prenotice interest, as explained in Lowy v. Commissioner, 35 T.C. 393, on which respondent relies in advancing respondent's position.

In Lowy, the parties had stipulated that the taxpayer was liable as a transferee for the respective Federal tax liabilities and the respective Federal additions to tax liabilities for two taxable years (collectively, Federal transferee liabilities) of a corporation that had distributed certain assets to the transferee-taxpayer. The

---

[178]Not only are the facts involved in Stanko v. Commissioner, 209 F.3d 1082, materially distinguishable from the facts involved in the instant cases, Stanko involved the Nebraska UFCA which was in effect for the period at issue therein; it did not involve the Nebraska UFTA. See id. at 1084, 1088; see also supra notes 171 and 172.

[*249] transferee-taxpayer in <u>Lowy</u> argued that he was not liable for any interest accruing before the date on which the Commissioner issued the notice of liability to him. The Commissioner took the position that the transferee-taxpayer was liable for interest that started to accrue on the respective dates on which the respective Federal tax liabilities for the two taxable years in question were required to be paid. See <u>id.</u> at 394.

We began our consideration of the issue presented in <u>Lowy</u> by pointing out that "[t]here are at least two different concepts relating to interest collectible from a transferee--one founded upon Federal statute and the other upon State law". <u>Id.</u> at 394. We explained the concept relating to interest that is founded on Federal statute as follows:

> The Federal statute itself spells out a liability for interest on a deficiency and fixes it at 6 per cent per annum from the due date * * * [by which the tax must be paid]. When a tax is not paid the United States becomes entitled, by Federal statute, not only to the tax and additions ("penalties," e.g., for negligence or fraud * * *), but also for interest at the rate of 6 per cent from the due date, and these additions and interest are collectible together with the basic deficiency by the United States. Such is the right which the Federal statute itself creates in respect of the deficiency in tax, and such is the measure of the taxpayer's liability to the Government. Had there been no transfer of assets by the corporation, such would be the extent of its liability to the United States. However, it did transfer its assets to petitioner [transferee-taxpayer] in an amount far greater than its total potential liability for taxes, "penalties," and interest. The parties have stipulated that petitioner "is a transferee" of the corporate assets "and is

[*250] liable, as such transferee" for specified taxes and "penalties" owing by the corporation for the years 1942 and 1943.  The net effect of this stipulation is that the debtor (the corporation) transferred its assets in such manner as to enable the creditor (the Government) to follow those assets in the hands of the transferee in order to satisfy its claim against the debtor.  To be sure, the liability of the transferee as such must arise under applicable State Law, cf. <u>Commissioner v. Stern</u>, 357 U.S. 39, but the quantum of the creditor's right--i.e., the amount of tax due, the additions to tax for negligence or fraud, and the amount of interest applicable thereto--must, of necessity, be determined in accordance with the Federal statute.  Certainly, it is the Internal Revenue Code and not New York law which fixes the amount of deficiency in tax.  And it is similarly the Internal Revenue Code, rather than State law, which spells out the right of the Government to the so-called penalties and interest.  These amounts in the aggregate constitute the claim of the United States against the taxpayer-transferor and they similarly measure the claim against the transferred assets.

<u>Lowy v. Commissioner</u>, 35 T.C. at 394-395.

We then turned in <u>Lowy</u> to a discussion of what we believed was "[t]he confusion * * * where the amount of the transferred assets is less than the amount of the creditor's claim, and where, in order to make the creditor whole, it may be necessary to find some liability against the transferee <u>for interest in respect of the transferred assets</u>."  <u>Id.</u> at 395.  With respect to that situation--the situation relating to interest founded on State law--we explained as follows:

Such interest, by its very nature, can arise only under State law, and must comply in every respect with applicable State law not only as to rate, but also as to the starting point.  Thus, if the transferred assets herein had been equal to only $100,000, substantially less than the

**[*251]** amount of the basic deficiencies, they would plainly have been insufficient to satisfy the Government's claim. However, in such circumstances, the transferee would have had the use of the transferred assets over a period of time, and it is quite possible that he would be liable, under State law, for interest, not on the Government's claim against the transferor, but on the amount of the transferred assets, measured from a point of time that would not be earlier than the date of transfer.

    \*      \*      \*      \*      \*      \*      \*

[T]he transferee proceedings herein are merely a substitute for a remedy against the transferee which must exist in the first instance under State law, but the underlying rights which the creditor is seeking to enforce are rights that have their source in the Internal Revenue Code. It is that law which spells out a liability for interest on a tax deficiency and fixes it at 6 per cent per annum from the date that the tax and returns are due. State law has no more to do with the determination of the amount of this liability than it has with fixing the liability for additions due to fraud or failure to file returns or with the correct computation of the basic tax itself. These are liabilities that are founded on Federal statute. It is therefore wholly inappropriate in this case, where the transferred assets are more than ample to discharge the full Federal liability of the transferor (including interest), to look to State law for the creation of any right to interest. However, as indicated above, where the transferred assets are insufficient, it is true that the creditor may have a further right to collect interest from the transferee, based upon the wrongful use of those assets by the transferee prior to payment. The latter right is one that is founded upon State law, and it is only in such circumstances that it becomes appropriate to investigate State law to determine the rate of interest, the date from which it runs, and the like. \* \* \*

Id. at 395-397 (fn. ref. omitted).

**[*252]** In the notice of liability that respondent issued to Mr. Fankhauser, respondent determined that, because the net value of the assets that FFI transferred to him (i.e., $1,824,143.99) was greater than the amount of the total (i.e., $694,519.43) of FFI's 2001 tax liability (i.e., $609,037.43) and FFI's 2001 penalty liability (i.e., $85,482), the amount of his transferee liability is the total amount of those liabilities, as well as interest as provided by law. In the notice of liability that respondent issued to Mr. Weintraut, respondent determined that, because the net value of the assets that FFI transferred to him (i.e., $514,520.35) was less than the amount of the total (i.e., $694,519.43) of FFI's 2001 tax liability (i.e., $609,037.43) and FFI's 2001 penalty liability (i.e., $85,482), the amount of his transferee liability is limited to that net value, as well as interest as provided by law. In the notice of liability that respondent issued to Ms. Fankhauser, respondent determined that the amount of her transferee liability is the total (i.e., $694,519.43) of FFI's 2001 tax liability (i.e., $609,037.43) and FFI's 2001 penalty liability (i.e., $85,482), as well as interest as provided by law. In that notice, respondent did not limit Ms. Fankhauser's transferee liability to the net value of the assets that FFI transferred to her, which respondent determined in that notice was

**[\*253]** $233,877.44, as well as interest as provided by law.[179] As noted previously, respondent acknowledges on brief that each petitioner's transferee liability under the Indiana UFTA is limited to the net value of the assets that FFI transferred to each of them in the SPR transactions under the SPRA, plus transferee interest.

---

[179]We note that the respective total net values of the assets that we find FFI transferred to each of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR transactions under the SPRA are different both from the respective total values of the transfers (1) that respondent determined in the respective notices of liability that respondent issued to them and (2) that respondent claims on brief. The parties stipulated, and we have found, that immediately before the closing of the SPRA on December 20, 2001, FFI had certain assets, which included its membership interest in FFW that had a value of $1,920,556.36 and certain nontax liabilities held by FFW that totaled $122,638.20. See supra note 28. The parties also stipulated, and we also have found, that as of the closing of the SPR redemption transaction under the SPRA FFI transferred to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in percentage membership interests in FFW of 68 percent, 22 percent, and 10 percent, respectively. As a result, as of that closing Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser held membership interests in FFW, the respective net values of which (rounded to the nearest dollar) were $1,222,584, $395,542, and $179,792. We also have found that as of the closing of the SPR sale transaction under the SPRA FFI made respective transfers to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser of $360,920.98, $116,768.55, and $53,076.62, which totaled $530,766.15, the amount of the purchase price set forth in the SPRA for the FFI stock of Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser. In addition, as noted supra note 170, we do not believe that the respective amounts of certain State retail sales taxes should be included in the respective amounts of FFI's transfers to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser under the SPRA. The parties' stipulations and our findings establish that the respective total values of the assets that FFI transferred to Mr. Fankhauser, Mr. Weintraut, and Ms. Fankhauser in the SPR transactions under the SPRA were $1,583,504.98, $512,310.55, and $232,868.62.

**[*254]** On the record before us, we find that the net value of the assets that FFI transferred to each of Mr. Weintraut and Ms. Fankhasuer in the SPR transactions[180] is less than FFI's total liability for its taxable year 2001, including the amount of interest as provided by law calculated from the date on which FFI's tax liability for that year was required to be paid to the date on which respondent issued the respective notices of liability to them. Consequently, we conclude that any prenotice interest for which each of them may be liable is interest that is based upon the law of Indiana. See Lowy v. Commissioner, 35 T.C. at 394-397.

In contrast, we are unable to find definitively on the record before us whether the net value of the assets that FFI transferred to Mr. Fankhauser in the SPR transactions is less than or greater than FFI's total liability for its taxable year 2001, including the amount of interest as provided by law calculated from the date on which FFI's tax liability for that year was required to be paid to the date on which respondent issued the notices of liability in question. That is because, as noted previously, respondent did not calculate or show in the notice of liability that respondent issued to Mr. Fankhauser (or in the respective notices of liability issued to Mr. Weintraut, and Ms. Fankhauser) the amount of interest as provided by law on the total of FFI's deficiency liability and penalty liability for its taxable

---

[180]See supra note 179.

**[*255]** year 2001.  Although the record otherwise establishes that as of July 7, 2009, respondent had assessed a total of $368,990.84 of interest on the total of FFI's deficiency liability and penalty liability for its taxable year 2001, respondent issued the notice of liability to Mr. Fankhauser on December 8, 2011, approximately 2½ years thereafter.  Additional interest as provided by law continued to accrue after July 7, 2009, on the total of those FFI liabilities to the date on which respondent issued the notices.  However, the record does not establish the amount of that additional interest.  Although we believe that it is likely that the net value of the assets that FFI transferred to Mr. Fankhauser in the SPR transactions remains greater than FFI's total liability for its taxable year 2001, including the amount of interest as provided by law calculated from the date on which FFI's tax liability for that year was required to be paid to the date on which respondent issued the notices of liability to him, we are reluctant to make a definitive finding in that regard on the record before us.[181]

---

[181]The interest calculations with respect to FFI's 2001 deficiency liability and FFI's 2001 penalty liability will involve the computation of interest at different rates compounded for a period of over nine years.  Those calculations must take account of the fact that respondent collected from the State of Indiana the Prudential demutualization funds of $43,926.57 to which FFI had been entitled, which reduced the amount of FFI's unpaid 2001 tax liability as of the date on which respondent collected those funds.  We thus are reluctant to make any definitive determination at this time as to whether the prenotice interest for which

(continued...)

**[\*256]**      We direct the parties to undertake as part of the computations under Rule 155 the calculation of the amount of interest as provided by law on the total of FFI's tax liability and penalty liability for its taxable year 2001 for the period that commenced on the date on which the tax for FFI's taxable year 2001 was required to be paid and that ended as of the day before the date on which respondent issued the respective notices of liability to petitioners.  We further direct that as part of the Rule 155 computations the parties compare the total of FFI's liability for its taxable year 2001, including the amount of interest so calculated, to the net value, determined consistent with our findings herein of the assets that FFI transferred to Mr. Fankhauser.

In the event that the calculations and the comparison that we have directed the parties undertake as part of the Rule 155 computations were to show that the net value of the assets that FFI transferred to Mr. Fankhauser in the SPR transactions is greater than FFI's total liability for its taxable year 2001, including the amount of interest calculated as directed above, we would conclude that respondent is entitled to prenotice interest from him that is founded upon Federal law, namely, the Internal Revenue Code.  See Lowy v. Commissioner, 35 T.C. at

_____

[181](...continued)
Mr. Fankhauser is liable is interest that is based upon Federal law or interest that is based upon the law of Indiana.

[*257] 394-397.  In that event, we would further conclude that the prenotice interest period with respect to Mr. Fankhauser would commence on the date on which FFI was required to pay the tax due for its taxable year 2001 and would run up to the date on which the notice of liability was issued.  See Estate of Stein v. Commissioner, 37 T.C. at 961; Lowy v. Commissioner, supra; Shockley v. Commissioner, T.C. Memo. 2016-8, at *7.  Moreover, any interest accruing during that prenotice interest period would be determined under section 6601, see Estate of Stein v. Commissioner, 37 T.C. at 961, and the rate of interest on any such interest would be determined under section 6621, see Shockley v. Commissioner, at *7.  In other words, if the calculations and the comparison that we have directed the parties to undertake as part of the Rule 155 computations were to show that the net value of the assets that FFI transferred to Mr. Fankhauser in the SPR transactions is greater than the total of FFI's liability for its taxable year 2001, including the amount of interest calculated as described above, he would be liable for the full amount of that total liability of FFI, including that amount of interest, which would be the prenotice interest for which he would be liable.

In the unlikely event that the calculations and the comparison that we have directed the parties undertake as part of the Rule 155 computations were to show that the net value of the assets that FFI transferred to Mr. Fankhauser in the SPR

[*258] transactions is less than FFI's total liability for its taxable year 2001, including the amount of interest calculated as described above on FFI's tax liability and penalty liability for its taxable year 2001, we would conclude, as we have with respect to Mr. Weintraut and Ms. Fankhauser, that any prenotice interest for which he may be liable is interest that is based upon the law of Indiana. See Lowy v. Commissioner, 35 T.C. at 394-397.

The parties do not cite, and we have not found, any Indiana authority involving a fraudulent transfer under the Indiana UFTA that addresses squarely whether a creditor is entitled to prenotice interest and if so, how and from what date that prenotice interest is to be calculated. Respondent invites our attention to certain caselaw in Indiana, and we have found additional Indiana caselaw, that considers so-called prejudgment interest which may be awarded before a judgment. The award of prejudgment interest under Indiana law "is founded solely upon the theory that there has been a deprivation of the use of money * * * and that unless interest is added the injured party cannot be fully compensated for the loss suffered. * * * Interest is not recoverable as interest but as additional damages to accomplish full compensation." Money Store Inv. Corp. v. Summers, 909 N.E.2d 450, 461 (Ind. Ct. App. 2009).

**[*259]** We conclude that the concept underlying the award of prejudgment interest in Indiana law is applicable in considering whether to award prenotice interest to a creditor who is entitled to a recovery in the case of a fraudulent transfer under the Indiana UFTA. We further conclude that Indiana caselaw addressing prejudgment interest is relevant to our consideration of any prenotice interest for which each of Mr. Weintraut and Ms. Fankhauser (and Mr. Fankhauser depending on the results of the Rule 155 computations as discussed above) may be liable.

The Indiana Court of Appeals has observed that "Indiana courts have long held that a statute is not the exclusive authority for prejudgment interest" and that "[m]any [Indiana] cases have awarded prejudgment interest in the absence of a statute authorizing such an award where the damages were 'ascertainable in accordance with fixed rules of evidence and accepted standards of valuation' at the time the damages accrued." Oil Supply Co., Inc. v. Hires Parts Serv., Inc., 670 N.E.2d 86, 93-94 (Ind. Ct. App. 1996) (quoting Bland Trucking, Inc. v. Kiger, 598 N.E.2d 1103, 1106 (Ind. Ct. App. 1992)), aff'd in part, rev'd in part on another issue, 726 N.E.2d 246 (Ind. 2000);[182] see also Troutwine Estates Dev. Co., LLC v. Comsub Design & Eng'g, Inc., 854 N.E.2d 890, 904 (Ind. Ct. App. 2006). According to

---

[182]The Indiana Supreme Court expressly affirmed the Indiana Court of Appeals' holding on prejudgment interest. See Oil Supply Co., Inc. v. Hires Parts Serv., Inc., 726 N.E.2d 246, 250 n.3 (Ind. 2000).

[*260] the Indiana Court of Appeals, "[o]nce the trier of fact determines that a party is liable for damages, 'prejudgment interest is proper only where a simple mathematical computation is required.'" Oil Supply Co., Inc., 670 N.E.2d at 94 (quoting Bland Trucking, Inc., 598 N.E.2d at 1106). In other words, as respondent points out, the Indiana Court of Appeals held that an award of prejudgment interest is appropriate where the trier of fact does not have to exercise judgment in order to determine the damages. See Larson v. Karagan, 979 N.E.2d 655, 663 (Ind. Ct. App. 2012).

On the record before us, we find that respondent was deprived of the use of the money that FFI was required to remit to the IRS in payment of its tax liability for its taxable year 2001 on the date on which that liability was required to be paid. On that record, we further find that the rationale for awarding prejudgment interest in Indiana law is present in these cases with respect to each of Mr. Weintraut and Ms. Fankhauser (and Mr. Fankhauser depending on the results of the Rule 155 computations as discussed above).

We have found, see supra note 179, the respective net values of the assets that FFI transferred to Mr. Weintraut and Ms. Fankhauser (and to Mr. Fankhauser) in the SPR transactions. The transferee liability of each of Mr. Weintraut and Ms. Fankhauser (and Mr. Fankhauser) is determinable. We conclude that we do not

[*261] have to exercise any judgment or discretion in order to determine the amounts of prejudgment interest. We further conclude that the prejudgment or prenotice interest period would be "measured from a point of time that would not be earlier than the date of the [FFI] transfer[s]"to each of Mr. Weintraut and Ms. Fankhauser (and Mr. Fankhauser depending on the results of the Rule 155 computations as discussed above), Lowy v. Commissioner, 35 T.C. at 395, up to but not including the date on which respondent issued the notice of liability to each of them, see Patterson v. Sims, 281 F.2d 577, 580 (5th Cir. 1960). On the record before us, we find that the prejudgment or prenotice interest period should begin on the date on which FFI's tax liability for its taxable year 2001 was required to be paid.

We consider now the rate that should be used in calculating prejudgment or prenotice interest in the case of each of Mr. Weintraut and Ms. Fankhauser (and Mr. Fankhauser depending on the results of the Rule 155 computations as discussed above). Ind. Code Ann. sec. 34-51-4-9 (LexisNexis 2008) establishes the prejudgment interest rate where an award for tortious conduct has been made "at the simple rate of interest determined by the court." However, under that statute, "[t]he rate set by the court may not be less than six percent (6%) per year and not [be] more than ten percent (10%) per year."

**[*262]**     Ind. Code Ann. sec. 24-4.6-1-103 (LexisNexis 2013) establishes the

prejudgment interest rate at 8 percent per year where an award has been made, as

follows:

> (a) * * * on money due on any instrument in writing which does not specify a rate of interest and which is not covered by IC 1971, 24-4.5 [Uniform Consumer Credit Code] or this article [Special Provisions Concerning Certain Transactions];

> (b) * * * [money due] on an account stated, account closed or for money had and received for the use of another and retained without his consent.

Each of these two Indiana Code provisions appears to be applicable in these

cases.  On the one hand, fraudulently depriving a creditor of money to which the

creditor is entitled may be viewed as in the nature of tortious conduct.  Conse-

quently, it would appear that Ind. Code Ann. sec. 34-51-4-9 should govern the

prejudgment interest rate here.  On the other hand, fraudulently depriving a

creditor of money to which the creditor is entitled may be viewed as involving

"money due on any instrument in writing which does not specify a rate of in-

terest", Ind. Code Ann. sec. 24-4.6-1-103, or money due "on an account stated

* * * [or an] account closed", id.  Consequently, it would appear that Ind. Code

Ann. sec. 24-4.6-1-103 should govern the prejudgment interest rate here.

**[\*263]** We have found no other guidance under the law of Indiana regarding the rate that should be used in calculating prejudgment interest. We direct the parties to cooperate and stipulate as part of the Rule 155 computations what the appropriate prejudgment or prenotice interest rate should be in the case of each of Mr. Weintraut and Ms. Fankhauser (and Mr. Fankhauser depending on the results of the Rule 155 computations as discussed above).

## Conclusion

We have considered all of the parties' respective contentions and arguments that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.[183]

---

[183]We note here one argument of petitioners that we have not expressly addressed but that we have considered. Petitioners argue that respondent failed to engage in reasonable efforts to collect FFI's unpaid 2001 tax liability and that therefore respondent may not collect the amount of that liability, as well as interest thereon as provided by law. Assuming arguendo that respondent was required to engage in reasonable efforts to collect FFI's unpaid 2001 tax liability in order for each petitioner to be liable as a transferee, on the record before us, we reject petitioners' argument. On the record before us, we find that respondent pursued reasonable collection efforts with respect to FFI's unpaid 2001 tax liability. We make this finding although we have also found that respondent was unaware of the Prudential demutualization funds of $43,926.57 until July 2011, when respondent's revenue officer was told about those funds by Mr. Fankhauser.

[*264]    To reflect the foregoing and respondent's concession regarding the amount of FFI's tax liability (excluding the penalty liability) for its taxable year 2001 that remains unpaid,

An appropriate order will be issued denying in part and granting in part petitioners' motion in limine, and decisions will be entered under Rule 155.